# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 94-KA-00402-SCT

### CONSOLIDATED WITH

### 91-IA-01207-SCT

*BYRON DE LA BECKWITH, VI*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/94 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MERRIDA COXWELL |
| | JAMES WARREN KITCHENS |
| | CHARLES RICHARD MULLINS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT S. FLYNN |
| DISTRICT ATTORNEY: | EDWARD J. PETERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/22/97 |
| MOTION FOR REHEARING FILED: | 1/20/98 |
| MANDATE ISSUED: | 4/2/98 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Medgar Evers, first Field Secretary for the NAACP in the State of Mississippi was shot in the back and murdered in Jackson, Mississippi, on June 12, 1963. Byron De La Beckwith, VI was arrested and charged with the murder on June 23, and indicted by the grand jury of Hinds County in July of 1963. He was twice tried in February and April of 1964. In each case, a hung jury necessitated a mistrial. Following his second trial, Beckwith was released on $10,000.00 bond. An order granting a *nolle prosequi* of the indictment, signed by the three circuit judges of the Seventh Circuit Court District was entered, without objection of the defendant, on March 10, 1969.

¶2. In December of 1990, the Hinds County grand jury again indicted Beckwith for the murder of

Evers. He was extradited from Tennessee to Mississippi and incarcerated in the Hinds County jail without bail. Following an interlocutory appeal to this Court, he was tried and convicted in 1994 for the murder of Medgar Evers and was sentenced to life imprisonment. Feeling aggrieved by the jury's verdict, Beckwith appeals to this Court.

## THE EVIDENCE

## THE DEATH OF MEDGAR EVERS

¶3. The last hours of Medgar Evers were recounted by the testimony of his widow, Myrlie. On direct examination, Ms. Evers testified as follows:

Q. Okay. When was the last time that you saw your husband, Medgar Evers, alive?

A. The last time that I saw Medgar alive was on June the 11th, 1963, when he left home that morning to go to work.

Q. Okay. And did the NAACP have an office that he worked out of, or what-- when you say he went to work, where would he go?

A. Well, there was an office. Office was located on Lynch Street here in Jackson. I recall that he left that morning after telling us goodbye with a very special embrace. And he went out to his car and was out there for a second or so, and came back in and told us to be sure to take good care of ourselves and to be sure to watch President Kennedy's address that night, and hugged and kissed us all again and--and left.

Q. Okay. Did you get an opportunity to talk with him at any time later on during the day?

A. Yes.

Q. When--without telling us what he said, when approximately was the last time you talked with him?

A. Well, it was late that evening, afternoon I should say. It was before President Kennedy's speech that night.

Q. Okay. Did you watch President Kennedy's speech?

A. Yes.

Q. Did you watch it together? Was he with you?

A. No, he was not. He--he--he didn't--had not returned home at that time. Just the children and myself.

Q. Okay. Did there come a time that he did return home?

A. Yes, he did return home.

Q. If you would, just take a minute and tell the jury about what time it was and what you

remember hearing and seeing at that time.

A. Well, he returned home on the 12th of June. It was slightly after midnight when he came home. We heard the car, the motor, which we were very familiar with, and the children said, "There's Daddy." I might add we were in the bedroom. And we heard the car pull in the driveway, and this horrible blast. And the children fell to the floor, as he had taught them to do. The baby was on the bed with me, and I bolted up off the bed and ran to the front door, and opened the door, and there was Medgar at the steps leading to the front door with his keys in his hand. It appeared that the force of the bullet had pushed him past his car, my car, and he had pulled himself around to--to the doorsteps.

The children--I screamed, I guess uncontrollably, and the children ran out shortly after I did, and they called, "Daddy, Daddy, get up. Please get up, Daddy." I recall going back in the house for a second to call someone--I don't even know who it was. At the time, I couldn't get through. I ran back out, and I kept calling to him, and the children were calling to him. I do recall, however, that when I first got out to him that there was another shot that was fired, and I remember dropping down to my knees again because I thought someone was trying to--to shoot me as well.

By the time I ran back out the second time, neighbors had come out and were over at the house. There were a couple of people helping to put Medgar on a mattress, and to put him in a vehicle to take him to a hospital for treatment.

¶4. Medgar Evers was found lying in a pool of blood clutching white T-shirts which read "JIM CROW MUST GO."

¶5. By 12:30 a.m., on the night of the murder, Captain B. D. Harrell, of the Jackson Police Department had assigned two detectives and a patrol unit to investigate the case. Officer Eddie Rosamond described what he saw when he arrived at the crime scene.

A. --and we got out of the car, our patrol car, and went up to see what had happened, and there was someone laying on--in the carport at the steps that go up to the kitchen door, in the kitchen, or in the--then the house, under the carport.

Q. Okay. And what, if anything, was done with the--what did you observe about this person you saw laying in the carport?

A. He was lying kinda face down on his--in a--kinda in a fetal position. And there was blood--he was laying in a puddle of blood.

Q. What, if anything, was done as far as any--obtaining any kind of medical aide or assistance?

A. The first thing we did was to try to get him to the hospital. We got him--we got a mattress, some kind of a mattress, and we used a neighbor's station wagon. We didn't wanna waste any time calling an ambulance and letting them get out. We got him in a station wagon, and carried him to the hospital. The station wagon belonged to Wells, Houston Wells, Mr. Houston Wells.

Q. Okay. And you followed or led the way with the police car--

A. We escorted them to the hospital.

¶6. Officer Ralph Hargrove of the Jackson Police Department went to the University Hospital on the night of June 12th to photograph Evers' body. He found Evers dead with a bullet hole in his back that had exited his chest.

## THE NEIGHBORHOOD

¶7. The Evers' home was located on Guynes Street, now Margaret W. Alexander Street, which runs West into Missouri Street which runs in a Southeast direction parallel to and into Delta Drive, now known as Medgar Evers Boulevard. Approximately 350 feet Southwest of the Evers' home, and located on Delta Drive were Joes's Drive-In and Pittman's Handy Andy Grocery.

¶8. Herbert Richard Speight testified that he was a cab driver in Jackson, Mississippi in 1963. On Saturday, June 7, 1963 he was parked at the Trailways Bus Station in Jackson waiting for a call. He testified that the man he later recognized as Beckwith approached him and walked up beside his car. According to the testimony of Speight, Beckwith "asked me if I knew Negro Medgar Evers, NAACP leader." He stated that Beckwith then went back into the bus station and came back with a map. The following colloquy occurred in Speight's testimony:

Q. Now, Mr. Beckwith asked you if you knew--what was the first thing he asked you when he came up to your cab?

A. He asked me if I knew Negro Medgar Evans. I understood it to be Evans instead of Evers. NAACP leader.

Q. And you told him that you did not?

A. I told him I did not.

Q. And that's when he went into the bus station and looked in the phone book?

A. Right.

Q. Then he came back. Did he come back to your cab a second--

A. He came back to my cab and had an address on--he told me it was on Lexington Street.

Q. What did he say to you then?

A. He asked me if I knew where Lexington Street was. I told him I did, but that couldn't be where the colored fellow lived because it's an all-white section.

Q. All right. What did Mr. Beckwith do then?

A. He turned around and went back to the bus station. He came back with another address on Buena Vista, if I recall right, and I told him that that couldn't be it because that was a white section.

Q. All right. What did he do next?

A. He went back and come back with another address, which was on Poplar Boulevard, and I told him that couldn't be right because that was a white section. And then I left the bus terminal and I didn't see him no more.

¶9. According to the Evers' neighbor, Kenneth Adcock, he and Betty Jean Coley were walking in the neighborhood around 12:30 a.m. when "I heard this loud boom come from my right side, and I thought I was shot or something....It sounded like a shotgun going off side of my head is how loud it was. And it scared Betty too...and I heard a lady scream." At the time of the shot, Adcock was standing East of a clump of bushes growing along Missouri Street behind the drive-in. After hearing the shot, Adcock heard someone running through the darkness. It "[s]ounded like, you know, leaves and bushes and stuff cracking, and then whoever shot was running (bout) hard as they could back toward Delta Drive."

¶10. The prosecution offered the prior testimony of deceased witness Betty Jean Coley. Ms. Coley testified that she was with Kenneth Adcock around midnight of June 11, 1963 in the vicinity of Missouri and Ridgeway streets. She stated that around 12:30 she and Adcock heard a gun fire. The gunshot appeared to come from some nearby bushes and "I heard a man running" after the gunshot. According to her testimony, the person appeared to be coming from a clump of nearby bushes and was running toward the parking lot of Joe's Drive-In.

¶11. Barbara Holder testified that she was a twenty-two year old "car-hop" working at Joe's Drive-In in 1963. She was at the drive-in on the evening of June 11, 1963. She was not working at the time but "all my friends hung-out there . . . so I went by there." She stated that her friend, Martha Jean O'Brien, was car hopping that night. Holder was standing outside of the drive-in with Ms. O'Brien when she saw a vehicle pull in to the drive inn and back up to the corner of the lot. She stated that the car "looked like a patrol car because it had a long . . . antenna on the side of it, and it was awful muddy when it pulled in. It was a white car, but it had a lot of mud on it." She identified the vehicle as a white Plymouth Valiant. She stated that a man "just sat in the car." She then left the drive-in and came back around midnight and stated that the car was still in the lot. She also testified that when the car had first backed into the lot:

[W]hoever was driving the car pulled up to the bathroom. It didn't back up. It just pulled right straight up - - the men's bathroom was on the back and there was a corner. The women's was on this side, and the men's was on this side. It pulled right up to the back and it - - the gentleman got out and went into the bathroom. Then it backed back over to where it was originally parked." She identified the person who got out of the vehicle as "about 5'7", 5'8", had on dark clothes and dark hair . . . it was a white man.

¶12. The State presented the prior testimony of Martha Jean O'Brien, a witness who could not be located. According to Ms. O'Brien, she was a seventeen year old car-hop working at the drive-in on the night of June 11, 1963. She stated that she saw a Valiant automobile enter the parking lot between 8:30 and 10:00 p.m. She noted that it had a long radio aerial on the back and that "it was real dirty". She saw a man get out of the Valiant and go to the restroom. She described the man as "very tall," dressed in dark clothes, and in his early twenties. She stated that the man did not have a hat on. She also testified that she had seen a white Valiant automobile, shown to her by the police about a week after the shooting, and "I told them it was the same car".

¶13. Ronald Jones testified that he was sixteen years of age in June of 1963 and worked part-time at Pittman's Grocery on Delta Drive. He and Robert Don Pittman, the son of the owner of the grocery store, were friends. Jones recalled getting off work around 9:00 p.m. on the night of June 11, 1963. He and Robert Don had a model airplane that they were flying in the parking lot of the store. The model plane landed on top of the store, where Jones went to retrieve it. While there he "noticed a car driving slow on Delta Drive. The speed limit was - - was forty miles an hour, and he was not doing - - I don't think was doing forty miles an hour, and it brought my attention because it had an antenna on the back of it, and I thought it was a police car". Jones described the car as a white Plymouth Valiant with a whip antenna on the back. Jones reviewed photographs of Beckwith's automobile and stated that the photographs looked like the car he saw.

¶14. Robert Don Pittman testified that he was fifteen years of age in 1963 and lived on Delta Drive where his parents owned and operated Pittman's Handy Andy Grocery. He stated that he was acquainted with Medgar Evers who had taught him how to play baseball in his backyard. Pittman testified that on Saturday, June 8, 1963, he and a friend, Mark Acy, saw a white Valiant parked "sorta beside the store" around 10:30 p.m. He described this vehicle as a 1962 Valiant with a ten foot aerial antenna. It had some type of Masonic emblem hanging from the rear view mirror. Pittman identified a photograph of Beckwith's Valiant as the vehicle he had seen. He stated that the car had been backed into the parking lot, facing the street. He also identified photographs of an emblem attached to the defendant's vehicle as being the emblem he saw on the rearview mirror.

¶15. Pittman next testified that on the night prior to the death of Medgar Evers he was playing with a model airplane when the airplane went on top of the store. He stated that when he went on top of the grocery store with Ronald Jones to retrieve his airplane, that he saw the same car driving up and down Delta Drive "doing about five, maybe ten miles an hour, real slow". Later that night Pittman again saw the car between 10:30 and 11:00 p.m. parked in the nearby drive-in parking lot. In response to questioning, Pittman on cross-examination also stated that he had earlier answered only specific questions put to him by investigators because "my father - - after . . . the blacks started calling us and threatening to kill us and what have you, my father said, 'Well, don't give them nothing they don't ask for,' and I obeyed him."

¶16. Ronald Mark Acy stated that he lived in Jackson in 1963, when he was sixteen years of age, and that he grew up with Robert Don Pittman. Acy was a meat cutter at the Pittman's grocery store on Delta Drive. He got off work from the grocery store around 9:00 p.m. on Saturday, June 8, 1963. He and Robert were walking down the street when they saw a white Plymouth Valiant backed into an alley between the store and some trees. He described the vehicle as a 1960 to 1962 Plymouth Valiant or Dodge Lancer. He described its color as light gray or off-white. He remembered that the car had a long antenna on the passenger's side and he saw "some kind of emblem hanging from the review mirror . . . ." He stated that the emblem had "some kind of big star on it, and then it had some kind of big sword - looking thing running through it some kind of way". He described this as a Shriner's emblem. He positively identified photographs of Beckwith's car as being the car he had seen and the photo of the Shriner's emblem as being identical to the one he had seen.

## THE INVESTIGATION

¶17. John Chamblee, a police officer with the City of Jackson in 1963, was at the police station on

the night of June 12, 1963 when the Captain of that shift told him there had been a shooting. He testified that he and detective Fred Sanders immediately jumped in their car and were at the murder scene within ten to fifteen minutes. At the scene, two uniformed police officers had arrived before them. Upon arrival, Chamblee and Sanders immediately took charge of the investigation. The body had already been removed and they observed blood and "some dropped clothing like a t-shirt or something of that nature". In the next few minutes, additional uniformed officers arrived and the scene was secured.

¶18. Officer Chamblee testified that he was able to trace the trail of the bullet through the victim, through a window in the Evers home, through a Venetian blind, and through an interior sheet-rock wall where it hit a refrigerator in the kitchen. Chamblee stated that the bullet was recovered by his partner, Detective Sanders. Chamblee also stated that the bullet had been introduced into evidence in two prior trials, though its absence in the trial below could not be explained.

¶19. Chamblee then testified that he and other officers measured the path of the bullet from the refrigerator, past the point of impact at the vehicle, to determine from whence it was fired. This search lead them to an area behind three small trees and bushes where they determined that a person had been recently standing. They found a small limb broken off a bush in this area. The Evers' home was within view of the bushy area and the limb had been broken off of a bush within the vision line from the trampled area to the Evers' home. A trail led through the bushes for around 150 to 200 feet to the parking lot of Joe's Drive-In. The area was about 200 feet from the Evers' home.

¶20. Following the initial investigation of the crime scene, Detective Chamblee assisted in obtaining the defendant's automobile which he identified as a Plymouth Valiant which had a CB radio antenna, "probably seven or eight feet tall". Chamblee remembers having seen some sort of Shriner's emblem in the vehicle or on the window.

¶21. The transcript of Detective O. M. Luke, taken at a prior trial, was introduced by the State, due to the physical infirmity of Mr. Luke. Detective Luke was employed with the Jackson Police Department in June of 1963 and assisted in the investigation at the crime scene. Luke first arrived at the crime scene around 8:00 a.m. on the morning following the murder. He testified that near the clump of trees, approximately 200 feet from the house, that "someone had cleared the vines out of the area of what I would call the north side of this tree, maybe the northwest side of the tree, approximately eighteen inches square. ...This hole was a man of average height, a man anywhere from 5' ½ tall to 6' could see through it." According to Luke:

> I started to search, along with my partner, in the vicinity. I came out near the edge - - the back of Pittman's lot in this trail. . . . There's a trail that leads off of Joe's parking lot here. ...The trail leads from the corner of this lot out to where this trail was, and then, of course, this trail was leading over across to Missouri Street. . . . And searching as closely as I was, I saw something in this hedge over there - - over here that didn't look right. I took a second look, and I could tell it was the butt of a gun. So I called my partner over, and he came over where I was. He was Captain Bennett - - he and Captain Bennett. Then we called Captain Hargrove, our identification officer. I parted the vines and the stuff back. It was stuck up in the vines, I could say, approximately this far, twelve to eighteen inches. And then, of course, the hole was - - the vine was pulled back over the hole where you - - you would have to be looking pretty close to

see it. ...The gun was not dropped, it was well hidden, and wasn't even touching the ground. ...It was approximately twelve inches off the ground.

According to Luke, the gun was approximately twenty-five feet from the edge of the drive-in parking lot.

¶22. Later at Police Headquarters, after Captain Hargrove had examined the gun for fingerprints, O. M. Luke pulled the breach back. According to Luke "it threw an empty hull out, and a fresh round of ammunition came up to go in the chamber. I fished them out. I didn't know how to pull off this bottom part of the plate. I fished them out, and there were six live rounds in the magazine underneath the chamber. One had been fired. It had not been ejected." Detective Luke identified the gun as a .30-06 caliber rifle, serial number 1052682. The gun had a United Golden Hawk scope, 6 x 32, serial number 69431.

¶23. Ralph Hargrove testified that he worked in the identification division for the Jackson Police Department for forty-two years and was so employed in 1963. He went to the University Hospital on the night of June 12, 1963, after receiving a report that Medgar Evers had been shot. At the hospital he photographed the body and then went to Medgar Evers' home. There he took photographs of the crime scene. The next day he took additional pictures of the crime scene including photographs of the gun being removed from the bushes behind the drive-in.

¶24. Officer Hargrove also photographed a latent finger print found on the telescopic scope of the rifle. He testified that he compared the print on the rifle with a known fingerprint of the defendant and that the latent fingerprint taken from the scope matched Beckwith's known fingerprint.

¶25. Hargrove further took photographs of Beckwith following his arrest. He identified four slides which included a photograph of the defendant showing a half moon scar above his right eye.

¶26. J.R.Gilfoy, former sheriff of Hinds County, worked for the Jackson Police Department in June of 1963. He testified that he was present when the gun in question was dusted for fingerprints by Captain Hargrove. He identified the rifle previously introduced into evidence as being the one he saw on June 12, 1963. He recalled that he examined the gun after the empty cartridge had been removed from the chamber and that in his opinion the gun "had been very recently shot". He noted that there was burnt powder in the barrel of the gun. He stated that the gun was very clean and had been "very, very well cared for considering its age."

## THE OFF-PREMISES INVESTIGATION

¶27. Dr. Forrest G. Bratley, a forensic pathologist, testified for the State. He performed an autopsy of Medgar Evers in June of 1963 and found that Evers died because of "hemorrhaging or loss of blood from a bullet wound of the right side of the chest." At that time he did not recover any bullets or metal fragments from the corpse. He stated that the bullet went through Evers' back and fractured or broke the eighth and ninth ribs of his back. After going through the ribs, the bullet went into the right lower lobe of the lung and then penetrated the fifth rib on the right front and exited the skin just above the right nipple.

¶28. Dr. Bratley also testified that he was requested by the District Attorney in 1963, Mr. William

Waller, to examine the defendant, Mr. De La Beckwith in jail. His examination was conducted on Sunday, June 23, 1963 and he stated that he examined Mr. Beckwith "at a distance, close up, and did see a mark over his right eye. This mark began at the inner edge of the right eyebrow and curved upwards and then downwards to the right, and disappeared into the eyebrow on the outer part of the eyebrow." He stated that the "injury had the shape of semi-circle, that is the part of a circle, and it was still a pink color as compared to the surrounding skin, and slightly below the level of the surrounding skin. There were no stitch marks present, suture marks, and the - - my impression was that this was a fairly recent injury and I would say it was less than thirty days old and at least ten days old." He stated that the injury he observed "was consistent" with the diameter of the telescopic scope found on the murder weapon, though he could not say that it was caused by that particular weapon.

¶29. Charles Crisco, an investigator for the Hinds County District Attorney's office, testified that he attended an exhumation of the body of Medgar Evers at Arlington National Cemetery on June 3, 1991. He photographed the body and attended a second autopsy on the body of Medgar Evers on June 4, 1991 at the Albany Medical Center in Albany, New York. He took custody of lead fragments removed from the body by Dr. Michael Baden.

¶30. Dr. Michael Baden stated that he was a physician and medical examiner and the present Director of Forensic Sciences for the New York State Police. He conducted the 1991 re-autopsy examination. He also x-rayed the body. Dr. Baden stated that the x-rays established that the bullet which went through Evers' body came from a high energy rifle. According to him, a handgun would not have caused the "star-burst" effect shown by x-rays. He found that, because there were no powder burns on the body, the discharge was more than three or four feet away at the time of firing and that in his professional opinion, the fragments found were consistent with having come from a .30-06 rifle.

¶31. Russell G. Davey, a fingerprint specialist with the Federal Bureau of Investigation in Washington, D.C., testified that he had examined the latent fingerprint taken from the rifle scope and that he saw nothing on that print to lead him to believe that it had been forged or was a planted fingerprint. He found that the latent fingerprint on the scope was made by one and the same finger as the print on a fingerprint card taken from Byron De La Beckwith, VI in 1991 and a United States Marine Corp card filed in January of 1942. Richard Poppleton testified that he was retired from the Federal Bureau of Investigation where he was employed as a Special Agent of the Firearms Identification Division. Poppleton testified that based on his examination of the spent cartridge found in the recovered rifle that it was fired by the gun found at the murder scene. He also stated that he had previously examined the recovered bullet and that the bullet found in the Evers' home was most similar to a .30-06, 180-grain, soft point bullet and was fired by an Enfield rifle, model 1917, .30-06 caliber.

¶32. Norman Casey testified as a retired FBI agent who had investigated the Evers murder in 1963. Casey took photographs of the Beckwith home in Greenwood, Mississippi and identified photographs of the home, including a picture of the doorway which had a Masonic emblem on the door facing.

**THE GUN**

¶33. Ennis Thornton McIntyre, III was a LeFlore County farmer in 1963. He stated that he knew De La Beckwith, VI in the 1960's and identified him at trial as the defendant. McIntyre had ordered a

1917 Enfield .30-06 rifle from a mail order house in 1959. He identified at trial an invoice from International Firearms Company of Montreal, Quebec describing the rifle which he purchased. He stated that he traded this rifle to Beckwith in 1960. He identified the weapon at trial as being the same rifle which he traded to Beckwith though he kept his own stock from the gun. It did not have a scope at the time he and Beckwith traded.

¶34. The State also produced the prior testimony of John W. Goza who is deceased. Goza owned Duck's Tackle Shop in Grenda, Mississippi. He stated that he had known Mr. Beckwith for "ten, twelve, fourteen years. A good long while." Goza stated that De La Beckwith purchased a Golden Hawk six power rifle scope and mount from him on May 12, 1963.

## THE VOLUBLE BECKWITH

¶35. The State introduced numerous witnesses who provided testimony and documentary evidence concerning the racial views of Byron De La Beckwith, VI and his comments regarding the murders of President John Kennedy and Medgar Evers.

¶36. Reed Massengill, a writer, testified that he was Beckwith's nephew and had corresponded by mail with him for about seven years. Massengill stated that Beckwith, "had tried, on a number of occasions over the past thirty years to - - to have a book written about his life, and had worked with or approached a number of different people." Beckwith, in his attempt to get a book written about himself, had approached Massengill and provided him "on a quite regular basis with racist propaganda, with Christian Identity tapes, with copies of letters he had written and had published in newspapers; the manuscript of a book that had been written about him by an author he had worked with; letters he had written to local townspeople in Signal Mountain about the fluoridation of their water; all kinds of materials." Massengill identified a letter provided to him by Beckwith dated June 15, 1957, with the sub-head "Segregation is Very Much Alive". This letter states in toto as follows:

> Editor, Daily News: I'm not a prophet of gloom, but things look pretty black for the shady outfit called the NAACP. The leaders of the NAACP, and their comrades, are going around, all over the nation, braying like jackasses and screaming that segregation is dead. The good Negro citizens of the USA can swallow that rubbish if they wish, but the truth is that segregation is very much alive, so don't try to shovel a spade full of dirt in his face. Mr. Segregation is so tall you can't go over him, so deep you can't go under him, and so wide you can't go around him. Believe it or not, the NAACP, under the direction of its leaders, is doing a first-class job of getting itself in a position to be exterminated.

> I thank God for the association of Citizens' Councils of America. Soon the cancerous growth, the NAACP, shall be cut out of the heart of our nation, and we will all live happily ever after.

> Fondest regards and best wishes. BDLB, Gwd., MS.

¶37. Massengill testified that Beckwith had provided him with two missives styled "To a Friend". They include the following language:

> Take your choice. Drive out or be driven out. It is imperative that we support the movement to encourage the Negro to return to his native country with dignity. Our generation is

compassionate and understands that slavery"--excuse me--"Our generation is compassionate and understand the slavery sins of both our northern and southern forefathers, bringing this tribe from its home. We acknowledge that we do not expect to reap the harvest of contempt and being overtaken. The foul, contemptible, selfish person who continually tells the Negro that America is equally his, that he's as good as anybody, that he has the right to govern this land should be ashamed to lie like that. Believing such a lie has put many a darkie in the river late at night; some at the end of a rope, stirring others of their race to unrest.

The Negro in our country is as helpful as a boll weevil to cotton. Some of these weevils are puny little runts, and can't create the volume of damage that others can. Some are powerful, becoming mad monsters, snapping and snarling and biting the cotton. They must be destroyed, with their retched remains burned, lest the pure white cotton bolls be destroyed.

¶38. Massengill produced a letter from Beckwith to his son dated November 22, 1963, which reads as follows:

My dear son:

Thank you for the two post cards about tests, and that you'll take off on Thursday.

And it looks like the country's politics are gradually going to get straight now pretty soon since Kennedy was assassinated.

Whoever shot Kennedy 'sho did some fancy shootin -- to be sure.

No need for us to make much fuss over it except that I'll say to me it came as no surprise".

I've had my head stuck up in TV all afternoon, and finally had to shut it off so I could write you.

Well, I guess when a few more of our enemies are gone then this will be a real fine world to live in -- Wonder who will be next?

I bet ole Medgar Evers told Kennedy when he got down there - - I thought you'd be along pretty soon - - Haw, Haw, Haw.

Now, it's best to keep this letter out of sight and don't let anyone see it, and--I'm sorry.

Ah, what a load off the country's back -- What a relief. When a few more reds bite the dust, we can live in peace once more - - All my love - - Your very happy father, Byron De La Beckwith.

¶39. Finally Massengill produced a letter from Beckwith to "My dear Willie,"dated November 16, 1976 in which Beckwith stated among other things that "So when you think of me, you see a man deep in debt, facing five years in prison, living like a nigger and as far in global, not state or county, Klan work as a 56-year-old man can be, and happy at it."

¶40. Mary Ann Adams testified that she was working for the Holmes County Co-Op in Lexington, Mississippi in 1966. She was introduced to Beckwith in September of 1966 at a restaurant between Tchula and Greenwood where the following occurred:

He came to the table with another man--with the other man that was with him. I was introduced to him as Byron De La Beckwith, the man who killed Medgar Evers. He stuck out his hand like this (demonstrating) to shake my hand, smiling and nodding. I refused to shake his hand. Told him--said that he was a murderer and I wouldn't shake his hand. He got extremely agitated and angry. Said he had not killed a man, but a damn chicken-stealing dog, and you know what you have to do with a dog when--after it's tasted blood.

¶41. Ms. Adams was then asked if, "at any time that you were introduced to this defendant as the man that killed Medgar Evers, what, if any, protest did he make?" She responded, "He made none. He just got angry when I refused to--to shake his hand."

¶42. Daniel R. Prince from Tennessee testified that he had lived in an apartment at the Beckwith residence in Signal Mountain, Tennessee, from November of 1986 to August of 1987. Prince's critical testimony consisted of the following colloquy:

Q. All right. Now, specifically, Mr. Prince, I wanna ask you whether or not at any time in your presence this defendant has made any type of statements concerning anyone that he had been tried twice for killing? A black man.

A. Yes, he did.

Q. All right. Would you tell the jury about that, please?

A. On an occasion when I was standing in his front yard--I don't remember how the conversation was led into--that he did make the statement that he was tried twice in Mississippi for killing that nigger.

Q. Okay. And what else did he say?

A. And he said that, "I had a job to do and I did it, and I didn't suffer any more for it than your wife if she were gonna have a baby."

Q. All right. Anything else said?

A. I don't remember at that time.

Q. All right. And what was he talking about, Mr. Prince, when he made that statement?

A. Sir?

Q. What was he talking about when he made that statement to you?

A. He was talking about the case that he had been tried for twice in Mississippi.

Q. All right. That he had did (sic) it, but he had a job to do?

A. Right.

¶43. Peggy Morgan, from Greenwood, Mississippi testified that she traveled to the Mississippi State Penitentiary in Parchman, Mississippi with Beckwith and her husband to visit her husband's brother,

Jimmy Dale Morgan, in the mid 1960's to mid 1970's. According to Morgan, Beckwith "started talking about some bombings." She gave the following testimony regarding her conversation with Beckwith:

Q. Tell what he said in reference to the murder or killing of Medgar Evers.

A. Okay. He said that he had killed Medgar Evers, a nigger, and he said if this ever got out, that he wasn't scared to kill again.

Q. Okay. If what ever got out?

A. This trip to the penitentiary.

Q. And if it got out that what? I didn't hear what you said. That if this got out--

A. He wasn't scared to kill again.

Q. All right. And did y'all make it to the penitentiary?

A. Yes, sir, we did.

Q. All right. How long were you there?

A. We didn't stay for the full visiting hours.

Q. Okay. Did you return back to Greenwood that same day?

A. Yes, sir, we did.

¶44. Elluard Jenoal (Dick) Davis testified for the state. Davis became involved with the Ku Klux Klan in the 1960's as an infiltrator working for the FBI. On October 21, 1969 he met with Beckwith at a restaurant in Winter Haven, Florida. Davis stated that Beckwith discussed his arrest and imprisonment and also his prior trials. According to Davis, Beckwith never admitted that he was guilty but also never denied it. Davis stated that Beckwith discussed "the term I think he used was 'selective killings' that he thought was necessary, if--and a partial solution to the right wing's problem. And I remember very distinctly that he said that he would never ask anyone to do anything that he hadn't already done himself."

¶45. Delmar Dennis, from Sevierville, Tennessee, a "small publisher" testified that he was a former pastor of the First Southern Methodist Church of Meridian, Mississippi and spent seven years as a coordinator for the John Birch Society. He joined the Ku Klux Klan in March of 1964 and was a member until June of 1964 when he dropped out. He stated that he got out of the Klan when he learned that it was a violent organization after attending a Klan meeting in Neshoba County, Mississippi, in June of 1964. Thereafter, in September of the same year, he infiltrated the Klan for the FBI where he remained undercover until October of 1967. Dennis stated that the first time he met Beckwith was on August 8, 1965, where he saw Beckwith at a Klan meeting in Byram, Mississippi. Beckwith was the featured speaker and Dennis remembered that "he was admonishing Klan members to become more involved, to become violent, to kill the enemy, to--he admonished us to kill from the top down, and he said, 'Killing that nigger didn't cause me any more physical harm than your wives

have to have a baby for you.'" Dennis obtained Beckwith's autograph, introduced as evidence below, at this meeting. Dennis also remembered meeting with Beckwith in 1967 when Beckwith was campaigning for lieutenant governor and promoting a newspaper called Southern Review.

¶46. Mark Reiley from Chicago, Illinois testified that he was a former sergeant at Angola State Penitentiary in Louisiana and that he handled security for Angola inmates who were sent to the Angola ward at Earl K. Long Hospital. He was assigned to guard Beckwith in the hospital. Beckwith was at that time serving a sentence, later vacated, for conviction of illegally transporting explosives in Louisiana. Reiley developed a strong personal relationship with Beckwith who became a father figure for him. Reiley spent from eight to twelve hours per day with Beckwith for several weeks. During this period of time, Beckwith would instruct him on the Bible and gave him a book called Verbatim. Beckwith told Reiley that "from the Bible . . . black people were beasts--beasts of the field. You had the beasts of the field and you had animals and fish and that type of thing." Beckwith stated that white people were "chosen people to rule over the earth and be in charge of the beasts of the field . . . ." Beckwith opined that "the blacks were there to sow the field and take care of the earth for the chosen people, so if they got out of line, just like any other animal would, you should kill them and not any way feel guilt about it." Reiley stated that he was present when Beckwith rang for a nurse. The following exchange occurred:

Q. And what race was that nurse?

A. She was black.

Q. And what happened when that nurse came to him?

A. Well, she was a nurse's aide, not a--not a nurse--

Q. And what happened when she came to his room?

A. He was very polite when he spoke to her, but he did say that he would--he would rather her go get a white person because he would rather a nigger not wait on him--wait on him or take care of him.

Q. And how did she react to that?

A. She didn't like it very much, and she--she got very upset . . . .

Q. What did he--what was his reaction to that? What did he say?

A. Well, they were--they were both screaming at each other at the same time, and I was paying more attention to what he said, and he said something to the effect --

BY MR. KITCHENS: Object to something to the effect, if Court please.

BY THE COURT: Sustain the objection.

Q. Do you recall the essence of the conversation and some of the exact words?

A. He was screaming back at her, "If I could get rid of an uppity nigger like Nigger Evers, I

would have no problem with a no-account nigger like you."

¶47. Later on another occasion, according to Reiley, Beckwith "told me that if he didn't--if he was lying and didn't have the power and connections he had, that he would be serving time in jail in Mississippi for getting rid of that nigger, Medgar Evers."

THE DEFENSE WITNESSES

¶48. The defense called five witnesses. The prior transcript of Roy Jones, deceased, was read to the jury. According to Jones, he served in the Greenwood police auxiliary in 1963. He had known Beckwith for about three years and had visited in Beckwith's home on two occasions. Jones stated that he saw Beckwith at a Billups Service Station in Greenwood, Mississippi, in a little alley near the station at 11:45 p.m. on June 11, 1963. Jones was on duty that night as an unpaid member of the Greenwood police auxiliary.

¶49. The defense also presented the transcript of the prior testimony of Hollis Creswell who was a police officer in the city of Greenwood in June of 1963. He stated that he had known Beckwith for approximately eight or ten years "maybe longer." Creswell stated that he was with Officer James Holley on the night of the murder of Medgar Evers, which he first learned of around 4 o'clock in the morning from the radio. He stated that he saw Beckwith at the Shell Service Station just south of the underpass in Greenwood, Mississippi at approximately 1:05 a.m. on June 12. He stated that the Shell Station adjoins the Billups Station and that he was approximately 75 to 100 feet from Beckwith when he saw him. He stated that he saw Beckwith getting gasoline for his car. Creswell said that Beckwith was driving a white Valiant and that his view of the vehicle was not obstructed. Creswell stated that although he knew that Beckwith was being investigated by the Jackson Police Department and the FBI from the time of Beckwith's arrest, that he never gave this information to the FBI or the Jackson Police Department.

¶50. James Holley, a Greenwood police officer, also testified on behalf of Beckwith. He stated that he was on duty on the night of June 11 and 12, 1963 with his partner, Lieutenant Creswell. He stated that he had known Beckwith for many years but did not have any sort of a personal relationship with him. Holley stated that he saw Mr. Beckwith at 1:05 a.m. the morning of June 12. He stated that he was in the Billups Service Station which adjoins the Shell Station with Officer Creswell. He testified that he was within 30 to 40 feet of Beckwith whom he saw standing beside his car with the attendant putting gas in the car. He identified the car as a white Plymouth Valiant which he had seen many times before. Holley also stated that it is a distance of between 90 and 95 miles from Jackson, Mississippi to Greenwood, Mississippi.

¶51. John Book, from Yazoo City, testified that he worked for Delta Liquid Plant Food Company in Greenville, Mississippi, in the 1960's. In June of 1963 Book was training Beckwith as a salesman for the company. Book stated that on June 10 in 1963 that Beckwith came to Greenville to view a farm with Book. Book stated that on that date, he observed a cut over Beckwith's right eye which he described as " a round, circular, half-moon type cut."

¶52. The defense also presented further testimony by previous transcript of Martha Jean O'Brien, a car-hop at the drive-in. Ms. O'Brien testified that the man she saw driving the white Valiant on the night of June 11, 1963 was a very tall, handsome man in dark clothing who was in his twenties.

## REBUTTAL

¶53. The State presented in rebuttal the testimony of Fred Sanders, chief investigator and training officer for the University Medical Center. He was previously employed by the Jackson Police Department as a detective lieutenant. His employment with the JPD included the years of 1963 and 1964. He participated in the investigation of the murder of Medgar Evers. During his investigation he spoke with Lieutenant Hollis Creswell and Officer James Holley of the Greenwood Police Department in June of 1963. He stated that he met with both Creswell and Holley shortly after the arrest of Beckwith and again in January of 1964. Neither officer told him that they had seen Beckwith in Greenwood on the day of the murder. He stated that he later met the two at the Crystal Grill in Greenwood and that Lieutenant Creswell "made the statement that he didn't think Beckwith did it, or he knew Beckwith didn't do it". According to Sanders, Officer Holley said very little. Again, neither officer told Sanders that they had seen Beckwith on the night in question at 1:05 a.m. in Greenwood.

## THE LAW

### ISSUES

### I. WHETHER BECKWITH WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.

¶54. Bryon De La Beckwith, VI was initially arrested for the death of Medgar Evers on June 23, 1963. He was thereafter twice tried for this offense in 1964. The first trial ended in a hung jury and mistrial on February 7, 1964. The second trial ended in a hung jury and mistrial on April 17, 1964. Following the second mistrial, the defendant was released on $10,000.00 bail. He filed no demand for a speedy trial following the second hung jury. William Waller, the prosecuting district attorney, did not seek re-election. His successor moved the court to enter a nolle prosequi of the indictment on March 10, 1969. The nolle prosequi was granted by the Seventh Circuit Court District, without objection by the defendant, on the same date. This order was signed, oddly, by all three Seventh Circuit Court judges.

¶55. The Sixth Amendment to the United States Constitution provides that:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . .

¶56. The defendant's speedy trial rights attach when he is arrested. *Smith v. State*, 550 So. 2d 406 (Miss. 1989). These rights continue until the defendant is convicted, acquitted or a formal entry is made on the record of his case that he is no longer under indictment.

¶57. Former Chief Justice Armis Hawkins succinctly dealt with the "nolle prosequi" issue in *Beckwith v. State*, 615 So. 2d 1134, 1147-48 (Miss.1992), hereinafter *Beckwith I,* where he stated:

> Defendants may be repeatedly retried, however, following mistrials granted because the jury was deadlocked and could not reach a unanimous verdict.

> We have also held that "retiring" or "passing" an indictment to the files is not an acquittal barring further prosecution, following which the case may be reopened upon motion of the State.

Pursuant to Section 22 of our Constitution, this Court has held that following a mistrial declared because of a hung jury, a nolle prosequi entered at the request of the State did not terminate the original jeopardy, and the State was not barred thereafter from seeking the re-indictment of and re-prosecuting the defendant from the same offense. This same principle has been applied in California and Florida.

Nor does this rule in and of itself offend the United States Constitution. The Federal Courts have held that the application of the double jeopardy rule "has never been considered absolute."

On the record before us, there is nothing to suggest any prosecutorial misconduct or manipulation in moving for a nolle prosequi in 1969. The State had unsuccessfully sought the conviction of Beckwith through two successive trials, both ending when the jury became deadlocked. A hopelessly deadlocked jury is clearly a manifest necessity for a mistrial.

Constitutional rights of an accused must be forever safeguarded. Society as well has the right to a criminal justice system that is not a toothless tiger. It is not at all unusual for jurors to be unable to agree on a verdict because they believe there is insufficient evidence to convict. If, following a mistrial declared in such an instance, the State does what it considers manifestly fair, and moves to dismiss the case, it would be shockingly wrong to hold that it could never have the case re-opened upon discovery of additional evidence.

In sum, the entry of the nolle prosequi in 1969 did not terminate Beckwith's original jeopardy or accrue unto him the right not to be re-indicted and re-prosecuted for the same offense.

***Beckwith I*** at 1147-48. (citations omitted).

¶58. Having previously found, in this case, that entry of the nolle prosequi in 1969 did not bar later indictment of Beckwith, we must now determine whether his rights to a speedy trial were violated prior to entry of the 1969 order of nolle prosequi.

¶59. Nearly five years passed between Beckwith's 1964 mistrial and entry of the *nolle prosequi* in 1969. Prior to 1974, our jurisprudence followed the "demand rule" which held that a defendant waives his rights to a speedy trial for any time period prior to filing his demand. ***Cummings v. State***, 219 So. 2d 673 (Miss. 1969), *cert. denied*, 397 U.S. 942 (1970). The demand rule was in effect in Mississippi until our adoption in ***Wells v. State***, 288 So. 2d 860 (Miss. 1974) of the now familiar four-prong test enunciated by the United States Supreme Court in ***Barker v. Wingo***, 470 U.S. 514, (1972).

¶60. We recognize that the nearly five year passage of time following Beckwith's second mistrial in 1964 until entry of the *nolle prosequi* in 1969 is presumptively prejudicial under the first factor, i.e. length of delay, of the ***Barker*** balancing test. Thus, this passage of time compels a full ***Barker*** analysis to analyze the reasons for the delay; the assertion or lack thereof of the speedy trial right; and the prejudice to the defendant. See ***Smith v. State***, 550 So.2d 406 (Miss. 1989).

Reason for the delay:

¶61. The reason for the delay is apparent from the record. The district attorney had brought

Beckwith to trial twice. Evidence adduced from files of the now-defunct Mississippi State Sovereignty Commission, leaked to *The Clarion Ledger* newspaper in Jackson in 1989, show that this arm of state government, unbeknownst to the prosecution at the time, had actively aided Beckwith's defense attorneys during the earlier trials. This evidence was presented to the court by Beckwith's counsel in the trial court below and they refer to it in this appeal. The article in question, written by Beverly Pettigrew Kraft, and published on December 18, 1990, quotes District Attorney Ed Peters as follows:

> Peters said he had been skeptical of the chances of a new prosecution in the Evers case. "The question of a new trial had been raised before, including at the 20[th] anniversary of Evers' death," Peters said.
>
> "It had always been my belief that the law would bar prosecution of this case, and I had always proceeded on this theory." Peters said. . . .
>
> "Until the Sovereignty Commission files, I never got past speedy trial, prior jeopardy, missing witnesses, missing evidence, dismissal of the indictment, mistrials. There were just too many things standing in the way," Peters said.
>
> The jury tampering question raised by the Sovereignty Commission records made Peters look at the case again.
>
> "I don't think what they did was morally right, but it wasn't legally wrong," Peters said of a Sovereignty Commission investigator's attempts to gather evidence about potential jurors. The Jurors themselves were not contacted before the trial.
>
> "Once the jury tampering investigation was opened, [Assistant District Attorney Bobby] DeLaughter expressed the opinion that it possibly would be tryable. I got him to look into it. He and two of our investigators have spent just untold days on putting the pieces back together," Peters said.
>
> "I would call it more of an evolution into the prosecution than just a headlong leap into, 'This is justice.'" Peters said.

¶62. We further note Beckwith's own contention to State witness Mark Reiley that he had "the power and connections" in Mississippi to avoid incarceration for "getting rid of that nigger, Medgar Evers." Beckwith's admitted complicity in thwarting the aims of fair and impartial justice can only be counted against Beckwith as a reason for the delay.

Assertion of the right:

¶63. There was no assertion of the speedy trial right. Beckwith argues that several newspaper clippings and one document opposing a mental evaluation establish proof that he asserted his right to a speedy trial. All of these clippings, and the document in question, concern the time period prior to Beckwith's earlier trials. No proof of any sort suggests that Beckwith requested or wanted a third trial. The United States Supreme Court recognizes that the assertion of the right to a speedy trial is still a paramount factor in determining whether that right has been violated. The Court has said:

The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

[407 U.S. at 532, 92 S.CT. at 2193](#).

¶64. We have said that while the right to a speedy trial is not waive d by silence, "this does not mean that the defendant has no responsibility to assert his right." *Spencer v. State*, 592 So.2d 1382, 1388 (Miss. 1991). Beckwith did not assert his right to a third trial and this factor must be weighed against him.

Prejudice:

¶65. Beckwith need not prove actual prejudice to his defense in this case. On the contrary, when the length of delay is presumptively prejudicial, the burden of persuasion is on the state to show that the delay did not prejudice the defendant. *State v. Ferguson*, 576 So.2d 1252, 1254 (Miss.1991). Nevertheless, if the defendant fails to show actual prejudice to his defense, this prong of the *Barker* balancing test cannot weigh heavily in his favor. *Polk v. State*, 612 So.2d 381, 387 (Miss.1992).

¶66. The nearly five year period ended not with a trial, but with a *nolle prosequi*. The *Barker* court emphasized that speedy trial rights are designed to protect three interests of defendants:

    a) Protect oppressive pretrial incarceration;

    b) minimize anxiety and concern of the defendant; and

    c) limit the possibility that the defense will be impaired.

*Barker* at 532.

¶67. Beckwith has wholly failed to furnish any material facts to establish that any of these interests were prejudiced during the nearly five years in question. In contrast to other cases finding the possibility of an impaired defense, in the case *sub judice*, all material evidence was preserved from prior proceedings. Thus, this factor does not weigh heavily against the state.

¶68. Our balancing of the *Barker* factors for this five-year period weighs in favor of the State. Even though the amount of time is counted against the State, the defendant's complicity with the Sovereignty Commission's involvement in the prior trials contributed to the delay; the defendant did not assert his right to a trial during this period; and no prejudice resulted from a *nolle prosequi* of all counts against Beckwith, since all material evidence had been preserved from prior proceedings.

## II. WHETHER DELAY OF PROSECUTION FROM 1964 TO 1990 VIOLATED THE DUE PROCESS, EQUAL PROTECTION, AND FUNDAMENTAL FAIRNESS PROVISIONS OF THE FEDERAL AND STATE CONSTITUTIONS.

¶69. We briefly restate the facts relevant to this issue. Beckwith was tried twice for the murder of Medgar Evers in 1964. After two mistrials, a nolle prosequi was entered in his case on March 10, 1969. No further action was taken against him by the State of Mississippi until he was re-indicted

twenty-one years later, in 1990. He was finally tried and convicted of the murder of Medgar Evers in 1994. The appellant argues that the lengthy delay between trials violates "fundamental concepts of justice."

¶70. We note at the outset that murder enjoys no statute of limitations. We have found above that the defendant was not prejudiced under the Sixth Amendment by any delay prior to entry of the *nolle prosequi* in 1969. The relevant query now before us is whether the state was prohibited from re-indicting Beckwith in 1990, more than 21 years after entry of the nolle prosequi and 26 years after the second mistrial in 1964.

### TIME BETWEEN THE 1964 MISTRIAL AND THE 1990 REINDICTMENT

¶71. The period following the second mistrial in 1964 and continuing until the new indictment in 1990 is controlled by due process considerations and the applicable statutes of limitation, rather than speedy trial rights. The United States Supreme Court in *United States v. MacDonald*, 456 U.S. 1, 7 (1982) held:

> [T]he Speedy Trial Clause has no application after the government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.

The Court in *MacDonald* also said:

> The Sixth Amendment right to a speedy trial is thus not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitation.

456 U.S. at 8. *See also United States v. Loud Hawk*, 474 U.S. 302, (Miss. 1986).

¶72. In *United States v. Lovasco*, 431 U.S. 783, 788 (1977), Justice Marshall, writing for an 8-1 majority, recognized that a lengthy pre-indictment delay, as far as the speedy trial clause of the Sixth Amendment is concerned, "is wholly irrelevant . . ." *See also U.S. v. Marion*, 404 U.S. 307 (1971); *U.S. v. Mize*, 820 F. 2d 118, 121 (5th Cir.), *cert. denied*, 484 U.S. 943 (1987); *U.S. v. Robinson*, 767 F. 2d 765 (11th Cir. 1985); *U.S. v. Hicks*, 798 F. 2d 446 (11th Cir. 1986), *cert. denied*, 479 U.S. 1035 (1987).

¶73. The *nolle prosequi* on March 10, 1969 dismissed the first indictment, thus formally ending the first prosecution. It was not a mere passing of the indictment to the files where the district attorney could move at any future term to withdraw it from the files and reactivate the prosecution. *Rush v. State*, 182 So. 2d 214, 216 (Miss. 1966). The end of the first indictment on the docket, under *MacDonald*, supra, and its progeny, closed out any Sixth Amendment speedy trial right. It did not, however, bar another prosecution for the same offense under a new indictment.

> [W]here a *nolle prosequi* is entered the particular case is at an end on the docket, . . . this does not bar another prosecution for the same offense if commenced in the court where the case originated, as was done in the instant case.

*Walton v. City of Tupelo*, 90 So. 2d 193, 194 (Miss. 1956). *See also Smith v. State*, 158 Miss. 355, 128 So. 891 (1930) (second prosecution not barred by *nolle prosequi* of previous indictment after a mistrial); *State v. Kennedy*, 96 Miss. 624, 50 So. 978 (1910); *State v. Thornhill*, 251 Miss. 718, 171 So. 2d 308 (1965); *Galloway v. State*, 574 So. 2d 1 (Miss. 1990).

¶74. Appellant cites as support for his argument *Doggett v. United States*, 505 U.S. 647, (1992), but *Doggett* is a straight Sixth Amendment case. There was never a time from arrest to final disposition when charges were not pending against Doggett. In fact, the U.S. Supreme Court in *Doggett* specifically left its prior decisions in *MacDonald*, *supra*, and *Loud Hawk*, *supra*, intact.

¶75. To determine whether Beckwith's due process rights were violated by the twenty-six year delay between the second mistrial and the return of the second indictment, we must first look at the applicable statute of limitations. There is no statute of limitations on murder. The legislature, in excepting certain crimes from the general statute of limitations imposed on criminal prosecutions by Sec. 99-1-5, Miss Code Ann. (1972), recognized that these crimes are so serious and the implications to public safety so great that prosecution should not be barred merely by the passage of time.

¶76. We find no arguable due process violations for the five year period from the second mistrial until entry of the nolle prosequi. The formal accusation had ended. Since no statutory limitations toll prosecutions for murder, and since the Sixth Amendment does not apply due to the absence of an indictment for 21 years, the only issue left is Beckwith's claim that he did not receive due process for the period following entry of the nolle prosequi until his reindictment in 1990.

¶77. We have stated in a pre-indictment analysis of due process violations that the burden of persuasion is on the defendant. *Hooker v. State*, 516 So. 2d 1349, 1351, (Miss. 1987), citing *United States v. Hendricks*, 661 F. 2d 38, 40 (5th Cir. 1981). In order to prevail under *Hooker*, Beckwith must show that 1) the preindictment delay caused actual prejudice to him, and 2) such delay was an intentional device used by the government to obtain a tactical advantage over the accused. The Court's decision in *Hooker* followed the United States Supreme Court's standard as set out in *Marion*, *supra*, and *Lovasco*, *supra*. We rejected Hooker's due process argument, finding no proof in the record that the state deliberately delayed the indictment for six years in order to gain an advantage over the defendant.

¶78. Beckwith urges this Court to overturn *Hooker*, arguing that the "intentional delay" requirement has been misapplied by the federal courts. He asks the Court to balance the prejudice to the accused against the prosecution's reason for the delay, a test which was used by the Fifth Circuit Court of Appeals in *United States v. Townley*, 665 F. 2d 579 (5th Cir.), *cert. denied*, 456 U.S. 1010 (1982) and by the Fourth Circuit Court of Appeals in *Howell v. Barker*, 904 F. 2d 889 (4th Cir.), *cert. denied*, 498 U.S. 1016 (1990). Beckwith admits that the Fifth Circuit returned to the "intentional delay" standard in *United States v. Hooten*, 933 F. 2d 293 (5th Cir. 1991), but argues that since *Hooten* did not expressly overrule *Townley*, it should be limited to the facts of that case. He claims that the "deliberate delay dicta" was "mistakenly cited as precedent."

¶79. Beckwith ignores *U.S. v. Beszborn*, 21 F. 3d 62 (5th Cir.1994), an even more recent case where the Fifth Circuit reiterated that in order to show a due process violation the defendant must show intentional delay for tactical advantage on the part of the prosecution. In addition to the lack of

"intentional delay," the Court also found a lack of actual prejudice in overturning a district court's dismissal of the charge against Beszborn. The district court had found prejudice in the fact that five potential witnesses had died and documents had been moved and could not be found, claims similar to those made in the present case. The Fifth Circuit held that the district court had misapplied the standard for a due process claim and that presumptive prejudice was not sufficient. Beszborn had shown nothing that the deceased witnesses would say which would have affected the case, nor did he show anything that could be proved by any missing or misplaced documents. Beckwith is in the same position. Witnesses for both the state and the defense had died in the interim between the trials, but testimony from previous trials was available and was read to the jury. Beckwith did not put into the record any facts he could have proved by these deceased witnesses that did not go to the jury through their prior testimony. Nor does his claim of memory loss fare any better. As the Fifth Circuit said, "Vague assertions of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from preindictment delay," citing *United States v. Harrison*, 918 F. 2d 496 (5th Cir. 1990); *United States v. Ballard*, 779 F. 2d 287 (5th Cir.), *cert. denied*, 475 U.S. 1109 (1986). See also *United States v. Delario*, 912 F. 2d 766 (5th Cir. 1990) (showing of intentional delay for tactical purposes required for claim of violation of due process.)

¶80. We note that other Federal Courts of Appeal have applied the same standard of "intentional delay." See *Acha v. United States*, 910 F. 2d 28 (1st Cir. 1990); *United States v. Lash*, 937 SF. 2d 1077 (6th Cir. 1991), *cert. denied*, 112 S. Ct. 397; *United States v. Ashford*, 924 F. 2d 1416 (7th Cir.), *cert. denied*, 502 U.S. 828 (1991); *United States v. Anagnostou*, 974 F. 2d 939 (7thCir. 1992), *cert. denied*, 507 U.S. 1050 (1993); *United States v. LeQuire*, 943 F. 2d 1554 (11thCir. 1991), *cert. denied*, 505 U.S. 1223 (1992).

¶81. We further note the similarities between this case and *Stoner v. Graddick*, 751 F. 2d 1535 (11th Cir. 1985). The state of Alabama brought charges against J. B. Stoner for the bombing of a black church nineteen (19) years after the crime. No reason was given by the state for the revival of the 19-year-old case. The Eleventh Circuit rejected Stoner's due process claim, holding that he had not met his burden of proving intentional delay for tactical advantage. The Court said that where there was no bar to prosecution by an applicable statute of limitations, "the constitution places a heavy burden on the defendant to show that pre-indictment delay has offended due process." *Id*. at 1540. If the 19 years between Stoner's crime and conviction did not offend due process, neither did the 21 years between Beckwith's *nolle prosequi* and his conviction.

¶82. The question of whether the State intentionally delayed reindictment of Beckwith is again answered by newspaper articles cited by Beckwith. In an August 17, 1987 article in *The Clarion Ledger*, District Attorney Ed Peters was quoted as follows:

> There is no way under any stretch of the law that this case could be tried again. Anyone having the first class in law school ought to know that.

As is further clarified by Mr. Peters' later statements in the previously mentioned December 18, 1990 article, the State never anticipated bringing new charges against Beckwith until the earlier involvement of the State Sovereignty Commission in Beckwith's defense was discovered. These statements establish satisfactorily that the State never intentionally delayed prosecution to gain tactical advantage.

¶83. We decline to reverse the intentional delay standard established by this Court in ***Hooker*** and followed by the Fifth Circuit Court of Appeals in ***Beszborn***. Due process is due process throughout both Mississippi and the Federal judicial systems. Beckwith has shown no due process violation which would justify overturning the jury's verdict in this case.

### III. WHETHER THE TRIAL COURT ERRED IN ITS RULINGS ON VARIOUS DISCOVERY VIOLATIONS.

¶84. Beckwith alleges that the trial court erred in its rulings on discovery violations regarding several witnesses. These allegations are discussed in turn below in the order in which they are raised in Beckwith's brief.

### A. Martha Jean O'Brien, Defense Witness

¶85. Martha Jean O'Brien was an employee of Joe's Drive-In who was on duty the night of Medgar Evers' murder. Soon after the murder, Ms. O'Brien gave a statement to police that she had seen a man in a white Plymouth Valiant pull into the drive-in on the night of the murder. She described the man as in his early twenties, slender, tall, and with dark curly hair and a full mustache covering his lip, which description did not match that of Byron De La Beckwith. Because there were no discovery rules in place at the time, the defense was unaware of this statement during Beckwith's 1964 trials. In her testimony during the first trial, Ms. O'Brien described the man she saw as being in his early twenties, very good looking and about six feet four inches tall.

¶86. Pursuant to discovery requests prior to the 1994 trial, the prosecution provided defense counsel with a copy of Ms. O'Brien's police statement and a transcript of her 1964 testimony. Being unable to locate Ms. O'Brien through all available means, including searches by investigators appointed by the trial court, the defense moved to have her 1964 testimony read to the jury. The prosecution stipulated that Ms. O'Brien could not be found, and her testimony was read to the jury. The trial judge denied defense counsel's request to read Ms. O'Brien's police statement to the jury.

¶87. On February 3, 1994, after the defense had rested and on the evening before closing arguments were to begin, defense counsel received a telephone call from Ms. O'Brien. She apparently called Mr. Kitchens because she had seen on television that the trial was almost over. Ms. O'Brien told Mr. Kitchens that she had gone to the District Attorney's office on August 11, 1993, at which time she was given an outstanding subpoena. She said the District Attorney's office never called her back, so she called and spoke to Mr. DeLaughter the night before the trial started. According to Ms. O'Brien, Mr. DeLaughter told her that Mr. Crisco would contact her when she was needed. When she saw on television that the trial was almost over, she decided to call Mr. Kitchens. Apparently, however, her address and telephone number had changed, for she told Mr. Kitchens that the District Attorney's office did not know where she was. She said that on the two occasions when she spoke to prosecutors, she had contacted them, and they did not have her address or telephone number. When Mr. Kitchens asked her if she still went by the name Martha Jean O'Brien, she said she did not and hung up without giving her name, address or telephone number. This conversation was recorded by Mr. Kitchens.

¶88. The following morning, defense counsel moved to call Mr. DeLaughter and Mr. Crisco to testify, outside the presence of the jury, regarding these troubling incidents. The trial judge ruled that

defense counsel could present this matter after closing arguments. When called to testify after closing arguments, Mr. DeLaughter admitted that he had spoken to Ms. O'Brien on the two occasions which she described to Mr. Kitchens. He testified that when defense counsel informed him that the defense intended to have Ms. O'Brien's prior testimony read to the jury because she could not be found, Mr. DeLaughter went to his office to call the telephone number he had for Ms. O'Brien to see if he could find her. Upon calling the number, he reached a business, American General Finance, and so he returned to the courtroom and stipulated to Ms. O'Brien's transcript testimony being introduced because she could not be found. Mr. DeLaughter testified that the first indication he had that the defense was looking for Ms. O'Brien was when defense counsel sought to introduce her prior testimony, and that prior to that, "[a]bsolutely it was not mentioned."

¶89. The defense then called Charlie Crisco, an investigator with the District Attorney's office, who testified that he had had Ms. O'Brien's address and telephone number since August of 1992, which was the last time he spoke with her. The record is unclear whether this address and phone number were current as of the time of trial.

¶90. The defense then called defense attorney Merrida Coxwell, who testified that on August 3, 1992, when the trial court heard Beckwith's motion to dismiss the case as a violation of his speedy trial right, Mr. Coxwell argued to the court that the defense was prejudiced by its inability to locate Martha Jean O'Brien. Mr. Coxwell testified that Mr. DeLaughter and District Attorney Peters were both present in the courtroom that day. At the close of this testimony, the defense moved for a mistrial, which motion the trial court took under advisement until after the jury completed its deliberations, at which time the judge overruled the motion. Defense counsel subsequently located Ms. O'Brien, and submitted with Beckwith's post-trial motions an affidavit by her detailing her aforementioned contact with the District Attorney's office.

¶91. Beckwith argues that the trial court erred both in refusing to hear this matter before closing arguments, when the defense could have moved to reopen its case, and in later overruling Beckwith's motion for a mistrial.

¶92. In preparation for trial, the defense submitted a comprehensive Rule 4.06 discovery request to the prosecution. We have held, "Our general discovery rule requires that, upon defense request, the prosecution disclose the names and addresses of all material witnesses. The rule extends to witnesses who may not be called at trial, where the witness may be reasonably expected to be helpful to the defense." *Gowdy v. State*, 592 So. 2d 29, 34 (Miss. 1991). There is no question that the whereabouts of Ms. O'Brien, whose prior testimony described a man in a white Plymouth Valiant at Joe's Drive-In on the night of the murder and whose description did not match that of Byron De La Beckwith, may reasonably have been expected to be helpful to the defense. It is also clear that the prosecution had been in contact with Ms. O'Brien and, at least at some point, knew her address and telephone number. The prosecution claims to have been unaware that the defense was searching for Ms. O'Brien until the defense moved to have her prior testimony read to the jury. In fact the prosecution received notice of this matter when the defense argued at the pretrial hearing that it was prejudiced by its inability to locate Ms. O'Brien. The prosecution's ignorance of the search for Ms. O'Brien may well have been a genuine oversight, but the failure to provide Ms. O'Brien's address and telephone number to the defense was a violation of Beckwith's due process rights if "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

*Cummins v. State*, 515 So. 2d 869, 876 (Miss. 1987) (quoting ***Brady v. Maryland***, 373 U.S. 83, 87 (1963)). The question, therefore, is whether the evidence was "material" to Beckwith's guilt. The test for materiality of evidence not disclosed to the defense is as follows:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Cummins*, 515 So. 2d at 876 (quoting ***United States v. Bagley***, 473 U.S. 667, 681 (1985)).

¶93. Of great significance in this case is that Ms. O'Brien's prior testimony was read to the jury. In it she described a man in a white Plymouth Valiant at Joe's Drive-In on the night of the murder who did not fit the description of Byron De La Beckwith. There is nothing to suggest that had she been found by the defense and called to testify, she would have testified any differently. Even if she had been found and testified differently, the prosecution likely would have impeached her credibility with the use of her prior testimony. As it happened, however, Ms. O'Brien's testimony was read to the jury and she was unavailable for impeachment purposes. The defense may in fact have profited from her unavailability.

¶94. Certainly, live testimony is always preferable to transcript testimony, but we do not find that Ms. O'Brien's prior testimony being read to the jury rather than her being available to testify is "sufficient to undermine confidence in the outcome of the trial." We find no reasonable probability that, had the prosecution provided Ms. O'Brien's address and telephone number to the defense prior to trial, Beckwith would not have been convicted. Therefore, the trial judge did not err in overruling Beckwith's motion for a mistrial. Because he did not err in this regard, any error in his refusal to hear the matter until after closing arguments did not prejudice the defense, and thus was only harmless.

## B. James Hobby, Defense Witness

¶95. James Hobby was a defense witness who was prepared to testify that he owned a white Plymouth Valiant matching the description of the car seen at Joe's Drive-In on the night of Evers' murder. According to Mr. Hobby, he parked his car at the drive-in on the night of the murder, and his was the only white Valiant parked at the drive-in. He was prepared to testify also that he heard a gunshot coming from the nearby woods at the time of the murder.

¶96. When the defense called Mr. Hobby to testify, the prosecution objected and moved to exclude his testimony on the grounds that defense counsel had not provided Mr. Hobby's name as a witness until mid-way through the trial when the State had rested its case in chief. The trial court adjourned for the day and ordered that the prosecution be allowed to interview the witness.

¶97. When the court reconvened the next day, the prosecution, having interviewed Mr. Hobby the previous evening, renewed its objection. The prosecutor stated that Mr. Hobby's name was not on the list of witnesses provided by defense counsel prior to trial, and pointed out that when the State read this list to the jury during voir dire, defense counsel did not point out the omission of Mr. Hobby's name. The prosecutor argued that the State had absolutely no notice until the defense began putting on evidence that Mr. Hobby would be called to testify. The prosecutor pointed out that one of the State's witnesses, Barbara Holder, had worked at the drive-in and knew Mr. Hobby well.[1]

Had the prosecution known of Mr. Hobby's identity as a witness and the substance of his testimony, the prosecutor argued, the State would have called Ms. Holder to rebut Mr. Hobby's testimony. As it stood, however, Ms. Holder had been excused after testifying and had returned to Texas.

¶98. Defense counsel responded that he had discussed with Mr. DeLaughter the names of all defense witnesses and "I had no reason to hide Mr. Hobby's name." Mr. DeLaughter countered that he had never been furnished with Mr. Hobby's name. After hearing the arguments, the trial court ruled:

> Well, gentlemen, the problem is that you place the court in the unenviable position of having to sit here and decide on the representations of the attorneys, and it -- it -- when that circumstance confronts the Court, the only proper resolution of that dispute is that the Court must fall back upon the strict letter of the law, and the law requires that the state and defense both reveal the witnesses that are to be called by the respective parties. I'm satisfied that it requires that that be done in writing, and it's, I think, admitted by all sides that that was not done in this instance. So the Court is going to deny this witness the opportunity to testify.

Defense counsel then proffered for the record a statement of Mr. Hobby's testimony.

¶99. In this situation, we are called upon to revisit the procedural guidelines which we established for trial courts to follow when addressing undisclosed evidence issues. At the time of this trial, discovery requirements and remedies for violations were governed by Uniform Criminal Rule of Circuit Court Practice 4.06, which provided in relevant part:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
>
> (1) Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
>
> (2) If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court should, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
>
> (3) The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
>
> The court shall follow the same procedure for violation of discovery by the defense.

These provisions are currently contained in Uniform Circuit and County Court Rule 9.04.

¶100. In the case of **Box v. State**, 437 So. 2d 19, 23-24 (Miss. 1983), Justice Robertson in a specially concurring opinion proposed a set of guidelines for trial courts to follow when addressing Rule 4.06 violations. The guidelines were later adopted by this Court and have since been frequently cited by the Court when disposing of undisclosed evidence issues. In **Traylor v. State**, 582 So. 2d 1003, 1006 (Miss. 1991), we enumerated those guidelines as follows:

1. Upon defense [or State] objection, the trial court should give the defendant [or prosecution] a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.

2. If, after this opportunity for familiarization, the defendant [or State] believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.

3. If the defendant [or State] does request a continuance the State [or defendant] may choose to proceed with trial and forego using the undisclosed evidence. If the State [or defendant] is not willing to proceed without the evidence, the trial court must grant the requested continuance.

Beckwith argues that because the prosecution did not request a continuance as required by the *Box* guidelines, the trial court erred in excluding Mr. Hobby's testimony. We disagree.

¶101. While it is true that a continuance must be sought before a party can complain of the admission of previously undisclosed evidence, a request for a continuance is not a prerequisite to the exclusion of such evidence, and the failure to request a continuance does not waive an objection that has been sustained. Although, under *Box*, a surprised party should ordinarily request a continuance when confronted with undisclosed evidence, the failure to do so does not abrogate the trial court's discretion to exclude such evidence in certain circumstances. "It would demean the high purpose of the Compulsory Process Clause to construe it as encompassing an absolute right to an automatic continuance or mistrial to allow presumptively perjured testimony to be presented to the jury." *Taylor v. Illinois*, 484 U.S. 400, 416 (1988). Indeed, Justice Robertson himself proposed the guidelines "in the form of flexible guidelines that ought generally be followed, not rigid rules the letter of which must always be obeyed." *Box*, 437 So. 2d at 23 (Robertson, J., specially concurring). Accordingly, we have previously sanctioned a trial court's departure from a strictly literal adherence to the *Box* guidelines in unusual circumstances. *See* *Glaskox v. State*, 659 So. 2d 591, 594 (Miss. 1995); *McCaine v. State*, 591 So. 2d 833, 836 (Miss. 1991).

¶102. In the case *sub judice*, after having interviewed Mr. Hobby, the prosecution did not request a continuance, but rather sought the exclusion of his testimony, an option well within the trial court's discretion when confronted with evidence not timely disclosed by the defense. *Houston v. State*, 531 So. 2d 598, 611 (Miss. 1988); *Coates v. State*, 495 So. 2d 464, 466-68 (Miss. 1986). Helpful to our determination of whether such a sanction was appropriate in this case is *Taylor*, *supra*.

¶103. In *Taylor*, the trial court excluded a defense witness whose name was not produced until the second day of trial after the prosecution's two principal witnesses had completed their testimony. 484 U.S. at 403. After the Illinois Appellate Court affirmed and the Illinois Supreme Court denied leave to appeal, the U.S. Supreme Court affirmed, holding that refusal to allow an undisclosed witness to testify is not prohibited by the Compulsory Process Clause of the Sixth Amendment and that such a sanction was appropriate under the facts of the case. *Id.* at 402. While the Court recognized that lesser sanctions would be adequate and appropriate in most cases, the Court stated:

[I]t is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process. One of the purposes of the discovery rule itself is to minimize

the risk that fabricated testimony will be believed. Defendants who are willing to fabricate a defense may also be willing to fabricate excuses for failing to comply with a discovery requirement.

*Taylor*, 484 U.S. at 413. The Court held, and we agree, that if "the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," it would be entirely appropriate to exclude the witness' testimony. *Id*. at 415.

¶104. In the case *sub judice*, there is no question that the defense knew for some time prior to trial of Mr. Hobby's identity and the substance of his testimony. Although defense counsel claimed to have "discussed" all defense witnesses with the prosecution prior to trial, Mr. Hobby's name was not produced in writing as required by the rules, and the defense did not point out the omission of Mr. Hobby's name on the list of defense witnesses read to the jury during voir dire. As we are bound by the record in this case, which reflects no prior disclosure of Mr. Hobby's name, we must assume that it was not until after the State had rested that the defense notified the prosecution of Mr. Hobby's identity as a witness. It is "reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed." *Taylor*, 484 U.S. at 414. Furthermore, the defense was aware of Mr. Hobby's testimony when the State called and examined Barbara Holder, an employee at Joe's Drive-In on the night of the murder who knew Mr. Hobby and who may have been used by the State to rebut Mr. Hobby's testimony. Because the prosecution was unaware of Mr. Hobby's testimony, however, Ms. Holder was excused after testifying and returned to Texas. It is therefore reasonable to presume as well that the defense was "motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." Although a continuance admittedly would have allowed the prosecution to retrieve Ms. Holder to rebut Mr. Hobby's testimony, we find that "[r]egardless of whether prejudice to the prosecution could have been avoided in this particular case, it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate." *Id*. at 417. The defense's conduct in this instance "gives rise to a sufficiently strong inference that 'witnesses are being found that really weren't there,' to justify the sanction of preclusion." *Id*.

¶105. Beckwith argues that the trial court did not evenhandedly enforce the discovery rules against the prosecution as well as against the defense. The record belies this assertion. The trial court in fact excluded State witness Bowen Johnson for precisely the same reason it excluded Mr. Hobby, i.e., Mr. Johnson's name was not timely disclosed to the defense. This argument is without merit.

¶106. We hold the prosecution's failure to request a continuance in this instance in no way diminished the authority of the trial court to exclude Mr. Hobby's testimony, and that such sanction was appropriate under the circumstances.

### C. Mark Reiley, State Witness

¶107. During the trial, on Friday, January 28, 1994, the District Attorney's office received a telephone call from Mark Reiley, who was calling from Chicago, Illinois, and who said he had seen news coverage of the Beckwith case on CNN. Mr. Reiley's name was not reflected in the records of either party. He told the prosecutors that while he was guarding Byron De La Beckwith at Angola State Penitentiary in Louisiana in 1979, Beckwith confessed to killing Medgar Evers.[2] The

prosecution immediately related this information to the trial court and defense counsel, and informed defense counsel that Mr. Reiley would be flying into Jackson the next day and would be available for questioning. On Sunday, January 30, District Attorney Peters notified defense counsel that Mr. Reiley had arrived and would be available for questioning the next day. Defense counsel was able to interview Mr. Reiley during lunch on Monday, January 31.

¶108. When the State called Mr. Reiley to testify, defense counsel objected on the grounds that the defense had had no opportunity to investigate Mr. Reiley's testimony. Defense counsel argued that more time was needed in order to retrieve records from Angola State Penitentiary and question other guards. The trial judge overruled the objection and allowed Mr. Reiley to testify.

¶109. The decision whether to admit the testimony of a witness whose name was not timely disclosed to the defense rests largely within the discretion of the trial court. *Overstreet v. State*, 369 So. 2d 275, 277 (Miss. 1979). We note that Mr. Reiley was by no means the only witness to testify that Beckwith had bragged about killing Medgar Evers. The jury had already heard from four other witnesses that Beckwith had proclaimed his involvement in Evers' assassination. We find that because Mr. Reiley's testimony was merely cumulative to similar testimony by numerous other witnesses, any error in its admission was only harmless. *See Overstreet*, 369 So. 2d at 277 (finding no abuse of discretion in admitting testimony of undisclosed witness where defense counsel had interviewed witness and witness' testimony was similar to other eyewitness testimony).

### D. Tom Van Riper, State Witness

¶110. Delmar Dennis, an ex-FBI informant and former member of the Ku Klux Klan, testified for the State regarding an incriminating statement made by Byron De La Beckwith at a Klan meeting in 1965. Mr. Dennis testified that he related this statement to the FBI agent he worked with, although he could not remember at trial which agent it was. On cross-examination, defense counsel established that the statement attributed to Beckwith by Mr. Dennis was not recorded in the FBI files containing information reported by Mr. Dennis. The State then called ex-FBI agent Tom Van Riper to testify that Mr. Dennis had related Beckwith's statement to him. Defense counsel objected to the calling of Van Riper because Van Riper's name as a witness had not been provided to the defense until the first day of trial.

¶111. The prosecution apparently did not become aware that Van Riper was the recipient of this information from Mr. Dennis until the day before testimony began when, on his way back from jury selection in Batesville, Mr. DeLaughter read a book about Beckwith written by Reed Massengill. The next day, Mr. DeLaughter provided defense counsel with Van Riper's name and telephone number, together with a photocopy of the passages in the book about which Van Riper would be questioned at trial.

¶112. Upon defense counsel's objection to the calling of Van Riper, the trial court called a recess to grant defense counsel's request for an opportunity to question the witness. When the court reconvened, defense counsel renewed his objection to any testimony by Van Riper as improper bolstering and a discovery violation. Defense counsel argued he had no opportunity "in the throes of the trial" to conduct any investigation of Van Riper's possible testimony. The trial court overruled the objection and allowed Van Riper to testify.

¶113. The admission of Van Riper's testimony calls for the same analysis as applied above to the testimony of Mark Reiley. We note that Van Riper was called merely to corroborate the testimony of one of several witnesses who had knowledge of alleged inculpatory statements made by Beckwith. Furthermore, once its objection to Van Riper's testimony was overruled, the defense did not request a continuance. Because the trial judge in his discretion allowed defense counsel to interview Van Riper before he took the stand, and due to the relative insignificance of Van Riper's testimony in light of other more direct evidence against Beckwith, we find that the defense was not unfairly prejudiced by the admission of Van Riper's testimony. *See* **Gallion v. State**, 396 So. 2d 621, 622-25 (Miss. 1981) (holding defense not prejudiced by testimony of three undisclosed witnesses where trial court called recess to allow defense counsel opportunity to interview them).

### E. Mary Ann Adams, State Witness

¶114. Mary Ann Adams, called by the State, testified that in September of 1966, she met Byron De La Beckwith in a restaurant outside Greenwood, Mississippi. She testified that Beckwith was introduced to her as "the man who killed Medgar Evers." Ms. Adams testified that when so introduced, Beckwith stuck out his hand to shake hers and was smiling and nodding. She testified that she told Beckwith he was a murderer and refused to shake his hand. Ms. Adams then testified that Beckwith became angry and told her "he had not killed a man, but a damn chicken-stealing dog, and you know what you have to do with a dog when -- after it's tasted blood." This testimony about what Beckwith told Ms. Adams was not included in her recorded statement taken by the prosecution and provided to defense counsel during discovery.

¶115. On cross examination, defense counsel questioned Ms. Adams about this alleged statement by Beckwith. She testified that she did not mention this comment when the prosecution took her taped statement on November 26, 1990, but that she told the prosecution of this comment in a second interview some months later. She could not remember whether anyone took her statement during the second interview. Ms. Adams admitted that in her first interview, she stated that she did not remember what Beckwith said to her when she met him.

¶116. After cross-examination and outside the presence of the jury, defense counsel moved for a mistrial due to the prosecution's discovery violation in failing to supplement Ms. Adams' statement with this additional information. Assistant District Attorney DeLaughter responded that he had provided defense counsel with the only statement he had taken from Ms. Adams and that, although he had spoken with her several times, he did not keep notes and dates every time someone came to talk to him about the case. The trial court cautioned both sides to timely supplement their discovery disclosures as required by the rules, and overruled the motion for a mistrial.

¶117. Beckwith argues that the trial court erred in overruling his motion for a mistrial due to the prosecution's failure to supplement Ms. Adams' statement, since the purpose of the requirement to supplement discovery is "to avoid 'ambush' or unfair surprise to either party at trial." **McCaine v. State**, 591 So. 2d 833, 836 (Miss. 1991). For several reasons, we agree with the State that this argument must fail.

¶118. Defense counsel himself first elicited testimony about the statement on cross-examination.

[BY MR. COXWELL:] And you said Mr. Beckwith said what? What was the statement you

claim --

A. He -- it wasn't a man he killed, but a damn chicken-stealing dog, and you know what you have to do to a dog once they've tasted blood. That's what he said.

Q. You sure about that?

A. Yes, sir.

Counsel impeached Ms. Adams' testimony by establishing that she did not mention Beckwith's comment in her recorded statement, but instead stated that she could not remember what Beckwith said. Therefore, even assuming *arguendo* that the prosecution was previously informed by Ms. Adams of Beckwith's statement, Beckwith suffered no prejudice because his attorneys were able to attack Ms. Adams' credibility in front of the jury.

¶119. Beckwith cites several cases wherein this Court found discovery violations to constitute reversible error. However, the cited cases all involve situations where the prosecution failed to provide defense counsel with written statements, reports or tapes. *McCaine*, 591 So. 2d at 835-36 (tape recording of incriminating statements); *Tanner v. State*, 556 So. 2d 681, 682-84 (Miss. 1989) (police offense report which contradicted defendant's trial testimony); *Fuselier v. State*, 468 So. 2d 45, 55-56 (Miss. 1985) (defendant's written statement and photocopies of footprints found in victim's carport). The situation below, on the other hand, involves an oral, unrecorded statement, not "tangible evidence" as in the cited cases. *Fuselier*, 468 So. 2d at 56. *See also Moore v. State*, 508 So. 2d 666, 667-68 (Miss. 1987) (finding State's nondisclosure of oral inculpatory statement by defendant was not reversible error). *Snelson v. State*, 93-DP-00023-SCT (Nov. 6, 1997), cited in a supplemental filing with this Court by Beckwith, stands for the proposition that it is reversible error for the prosecution to knowingly fail to inform the defense of unrecorded culpable statements. *Snelson* is distinguishable from this case on two primary points. First, the prosecution had no knowledge of Ms. Adams' statement prior to trial. Her statement was as much a surprise to the State as it was to Beckwith. Second, *Snelson* was a death penalty case. We review trial court proceedings in death penalty cases with "heightened scrutiny."[(3)]

¶120. We are cognizant of the inclination of witnesses to be more truthful and open on the witness stand, than when enduring a pretrial interview. We do not find reversible error for every inconsistent, non-recorded statement made in open court. Such inconsistences are better dealt with by searching cross examination and the determination whether to admit such evidence is better left to the sound discretion of the trial judge.

¶121. Because defense counsel was allowed to fully impeach Ms. Adams' testimony on cross-examination, any error committed by the prosecution in failing to supplement her recorded statement was harmless. Therefore, this assignment of error is without merit.

### IV. WHETHER THE TRIAL COURT ERRED IN ADMITTING IRRELEVANT AND INFLAMMATORY EVIDENCE.

¶122. Beckwith argues that the trial court erred in admitting into evidence various items for the sole purpose of inflaming and prejudicing the jury against the defendant.

## A. Inflammatory Letters and Manuscript Page

¶123. Reed Massengill was the nephew of Byron De La Beckwith's wife of twenty years, Mary Louise Williams. From 1986 to 1992, Mr. Massengill corresponded with Beckwith in an effort to write a book about Beckwith's life. To aid Mr. Massengill, Beckwith sent him letters Beckwith had written, racist propaganda, and a manuscript of a book about Beckwith written by another author who had collaborated with Beckwith. Mr. Massengill also received documents and materials from his aunt, Ms. Williams. During Mr. Massengill's testimony, and over defense objections, the trial court admitted into evidence three of the letters and a page from the book manuscript.

¶124. The documents admitted into evidence expressed support for segregation and hostility towards the black race and the NAACP, spoke with favor of the assassination of President John F. Kennedy and proclaimed involvement with the Ku Klux Klan. The manuscript page contained a letter submitted by Beckwith in 1957 to a newspaper editor for publication. It reads in part:

> Believe it or not, the NAACP, under the direction of its leaders, is doing a first class job of getting itself in a position to be exterminated!

In an undated letter "To a Friend," Beckwith wrote:

> The Negro in our country is as helpful as a boll weevil to cotton. Some of these weevils are puny little runts, and can't create the volume of damage that others can. Some are powerful, becoming mad monsters, snapping and snarling and biting the cotton. They must be destroyed, with their retched remains burned, lest the pure white cotton bolls be destroyed.

In a November, 1963 letter to his son, Beckwith wrote:

> And it looks like the country's politics are gradually going to get straight now pretty soon since Kennedy was assassinated. Whoever shot Kennedy sho did some fancy shooting, to be sure. No need for us to make much fuss over it except to say, "to me it came as no surprise." . . . Well, I guess when a few more of our enemies are gone then this will be a real fine world to live in -- wonder who will be next? I bet ole Medgar Evers told Kennedy when he got down there, "I thought you'd be along pretty soon." Haw. Haw. Haw. Now its best to keep this letter out of sight and don't let anyone see it. Oh, what a load off the country's back -- what a relief. When a few more "Reds" bite the dust we can live in peace once more.

In a 1976 letter to Ms. Williams, Beckwith wrote:

> So when you think of me, you see a man in deep debt, facing five years in prison, living like a nigger and as far in global, not state or county, Klan work as a 56-year-old man can be, and happy at it.

¶125. Beckwith argues that because none of these documents contained an admission to the murder of Medgar Evers, they were irrelevant to the crime charged in this case. He contends the documents constituted character evidence used to prove that he acted in conformity therewith in violation of Mississippi Rule of Evidence 404(b). Even if the evidence was permissible under Rule 404(b), Beckwith argues, its probative value was substantially outweighed by the danger of unfair prejudice, and thus the documents were inadmissible under Rule 403. The State argues that the documents were

not "other crimes, wrongs, or acts" within the meaning of Rule 404(b), and thus the rule was inapplicable. The State also contends that the evidence was relevant under Rule 401 and thus was admissible under Rule 402. Even if Rule 404(b) was applicable, the State urges, the evidence was admissible because it was introduced to show motive. The State argues, finally, that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We agree with the State.

¶126. Beckwith urges us to hold that any evidence not amounting to an admission is irrelevant to show motive. There is nothing in our Rules of Evidence, however, that even remotely suggests such a principle. Clearly, the rules do not intend such an unlikely result, for Rule 404(b) provides that evidence of other acts, while not admissible to prove the character of a person in order to show that he acted in conformity therewith, may nonetheless be admissible for other purposes, including proof of motive.

¶127. We are asked here to determine whether Beckwith's letters constituted "other crimes, wrongs, or acts" under Rule 404(b). If the letters did constitute "other crimes, wrongs, or acts," then our analysis turns on whether the trial judge abused his discretion under Rule 403 in admitting the evidence despite the danger of unfair prejudice. However, even if the letters do not fall under Rule 404(b), our analysis is still essentially the same, since the letters could still be relevant under Rules 401 and 402 to show intent or motive. *May v. State*, 524 So. 2d 957, 965 (Miss. 1988). In either scenario, the question of remoteness enters the analysis as a question of relevancy. *May*, 524 So. 2d at 965.

¶128. In the case of *Kolb v. State*, 542 So. 2d 265 (Miss. 1989), the defendant was arrested and charged with sexual battery of a child. While in jail following his arrest, the defendant wrote two letters in which he indicated that he had sexual urges toward small children, which letters were admitted into evidence over the defendant's relevancy objection. On appeal, this Court affirmed, holding the letters were relevant to show that the defendant did have such sexually deviant tendencies in conjunction with the issue of whether he in fact engaged in the act with which he was charged. *Kolb*, 542 So. 2d at 269. "The weight to be given to the letters was entirely up to the jury." *Id.* Although the Court determined the admissibility of the letters under a Rule 401/402 analysis, we noted that federal courts have held such evidence to be admissible under Rules 403 and 404 as well. *Id.* (citing *McGahee v. Massey*, 667 F.2d 1357 (11th Cir.), *cert. denied,* 459 U.S. 943 (1982); *U.S. v. Free*, 574 F.2d 1221 (5th Cir.), *cert. denied,* 439 U.S. 873 (1978); *Oliphant v. Koehler*, 594 F.2d 547 (6th Cir.), *cert. denied,* 444 U.S. 877 (1978)).

¶129. Likewise, we believe that Beckwith's expressions of violent animosity towards the black race, the NAACP and civil rights leaders were relevant to establish his motive for killing Medgar Evers, the black leader of the NAACP's Mississippi chapter. As for the remoteness of the letters, such determination was one for the sound discretion of the trial judge. *Edlin v. State*, 533 So. 2d 403, 407 (Miss. 1988), *cert. denied*, 489 U.S. 1086 (1989); *May v. State*, 524 So. 2d 957, 965 (Miss. 1988). We do not believe the judge abused his discretion in this instance, given that the letters were not isolated and were written both before and after Medgar Evers was killed. As in *Kolb*, the weight to be given the letters was entirely up to the jury.

¶130. Finally, these documents were particularly probative since there was no evidence that Beckwith

ever met Mr. Evers face to face. Beckwith's views, which he expressed in these documents, offered the only explanation of his motive for killing Mr. Evers. Although the prosecution is not required to show motive, it is certainly entitled to do so in order to paint a clearer picture of the crime. To be sure, this evidence prejudiced Beckwith's defense, but we do not believe the prejudice was so "unfair" as to outweigh its probative value. Beckwith himself provided these documents to Mr. Massengill in order to aid the effort to write a book about Beckwith's life. Beckwith's intent apparently was to express to the world his hostile views towards the black race in America and its leaders. We do not find it unfair that these views were presented to the jury so that it could determine whether such views led Beckwith to murder Medgar Evers. We hold the trial court did not err in finding that this evidence was relevant to show motive, and that its probative value was not substantially outweighed by the danger of unfair prejudice.

### B. Irrelevant and Inflammatory Testimony of Dick Davis

¶131. Dick Davis was an FBI informant who infiltrated the Ku Klux Klan. He was allowed to testify, over defense objection, that on October 21, 1969, he met and had a conversation with Byron De La Beckwith. He testified that although Beckwith neither admitted nor denied killing Medgar Evers, Beckwith discussed "selective killings" as a "partial solution to the right wing's problem." Mr. Davis testified that Beckwith said "he would never ask anyone to do anything that he hadn't already done himself."

¶132. Beckwith here raises the same objection as to the letters above, i.e., the evidence was irrelevant since it contained no admission to the killing of Medgar Evers, and any probative value was substantially outweighed by the danger of unfair prejudice. Using the same analysis as above, we find the evidence was relevant to show that Beckwith had violent tendencies towards his perceived political/social enemies in conjunction with the issue of whether he engaged in the "selective killing" of Medgar Evers. The question of remoteness is not a problem here, for although Beckwith did not directly admit to killing Evers, his statement that "he would never ask anyone to do what he hadn't already done himself" certainly suggested that he had killed before, and Evers may have been the victim to which he was referring. We believe that such determination was one for the jury. We find the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, and thus the evidence was properly admitted.

### C. Improper Other Crime Testimony by Mark Reiley

¶133. Mark Reiley was prepared to testify that while he was guarding Byron De La Beckwith in the hospital ward at Louisiana's Angola State Penitentiary in 1979, Beckwith admitted to killing Medgar Evers. Prior to Mr. Reiley's testimony, the defense objected to any mention being made of the circumstances of Beckwith's alleged confession, because the five-member jury conviction for which Beckwith was incarcerated at Angola had subsequently been declared unconstitutional by the U.S. Supreme Court and had been vacated. The trial judge ruled that Mr. Reiley could testify as to where his conversation with Beckwith took place, but not as to aspects of Beckwith's confinement. During his testimony, Mr. Reiley stated that while a sergeant at Angola State Penitentiary, he was assigned to guard Bryon De La Beckwith at the prison ward of Earl K. Long Hospital.

¶134. Beckwith argues that the admission of this testimony was error because under **_Loper v. Beto_, 405 U.S. 473, 483 (1972),** prior void convictions may not be used for impeachment purposes. *See*

*also* **Signer v. State**, 536 So. 2d 10, 12 (Miss. 1988) (finding that admission for impeachment purposes of prior conviction that had been set aside violated Mississippi Rule of Evidence 609(c)). Beckwith also contends the evidence was inadmissible under Rule 404(b), which prohibits the admission of other crimes, wrongs or acts to prove a person's character in order to show that he acted in conformity therewith.

¶135. In *Loper*, cited by Beckwith, the U.S. Supreme Court phrased the issue as follows: "Does the use of prior, void convictions for impeachment purposes deprive a criminal defendant of due process of law where their use might well have influenced the outcome of the case?" *Loper,* 405 U.S. at 480. In that case, the defendant was charged with statutory rape of his eight-year-old stepdaughter. In finding the admission of the prior void convictions to be error, the Supreme Court noted that the issue of innocence or guilt "turned entirely on whether the jury would believe the testimony of an 8-year-old girl or that of [the defendant]. And the sole purpose for which the prior convictions were permitted to be used was to destroy the credibility of [the defendant's] testimony in the eyes of the jury." *Id*. at 482.

¶136. In the case *sub judice*, Mr. Reiley's testimony regarding the circumstances of his relationship with Beckwith was not introduced for impeachment purposes, nor was it so vital to the central issue in the case as "to have influenced the outcome of the case." *Loper* is therefore inapplicable. Regarding Rule 404(b), it is true that evidence of other crimes is generally not admissible against an accused. *Gray v. State*, 351 So. 2d 1342, 1345 (Miss. 1977). Although there are certain recognized exceptions to the rule, the use of Mr. Reiley's testimony in this instance does not appear to fall within any of the exceptions. *See* **Gray**, 351 So. 2d at 1345. The question remains, however, whether the trial judge's abuse of discretion in admitting this testimony was prejudicial to Beckwith. *Parker v. State*, 606 So. 2d 1132, 1137 (1992).

¶137. In *Parker*, we ruled that because the improper other crimes evidence was of a different type than that with which the defendant was currently charged, the prejudicial effect, if any, was minimal, and thus the trial court's abuse of discretion in admitting the evidence did not necessitate a reversal. *Parker,* 606 So. 2d at 1137. Later, in *Duplantis v. State*, 644 So. 2d 1235, 1248 (Miss. 1994), *cert. denied*, 115 S. Ct. 1990 (1995) we stated:

> This is not a case where the other crimes evidence is similar or identical to the crime with which the defendant is currently charged, thereby making it likely that the jury would find him guilty this time simply because he had done it before. Consequently, the risk of unfair prejudice is minimal.

Furthermore, in *Duplantis*, "[n]o details of the other crimes were offered." 644 So. 2d at 1246.

¶138. In the case *sub judice*, Mr. Reiley made no reference to the details of the crime for which Beckwith was incarcerated. Mr. Reiley merely explained his duties at the prison in order to give the jury a rational and coherent picture of his relationship with Beckwith and the circumstances of Beckwith's confession. We do not feel the jury was more likely to convict based on this testimony, the primary effect of which was not to show that Beckwith had committed another crime, but rather was to lay the foundation for much more incriminating evidence, i.e., a confession. Although trial courts generally should avoid admitting testimony which alludes to other crimes committed by the defendant, we find that the trial court's failure to do so in this instance did not amount to reversible

error.

### D. Improper Other Crime Testimony by Peggy Morgan

¶139. Peggy Morgan was prepared to testify that sometime in the late 1960's or early 1970's, she and her husband gave Byron De La Beckwith a ride from Greenwood, Mississippi, to Mississippi State Penitentiary at Parchman, during which ride Beckwith confessed to killing Medgar Evers. According to Ms. Morgan, Beckwith was going to Parchman to visit an inmate, Cecil Sessums, who had been convicted of bombing the home of civil rights activist Vernon Dahmer in Hattiesburg. Before she took the stand, the defense objected to any testimony regarding bombings or the identity of the inmate whom Beckwith was going to visit. The trial judge sustained the objection, ruling that Ms. Morgan could testify about those portions of her conversation with Beckwith that involved Medgar Evers and the offense charged, but she could not testify regarding the identity of the inmate or the charges against him. Assistant District Attorney DeLaughter responded, "She won't get into that unless I ask her, which I won't ask her." When defense counsel requested that the record reflect that the prosecution did not undertake to caution the witness before she took the stand, Mr. DeLaughter responded that he would talk to her.

¶140. During Ms. Morgan's direct examination, the following exchange took place:

> Q. All right. Now, at any time on this trip, Ms. Morgan, would you tell the ladies and gentlemen of the jury what, if any, statements that this defendant made concerning the murder or killing of Medgar Evers?
>
> A. Yes, sir. He started talking about some bombings --

At this point, the defense objected and moved for a mistrial. The trial judge overruled the objection, but told the prosecutor to move along. Nothing more was said regarding bombings. Beckwith argues that Ms. Morgan's comment about bombings constituted improper other crimes evidence under Rule 404(b).

¶141. This situation is virtually identical to that in *Watson v. State*, 521 So. 2d 1290 (Miss. 1988). In that case, the following exchange occurred during the prosecution's direct examination of a witness:

> Q. Have you had any contact with [Watson] lately?
>
> A. He's come by the office where I work, but we didn't really talk. He was just telling me he was out of jail --

*Watson*, 521 So. 2d at 1293. The defense objected at this point and moved for a mistrial, which objection and motion the trial court overruled. *Id*. On appeal, this Court affirmed, holding:

> The answer of [the witness] was not responsive to the question and there was no purposeful effort or intent on the part of the State to elicit such information from the witness. Assuming arguendo that the answer constituted error, certainly it was harmless error under the facts of this case.

*Id*. at 1294. Similarly, in *Craft v. State*, 656 So. 2d 1156, 1165 (Miss. 1995), we held that a witness'

reference to another possible crime committed by the defendants did not warrant a reversal where the witness alluded to the other crime only once and "the prosecution did not deliberately ask or infer about whether the defendants had been involved in any other offenses."*See also* **United States v. Webster**, 750 F.2d 307, 336 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106 (1985) (holding that "fleeting, unexplained reference" to other crime was "obviously not reversible error").

¶142. In the case *sub judice*, the prosecutor did not ask Ms. Morgan about any comments made by Beckwith regarding bombings, but instead asked her about comments regarding Medgar Evers, to which question Ms. Morgan's answer was unresponsive. The prosecutor thereafter directed Ms. Morgan's testimony towards matters involving Medgar Evers, and the "bombings" were never again mentioned. Clearly, the prosecution did not deliberately elicit testimony regarding other crimes. There is also some doubt as to whether the naked reference to "bombings," without any indication as to who may have perpetrated them, could be considered testimony of "other crimes" committed by Beckwith. As in **Watson**, however, even assuming *arguendo* that the answer constituted error, the error was harmless. We therefore find no reversible error under this assignment.

### V. WHETHER THE TRIAL COURT ERRED IN OVERRULING BECKWITH'S OBJECTIONS TO IMPROPER COMMENTS MADE BY THE PROSECUTION.

¶143. Beckwith alleges several instances of improper comments by the prosecution, his objections to which were overruled.

### A. Improper Comment on Beckwith's Right Not to Testify

¶144. During voir dire questioning of the jury panel by defense counsel regarding Beckwith's presumption of innocence, panel member Christine Butts made the following comments:

A. I said I cannot judge him by just setting [sic] here looking at him. I want to hear his saying and maybe I could, you know, judge him by what he saying. I can't judge him just looking at him.

Q. In other words, you would have to hear what he said?

A. That's right.

Q. Okay. And you would require that before you could make a decision?

A. That's right.

Later, the prosecution requested individual voir dire in chambers of Ms. Butts regarding this matter, during which examination the following exchange occurred:

[BY MR. PETERS:] Ms. Butts, I think that you misunderstood, but maybe you didn't, and I need to know. We talked to you a lot about what the law was and could you follow the law, and that sort of thing. One of the laws is that a defendant doesn't have to testify. Do you recognize that? Do -- now --

A. I didn't recognize it. Now, since you, you know --

Q. If I tell you that's the law, would that be all right with you?

A. Yes, sir.

Q. Would you require the defendant to take the stand and testify if the law doesn't require him to take the stand and testify?

A. No, I wouldn't require --

BY MR. KITCHENS: Your honor. Excuse me, Ms. Butts. We wish to interpose an objection to the District Attorney asking that particular question on the basis of *Hines v. State*.

BY THE COURT: Be overruled.

Q. So if the state didn't prove the defendant guilty, would you require any other proof?

A. (Ms. Butts nodded negatively.)

Q. That's all you -- if we didn't prove our case, you wouldn't require them to do anything?

A. No, sir.

Beckwith argues the trial court erred in overruling his objection.

¶145. In *Hines v. State*, 339 So. 2d 56, 57 (Miss. 1976), the prosecutor asked the jury panel during voir dire, "Do each of you realize that the defendant has the right not to testify in this case? You are not to draw any inference as to guilt or innocence of the defendant whether he does or does not take the stand." The defense immediately objected and moved for a mistrial, which objection and motion the trial court overruled. On appeal, this Court reversed, holding that the prosecutor's remarks, coupled with the defendant's decision not to testify, were tantamount to an improper comment on the defendant's failure to testify. *Hines*, 339 So. 2d at 57. *Hines*, however, is distinguishable from the instant case.

¶146. In the case *sub judice*, the prosecutor's comment was not made to the entire jury panel, but rather was addressed to an individual juror in chambers. Thus, the entire panel was not tainted by any prejudice occasioned by the prosecutor's remarks. Furthermore, the prosecutor's comments were an attempt to dispel Ms. Butts' misunderstanding of the presumption of innocence which she expressed in response to questioning by defense counsel. Ms. Butts had indicated in no uncertain terms that she would not feel comfortable determining Beckwith's guilt or innocence unless he took the stand and testified. This is exactly the misconception that our prohibition of comments on the defendant's failure to testify is intended to prevent. We cannot say the prosecutor's remarks to Ms. Butts caused such a misconception when she clearly already had it. If anything, the prosecutor's explanation cleared up Ms. Butt's misunderstanding, as is apparent from her responses. If the defense felt that Ms. Butts was in any way prejudiced against Beckwith, then the defense was certainly free to challenge her for cause or peremptorily. We find that the prosecutor's voir dire comments made in chambers to an individual juror in response to that juror's clear misunderstanding of the law did not amount to an improper comment on Beckwith's failure to testify.

¶147. Beckwith also assigns as error the following comment made by the prosecutor during closing

argument:

> [BY MR. PETERS:] And he took this gun, his gun -- doesn't deny that -- his scope -- doesn't deny that --
>
> BY MR. KITCHENS: Object to improper argument about the defendant not denying it and move for a mistrial.
>
> BY THE COURT: All right. The objection will be overruled.
>
> BY MR. PETERS: His fingerprint, no evidence to the contrary. No evidence to the contrary whatsoever. His gun, his scope, his fingerprint.

Beckwith argues the prosecutor's comment that Beckwith did not deny ownership of the gun or the scope constituted an improper comment on Beckwith's failure to testify.

¶148. When there is a question as to the prosecution's comment on the defendant's failure to testify, each case must be considered individually on the facts of that particular case. *Conway v. State*, 397 So. 2d 1095, 1099 (Miss.), *cert. denied,* 449 U.S. 826 (1980); *Peterson v. State*, 357 So. 2d 113, 117 (Miss. 1978). Taken in context, it appears that the remarks *sub judice* were not a comment on Beckwith's failure to testify but rather they were a comment on the defense's failure to produce any evidence to refute the State's evidence. We have held that it is not error to comment on the defense's failure to offer any evidence to contradict the State's evidence. *Lee v. State*, 435 So. 2d 674, 678 (Miss. 1983); *Conway*, 397 So. 2d at 1100 (citing *Johnson v. State*, 109 Miss. 622, 68 So. 917 (1915)). Even if error, such comment is harmless beyond a reasonable doubt where the evidence of guilt is so overwhelming that the jury would have returned a guilty verdict in spite of the prosecutor's comment. *Lee*, 435 So. 2d at 678; *Conway*, 397 So. 2d at 1100 (citing *Chatman v. State*, 244 Miss. 659, 145 So. 2d 707 (1962); *Lambert v. State*, 199 Miss. 790, 25 So. 2d 477 (1946)). This is especially true in cases in which the defendant does not face the death penalty. *See West v. State*, 485 So. 2d 681, 688 (Miss. 1985), *cert. denied*, 479 U.S. 983 (1986)(stating overwhelming proof of guilt might have rendered comment on defendant's failure to testify harmless had defendant been charged with murder instead of capital murder).

¶149. In the case *sub judice*, the evidence of guilt included, among other things, the following: (1) Beckwith was seen in Jackson three days before the murder asking where Medgar Evers lived; (2) a white Plymouth Valiant matching the description of Beckwith's car was seen parked at Joe's Drive-In near Ever's home on the night of the murder; (3) Beckwith's rifle was found at the scene of the murder with his fingerprint on the scope; and (4) Beckwith confessed to at least five different people that he killed Medgar Evers. In light of such overwhelming evidence of guilt, any error occasioned by the prosecutor's comments was harmless beyond a reasonable doubt. Furthermore, there is an additional reason to deny relief from this alleged error.

¶150. We have held such comments to be harmless error where the trial court instructed the jury not to consider the fact that the defendant did not testify. *Jackson v. State*, 440 So. 2d 307, 310 (Miss. 1983); *Barnes v. State*, 230 Miss. 299, 92 So. 2d 863 (1957). In the instant case, the defense requested and was granted Instruction D-9, which provided, "The Court instructs the Jury that the defendant has an absolute right under the law not to testify in this case, and the Jury shall draw no

inference whatever from Mr. Beckwith's not having done so." We have reasoned that such an instruction "probably brought to the attention of the jurors, and impressed them, the fact that [the defendant] did not testify, more than the argument of the district attorney." *Jackson*, 440 So. 2d at 310. For this and the aforementioned reasons, we find that the prosecutor's comments during closing argument did not amount to reversible error.

## B. Improper, Prejudicial Comments During Closing Argument

¶151. During closing argument, in reference to the defense's cross-examination of Peggy Morgan on her history of family problems, the District Attorney made the following comments:

> Whenever a defense attorney says, and gets sugar-tongued, "Now, I don't wanna hurt your feelings, and I -- I don't mean to ask this, but I gotta know," grab your throat because he's fixing to slit it. . . . And he would do that to get a back-shooting murderer turned loose.

The defense objected and moved for a mistrial, arguing the prosecutor was improperly denigrating defense counsel. The trial court overruled the motion and instructed the prosecutor to move along. The prosecutor later stated, "That's the reason people won't -- like Mark Reiley won't come forward because of what happened to Ms. Morgan." The defense again objected, which objection was overruled. The prosecutor later argued, "Don't let him walk out of here and continue to brag about it, and say, 'I got twelve more. Twelve more. And I fooled them. And I can say it to whoever I want to.'" After another defense objection was overruled, the prosecutor continued:

> "I can say it to whoever I want to. I've already proven that. I can say it to IRS workers; I can say it to FAA workers. I can say it to FBI informants. I can say it to whoever I want to, because they can't convict me. I am Byron De La Beckwith from Greenwood, Mississippi, and they can't convict me, and I'll just brag all I want to, just like I have in the past," because, remember this, a verdict of not guilty gives him the absolute freedom to say whatever he wants.

The defense again objected, which objection was overruled. Beckwith argues these comments were highly prejudicial and warrant a reversal.

¶152. We have always allowed counsel considerable latitude in the argument of cases. "He may draw whatever deductions seem to him proper from these facts, so long as he does not use violent and abusive language, and even in many cases invectives may be justified and even called for . . . ." *Shell v. State*, 554 So. 2d 887, 900 (Miss. 1989) (quoting *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 131 So. 817 (1930)), *rev'd on other grounds*, 498 U.S. 1 (1990). With regard to Ms. Morgan, the prosecutor apparently was trying to bolster her credibility in light of the defense's vigorous cross-examination of her. As for the comments regarding Beckwith, the prosecutor was drawing the jury's attention to the abundant evidence that Beckwith had bragged about killing Medgar Evers. Although some of the prosecutor's comments may have bordered on impropriety, the question on appeal is "whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created." *Davis v. State*, 530 So. 2d 694, 701 (Miss. 1988). We cannot say, in light of the overwhelming evidence against Beckwith, that the jury's verdict was likely influenced by any prejudice that may have been occasioned by the prosecutors remarks.

## VI. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW BECKWITH'S FORMER TESTIMONY TO BE READ INTO EVIDENCE.

¶153. Mississippi Rule of Evidence 804(b) provides that a witness' former testimony is not excluded by the hearsay rule if the witness is unavailable. Rule 804(a) provides that a witness is unavailable if he "[t]estifies to a lack of memory of the subject matter of his statement," or "[i]s unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." Beckwith argues that because he was over 73 years old at the time of trial, had several serious physical problems, was on numerous medications that affected his mental abilities, and had testified at his speedy trial hearing to the effect of his memory loss, the trial court erred in overruling his motion to have the transcript of his 1964 testimony read into evidence.

¶154. In *Parker v. State*, 514 So. 2d 767, 773 (Miss. 1986), *cert. denied*, 485 U.S. 1014 (1988), this Court set out the requirements of the former testimony exception.

> Those requirements are (1) the former testimony must have been given under oath; (2) the party against whom the testimony is offered must have had a reasonable opportunity for cross-examination; (3) there must have been an identity of the parties in the former trial and in the trial in which the testimony is offered; (4) there must have been an identity of the issues; and (5) the witness must be unavailable at the time of the second proceeding.

*Parker*, 514 So. 2d at 773 (citing *Jolly v. State*, 269 So. 2d 650, 654 (Miss. 1972)). In *Parker*, because the trial at issue was a retrial of the same charges of the earlier trial, we held the witness' former testimony was admissible. *Id.* Beckwith argues that likewise, because the 1994 trial was a retrial of the same charges tried in 1964, his former testimony was admissible. In *Parker*, however, because the witness was in West Germany at the time of trial, there was no issue as to his unavailability. *Id.* In the case *sub judice*, on the other hand, although there was no issue as to the identity of the parties and issues, Beckwith was present at the trial.

¶155. The party offering the former testimony bears the burden of proving the unavailability of the witness, and the determination of unavailability is a judicial exercise reviewable on appeal only for abuse of discretion. *See United States v. Amaya*, 533 F.2d 188, 191 (5th Cir. 1976), *cert. denied*, 429 U.S. 1101 (1977). In the case *sub judice*, although the trial court overruled Beckwith's motion to have his former testimony read into evidence, the court ruled:

> The Court will, however, allow the defense the latitude of presenting evidence which was recorded at the previous trial through the -- through the deposition or the transcript in the event the defendant's testimony reveals that he fails -- his memory fails him in that -- in that respect.

In *McDonnell v. United States*, 472 F.2d 1153, 1115 (8th Cir.), *cert. denied,* 412 U.S. 942 (1973), the Eighth Circuit held that such a ruling was supported by textwriters and case law. Beckwith, however, declined the court's offer and invoked his Fifth Amendment right not to testify, which indicates that his allegation of "unavailability" was motivated by his desire not to take the witness stand. While a defendant clearly has the right not to testify, he may not invoke that right and avoid cross-examination while claiming the right to have his former testimony put before the jury. *United States v. Bennett*, 539 F.2d 45, 54 (10th Cir.), *cert. denied*, 429 U.S. 925 (1976). Under the circumstances of this case, we find the trial court did not abuse its discretion in ruling that Beckwith's

former testimony could be read to the jury in the event his testimony revealed a lack of memory as to a portion of the subject matter.

### VII. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURORS PRIOR TO DELIBERATIONS THAT THE NEXT MORNING THEY COULD PACK THEIR BELONGINGS IN ANTICIPATION OF GOING HOME.

¶156. On February 3, 1994, after the parties had finally rested and before the jury retired for deliberations, the trial judge instructed the jurors that when preparing to leave their rooms the next morning, they could "pack up your belongings and have those ready to load on the bus or the facility that they have for you in the morning so that -- that you can go ahead and be transported back to your hometown, in the event that we reach a verdict tomorrow." After the jury left the courtroom, Beckwith moved for a mistrial, arguing the judge's comments improperly impressed the jury that they were expected to reach a quick verdict. The trial court overruled the motion, but offered to have the bailiffs instruct the jury to wait until after they have reached a verdict before preparing to go home, to which offer defense counsel responded that "the harm has been done, and it would be impossible to unring that bell." Beckwith argues the trial court erred in overruling his motion for a mistrial.

¶157. It is true, as Beckwith asserts, that the trial court should not make it known to anyone, especially the jurors, how long he plans to allow the jury to deliberate. *Wade v. State*, 155 Miss. 648, 124 So. 803 (1929). The instant situation, however, is very similar to that in *Jackson v. State*, 551 So. 2d 132, 147 (Miss. 1989), in which the trial judge allowed the jurors to return to their hotel rooms to collect their belongings before retiring to deliberate upon their verdict. On appeal, we denied the defendant/appellant's assignment of error, holding:

> The record reflects no contemporaneous objection to the Circuit Court's "pack up your stuff" suggestion. To obtain review of such remarks, the point ordinarily must be called to the court's attention when made, and corrections thereof requested, or proper objection made, at that time unless the court's conduct, on the entire record, was so reprehensible and prejudicial as to deny fair trial or due process. *Jackson Yellow Cab Co. v. Alexander*, 246 Miss. 268, 148 So. 2d 674 (1963). There is no showing that the Circuit Court so abused its discretion in the premises, nor does any contemporaneous objection appear in the record.

*Jackson*, 551 So. 2d at 147.

¶158. In the case *sub judice*, Beckwith did not contemporaneously object to the trial court's "pack up your stuff" suggestion, nor did he request correctional action. He instead waited until the jury left the courtroom and then moved for a mistrial. Furthermore, when the trial judge offered to correct any error, the defense responded that it was too late "to unring that bell." Also, the judge had informed the jurors that they could go home "in the event that we reach a verdict tomorrow." The court's conduct, on the entire record, was not so reprehensible and prejudicial as to deny a fair trial or due process. Under *Jackson*, Beckwith's failure to contemporaneously object and request corrective action bars this assignment of error.

### VIII. WHETHER THE TRIAL COURT ERRED IN RECEIVING AND REPLYING TO A NOTE FROM THE JURY, DURING DELIBERATIONS, WITHOUT INFORMING DEFENSE COUNSEL UNTIL AFTER THE FACT, AND IN INFORMING THE

**JURORS BY NOTE THAT THEY COULD LOOK AT EACH OTHER'S TRIAL NOTES.**

¶159. During its deliberations, the jury sent a note to the trial judge asking if jurors were allowed to look at notes taken by other jurors during trial in order to help them remember the testimony of the many witnesses. Without notifying counsel either for the State or for the defense, the judge sent the jury a message, written at the bottom of the jury's note:

Yes, you may use the notes for reference. You may refer to the notes of other jurors.

Beckwith argues the trial court erred both in communicating with the jury during deliberations without the knowledge of defense counsel, and in failing to give the jurors a proper limiting instruction with regard to using their trial notes.

¶160. Beckwith cites *Edlin v. State*, 523 So. 2d 42, 45 (Miss. 1988), *cert. denied*, 489 U.S. 1086 (1989), for the principle that "[i]t is a matter of fundamental fairness and due process that the defendant is entitled to be apprised of communications between the court and the jury during deliberations." Beckwith contends the trial court's *ex parte* communication with the jury during deliberations was "presumptively prejudicial," as it was in *Edlin*, 523 So. 2d at 45. In *Edlin*, however, the trial judge instructed the deadlocked jury to continue deliberations because "we had put too much time and work on this case." *Id*. at 44. Such an instruction had been prohibited by the U.S. Supreme Court in *Allen v. United States*, 164 U.S. 492 (1986) and by this Court in *Sharplin v. State*, 330 So. 2d 591 (Miss. 1976). The *Edlin* Court ruled that because such an instruction "directly affects the purity of the verdict," it was presumptively prejudicial. *Edlin,* 523 So. 2d at 45.

¶161. In *Young v. State*, 420 So. 2d 1055, 1058 (Miss. 1982), we held that the trial court's *ex parte* instruction to the jury during deliberations did not prejudice the defendant where the instruction "was neither a substantive instruction on a question of law nor indicative of a requirement that the jury must continue deliberating until a verdict was reached." On the defendant's federal habeas corpus appeal, the Fifth Circuit approved, holding:

Such a communication amounts to a due process violation, however, only "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence, and to that extent only." *Gagnon*, 470 U.S. at 526, 105 S.Ct. at 1484 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S.Ct. 330, 332-33, 78 L.Ed. 674 (1934)). When not secured by a specific constitutional provision, the defendant has a constitutional right to be present only when his presence "bears, or may fairly be assumed to bear a relation, reasonably substantial, to his opportunity to defend." *Snyder*, 291 U.S. at 106, 54 S.Ct. at 332. Because the ex parte instruction in the instant case does not implicate a specific constitutional provision, Young must demonstrate that, based on all the circumstances, the instruction prevented him from receiving a fair and just hearing. *See Snyder*, 291 U.S. at 116-17, 54 S.Ct. at 336 (the due process clause requires us to examine the particular conditions and results to determine whether the hearing was unfair).

*Young v. Herring*, 938 F.2d 543, 557-58 (5th Cir. 1991) (footnotes omitted), *cert. denied*, 503 U.S. 940 (1992). *See also United States, ex rel. Securities and Exchange Commission v. Billingsley*, 766 F.2d 1015, 1021 (7th Cir. 1985) (holding trial court's *ex parte* communication with jury during

deliberations did not prejudice defendant where "the court maintained strict neutrality and avoided dangers inherent in communicating with the jury on substantive matters in the absence of defendant and his counsel"). Thus, although trial courts should always apprise counsel for all parties of communications with the jury, our determination of whether the court's failure to do so in this instance turns on whether the *ex parte* communication prejudiced Beckwith so as to deny him a fundamentally fair trial.

¶162. Juror note-taking is left to the sound discretion of the trial judge, and we have recommended that when jurors are allowed to take notes, the judge should give directions and set limitations on the use of the notes. *Wash v. State*, 521 So. 2d 890, 897 (Miss. 1988); *see also Nixon v. State*, 533 So. 2d 1078, 1095 (Miss. 1987), *cert. denied*, 490 U.S. 1102 (1989). The evidence in the case *sub judice* was very complex and consisted of the testimony of many witnesses. Indeed, as evidenced by the jury's request, the jurors were having trouble remembering the testimony of some of the witnesses. In his discretion, the trial judge informed them that they could refer to each other's notes "for reference." Although a more detailed limiting instruction may have been appropriate, we cannot say that the trial court's instruction amounted to an abuse of discretion. Accordingly, the trial court's error in communicating with the jury *ex parte* did not deny Beckwith a fundamentally fair trial, and thus was harmless.

### IX. WHETHER THE TRIAL COURT ERRED IN OVERRULING BECKWITH'S MOTION FOR MISTRIAL FOLLOWING THE PROSECUTION'S REFERENCES TO SEVERAL EXHIBITS AS "APPELLATE" EXHIBITS.

¶163. During its case in chief, the prosecution sought to have the former testimony of FBI agent Francis Finley read to the jury. The defense objected, which objection was overruled. The prosecutor then asked that a list showing which FBI agents were unavailable for trial be marked as an "appellate" exhibit. Defense counsel then stated, "Your Honor, we will have an objection to what Mr. DeLaughter just said at a later time, if we may reserve the right to make that objection," which request the trial court granted. The prosecutor thereafter referred to "appellate" exhibits on three separate occasions, each time the defense reserving the right to object at a later time. After the jury recessed for the day, the defense brought the prosecutor's comments to the court's attention and moved for a mistrial. The trial judge overruled the motion, saying he understood it was an "oversight, " and instructed the prosecution to thereafter refer to appellate exhibits as "Court's exhibits." Beckwith argues the prosecutor's references to appellate exhibits improperly impressed upon the jurors' minds that they were not the final judges in the case and their decision was reviewable by another court.

¶164. Beckwith cites as his authority the cases of *Wiley v. State*, 449 So. 2d 756 (Miss. 1984), and *Howell v. State*, 411 So. 2d 772 (Miss. 1982). We reversed in those cases, however, because the prosecutors specifically argued to jurors during closing arguments that their decisions were reviewable by a higher court. *Wiley*, 449 So. 2d at 761-763; *Howell*, 411 So. 2d at 773-77. Clearly, those arguments were far more prejudicial than the isolated, inadvertent references to appellate exhibits complained of here. In fact, the first time the prosecutor referred to an appellate exhibit, the defense raised no objection at all. Then, after reserving its right to object on the second occasion, the defense permitted the prosecution to refer to appellate exhibits three more times before stating the objection. If the defense felt truly prejudiced by the prosecutor's statements, it would have been a

small matter to approach the bench and ask for a correction. As it stood, however, neither the prosecution nor the judge had any way of knowing that to which the defense was objecting. The defense apparently made a tactical decision to wait and move for a mistrial. "Whenever a defendant makes a calculated, tactical choice and comes out on the losing end, he cannot then shift the burden to the State or to the trial judge." *Lancaster v. State*, 472 So. 2d 363, 366 (Miss. 1985). Because the defense failed to timely state its objection and request corrective action, and because the trial judge corrected any error by instructing the prosecution to use the term "Court's exhibits," we find this assignment of error to be without merit.

## X. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE PROSECUTION TO CONDUCT IMPROPER CROSS- EXAMINATION AND REDIRECT EXAMINATION OF WITNESSES.

### A. Improper Cross-Examination of James Holley

¶165. James Holley was a former Greenwood Police Officer who was called by the defense to testify that he saw Byron De La Beckwith in Greenwood on the night of Medgar Evers' murder. On cross-examination, the prosecution was allowed, over defense objection, to impeach Mr. Holley's testimony with prior inconsistent statements he made during his testimony at Beckwith's grand jury proceeding in 1990. The District Attorney had tape recorded Mr. Holley's grand jury testimony and had had it transcribed, a copy of which transcript was provided to the defense. Beckwith argues that Mr. Holley's grand jury testimony was improper impeachment evidence since, under *State v. Burrill*, 312 So. 2d 1, 3 (Miss. 1975), a defendant has no right in Mississippi to compel the presence of a stenographer at grand jury proceedings.

¶166. We squarely addressed this issue in *Scott v. State*, 446 So. 2d 580 (Miss. 1984). In that case, the prosecutor attempted to impeach a defense witness' testimony by use of her grand jury testimony. *Scott*, 446 So. 2d at 584. The prosecutor had no transcript of the witness' grand jury testimony, but rather simply gave his versions of what she had told the grand jury, which versions she denied. *Id*. We noted that "[f]ederal courts permit the introduction of grand jury testimony to impeach a witness where there is a transcript of that proceeding and where the witness is available for examination." *Id*. (citing *Young v. United States*, 406 F.2d 960, 132 U.S.App.D.C. 142 (1968)). Because there was no transcript of the witness' grand jury testimony, we reasoned:

> The district attorney could have simply made any incriminating statement he chose and repeatedly asked [the witness] had she not made that statement before the grand jury. Without a transcript of the proceedings the only rebuttal to the district attorney's line of questioning becomes the witness' denial.

*Scott*, 446 So. 2d at 584. The two dangers inherent in such a situation, we explained, are (1) the prosecutor, whom the jury is far more likely to believe, becomes a witness against the defendant, and (2) defense counsel, having been barred from the grand jury proceedings, has no way of rebutting the prosecutor's accusation. *Id*. at 584-85. We reversed on the issue, holding that "allowing a district attorney to accuse a witness of making conflicting statements before a grand jury without offering any proof to that effect amounts to a denial of due process." *Id.* at 585. Our determination in the case *sub judice*, therefore, is whether the transcript of Mr. Holley's grand jury testimony constituted "any proof to that effect" under *Scott*. We find that it did.

¶167. Although there might be some question as to the trustworthiness of a prosecutor's assertions of a witness' grand jury testimony where those assertions are supported only by a transcript which the prosecutor himself had prepared, in the case *sub judice* Mr. Holley's grand jury testimony was transcribed from a tape recording, which transcript was provided to the defense, and which tape recording was offered to the defense. Furthermore, when the district attorney showed to Mr. Holley and read to him portions of his alleged grand jury testimony, Mr. Holley's responses indicated that those were in fact the statements he made to the grand jury. Therefore, this was not a case where the jury had only the prosecutor's unsupported version of Mr. Holley's grand jury testimony to weigh against Mr. Holley's trial testimony, nor was defense counsel without any means to rebut the prosecutor's assertions. The concerns we expressed in *Scott* having been met, we hold the trial court did not err in permitting the prosecutor to impeach Mr. Holley's testimony by use of his grand jury testimony.

¶168. Beckwith also argues, without citing any authority, that the trial court erred in permitting the prosecutor, over the defense's continuing objection, to question Mr. Holley about Beckwith's outspoken views on racial segregation and whether Mr. Holley shared those views. Beckwith contends this line of questioning was irrelevant and did nothing more than inflame and prejudice the jury.

¶169. We have discussed above the relevancy of evidence regarding Beckwith's views on racial segregation, and we concluded that such evidence was admissible to show motive. As for evidence that Mr. Holley shared those views, Mississippi Rule of Evidence 616 provides, "For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible." This state allows wide-open cross-examination of any matter affecting the credibility of a witness, including a witness' possible interest, bias or prejudice in a case. *Meeks v. State*, 604 So. 2d 748, 755 (Miss. 1992). We find that Mr. Holley's testimony that he shared Beckwith's views on racial segregation was admissible for the purpose of showing a possible bias or prejudice in the case so as to attack Mr. Holley's credibility under Rule 616.

### B. Improper Redirect Examination of State's Witnesses

¶170. Beckwith argues that the trial court erred in permitting the prosecution, over defense objections, to conduct redirect examination of witnesses John Chamblee, Tom Van Riper and Reed Massengill on matters that were not first brought out on cross-examination. He cites Mississippi Uniform Criminal Rule of Circuit Court Practice 5.08, which provided, "Redirect examination is limited to matters brought out on cross-examination." *See also West v. State*, 463 So. 2d 1048, 1055 (Miss. 1985). Beckwith asserts that redirect examination is limited only to *new* matters brought out on cross-examination which were not brought out on direct. We find this is an unduly restrictive limitation which is not required by the rule.

¶171. Beckwith complains that on redirect examination of John Chamblee, the prosecutor questioned Mr. Chamblee about whether statements by two witnesses confirmed the theory that the shot that killed Medgar Evers came from the nearby trees, which witnesses were not discussed on direct or cross-examination. However, the record reflects that on cross-examination, defense counsel questioned Mr. Chamblee about whether it was possible to determine if the shot was fired from the clump of trees. Beckwith also complains that the prosecution questioned Reed Massengill on redirect

about Beckwith's religious beliefs. The record reflects that defense counsel as well questioned Mr. Massengill about Beckwith's religious beliefs on cross-examination. Regarding Tom Van Riper, Beckwith complains that the prosecution questioned Van Riper on redirect about the Neshoba County murders, but the record reflects that defense counsel on cross- examination questioned Van Riper about that case as well.

¶172. The trial court has broad discretion in allowing or disallowing redirect examination of witnesses. *West*, 463 So. 2d at 1055. When "the defense attorney inquires into a subject on cross-examination of the State's witness, the prosecutor on rebuttal is unquestionably entitled to elaborate on the matter." *Hart v. State*, 639 So. 2d 1313, 1317 (Miss. 1994) (quoting *Hogan v. State*, 580 So. 2d 1275, 1278 (Miss. 1991)); *Crenshaw v. State*, 520 So. 2d 131, 133 (Miss. 1988). We decline to adopt Beckwith's construction of the rule to require that redirect examination be limited only to matters *first* brought out on cross-examination. If such were the rule's intent, the rule would so provide. Because these matters were all "brought out on cross-examination," we find the trial court did not abuse its discretion in allowing redirect examination on the matters.

## XI. WHETHER THE TRIAL COURT ERRED IN GRANTING JURY INSTRUCTION S-1 AND IN DENYING JURY INSTRUCTION D-17.

### A. Jury Instruction S-1

¶173. Beckwith argues that Jury Instruction S-1, granted over defense objection, erroneously included the phrases "not in necessary self-defense" and "without the authority of law." The instruction reads as follows:

> The Court instructs the jury that murder is the killing of a human being, **not in necessary self-defense**, and **without the authority of law**, by any means or by any manner, when done with the deliberate design to effect the death of the person killed. The Court further instructs you that if you believe from the evidence in this case, beyond a reasonable doubt, that Byron De La Beckwith on or about June 12, 1963, killed Medgar Evers, a human being, **without authority of law**, with deliberate design to effect the death of Medgar Evers, and **not in necessary self-defense**, then Byron De La Beckwith is guilty of murder, and it is your sworn duty to so find.

(emphasis added).

¶174. Beckwith points out that "not in necessary self-defense" was not an element of the crime charged under the statute nor was it referred to in the indictment, and thus the phrase was surplusage. He cites cases which hold that an instruction should not be given to the jury submitting a theory which is not supported by the evidence. *See Strong v. State*, 600 So. 2d 199, 203 (Miss. 1992); *Wadford v. State*, 385 So. 2d 951, 954 (Miss. 1980). Beckwith argues that because he did not claim self-defense and there was no evidence to support such a theory, the trial court erred in including such language in the instruction.

¶175. Critical to our determination of this issue is whether Beckwith was prejudiced by the inclusion of the surplusage, "not in necessary self-defense." In *Swanier v. State*, 473 So. 2d 180, 188 (Miss. 1985), the trial court instructed the jury that it must find that the defendant "did unlawfully, willfully and feloniously and of his malice aforethought kill and murder" the victim in the commission of a

crime or felony or armed robbery in order to find the defendant guilty. On appeal, the State admitted that the phrase "and of his malice aforethought" was surplus as it was not required under the statute, but argued that the phrase served only to raise the State's burden of proof and could in no way have prejudiced the defendant. *Swanier*, 473 So. 2d 188. We agreed, ruling that the defendant failed to show how the surplus language prejudiced him whatsoever. *Id.*

¶176. Beckwith contends the instruction permitted the prosecution during closing argument to make the following irrelevant remarks:

> Not in necessary self-defense was this done. Medgar Evers didn't do anything of a violent nature to this defendant.

As we have often stated, however, counsel may draw upon the facts in evidence when arguing a case, and thus the prosecutor could have made these comments with or without the disputed instruction, for the evidence clearly showed that Medgar Evers was threatening no one when he was shot in the back. We fail to see how the phrase "not in necessary self-defense," which served only to raise the State's burden of proof, could have prejudiced Beckwith.

¶177. Beckwith also argues the phrase "without the authority of law" was an abstract statement of law which left the jury to speculate at its meaning and rendered the instruction fatally defective in the absence of proper explanation. However, the phrase "without authority of law" was taken directly from the statute under which Beckwith was charged. Miss. Code Ann. § 97-3-19 (1972). We have held that instructions are proper when they track the language of the statute. *Deal v. State*, 589 So. 2d 1257, 1260 (Miss. 1991); *Mackbee v. State*, 575 So. 2d 16, 34 (Miss. 1990); *Johnson v. State*, 475 So. 2d 1136, 1140 (Miss. 1985). Furthermore, we have approved the use of the phrase "without authority of law" in jury instructions, ruling that the phrase is synonymous with "feloniously." *Mackbee*, 575 So. 2d at 34; *Johnson*, 475 So. 2d at 1140. This argument therefore is without merit.

### B. Jury Instruction D-17

¶178. Beckwith argues the trial court erred in denying Jury Instruction D-17, which set out the elements of the charge of murder and instructed the jury that before Beckwith could be found guilty, the prosecution was required to prove each and every one of those elements beyond a reasonable doubt. (R. 405). He points out that a defendant is entitled to have the jury clearly instructed that the State has the burden of proving beyond a reasonable doubt each and every material element of the offense. *Watson v. State*, 465 So. 2d 1025, 1031 (Miss. 1985).

¶179. When determining the sufficiency of jury instructions, this Court reads them together and if the jury is fully and fairly instructed by other instructions, the refusal of any similar instruction does not constitute reversible error. *Laney v. State*, 486 So. 2d 1242, 1246 (Miss. 1986). "[A] trial court need not grant an otherwise valid instruction if the subject matter contained in the proposed instruction is adequately covered by an instruction already granted." *Griffin v. State*, 610 So. 2d 354, 356 (Miss. 1992). In *Watson*, cited by Beckwith, the trial court granted Instruction S-1, which set forth the elements of the crime charged, and Instruction C-13, which instructed the jury on the State's burden of proving every material element of the crime charged beyond a reasonable doubt. *Watson,* 465 So. 2d at 1030-31. We affirmed on appeal, holding that when read together, the two instructions made the State's burden of proof apparent, and thus no reversible error was committed in refusing to grant

Instruction D-4 on the State's burden of proof. *Id.* at 1031.

¶180. Likewise, in the case *sub judice*, Instruction S-1 set forth the elements of the crime charged. The trial court also granted Instruction D-7, which reads:

> The Court instructs the jury that the law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State of Mississippi the burden of proving Mr. Beckwith guilty of every material element of the crime with which he is charged. Before you can return a verdict of guilty as to Mr. Beckwith the State must prove to your satisfaction beyond a reasonable doubt that he is guilty.

> The presumption of innocence attends Mr. Beckwith throughout the trial and prevails at its close unless and until it is overcome by evidence beyond a reasonable doubt. Mr. Beckwith is not required to prove his innocence.

We find that taken together, these instructions fully and fairly instructed the jury on the State's burden of proving every material element of the crime charged beyond a reasonable doubt, and thus no reversible error was committed in denying Instruction D-17.

### XII. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE PREJUDICIAL PHOTOGRAPHS INTENDED TO INFLAME THE JURY AND CREATE SYMPATHY FOR THE VICTIM AND HIS FAMILY.

¶181. During its examination of Myrlie Evers, the prosecution sought to introduce two photographs of Medgar Evers' body in its casket, one taken at his funeral in Jackson, Mississippi, and one taken at his funeral at Arlington National Cemetery in Virginia. The defense stipulated to the identification of the deceased, and objected to the introduction of the photographs on the grounds of relevance. The trial court overruled the objection and admitted the photographs into evidence.

¶182. Beckwith argues the photographs had no probative value after the identification of the deceased was stipulated, and thus the trial court erred in admitting the photographs into evidence. He contends the photographs served only to inflame and prejudice the jury and create sympathy for the victim and his family. Beckwith cites *Hurns v. State*, 616 So. 2d 313, 319 (Miss. 1993) and *Sudduth v. State*, 562 So. 2d 67, 70 (Miss. 1990) for the principle that photographs of a murder victim should not ordinarily be admitted where the killing is not contradicted or denied, and the *corpus delicti* and identity of the victim have been established.

¶183. Both in *Hurns* and in *Sudduth*, however, we went on to say that photographs of bodies may nevertheless be admitted into evidence in criminal cases where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory. *Hurns*, 616 So. 2d at 319; *Sudduth*, 562 So. 2d at 70. In *Hurns*, the trial court admitted gruesome photographs of multiple wounds to the beating victim's head. 616 So. 2d at 319. In *Sudduth*, the trial court admitted photographs of the body of the elderly rape victim, including photographs of stab wounds, an orange in the victim's mouth and a glass vase in her vagina. 562 So. 2d at 69. We affirmed in both cases, holding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. *Hurns*, 616 So. 2d at 319; *Sudduth*, 562 So. 2d at 70.

¶184. The admission of photographs into evidence is within the sound discretion of the trial judge, and such admission will be upheld on appeal absent a showing of an abuse of that discretion. *Sudduth*, 562 So. 2d at 69; *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989), *cert. denied*, 494 U.S. 1074 (1990). If photographs are relevant, the mere fact that they are unpleasant or gruesome is no bar to their admission into evidence. *Sudduth*, 562 So. 2d at 69; *Davis*, 551 So. 2d at 173. In affirming the admission of photographs of the victim's body in *Davis*, we stated:

> In the case at bar the defense admitted that Davis had killed Mrs. Reid, so there was no need to establish the identity of the killer or victim. It appears that the exhibits have some probative value, and although they are extremely unpleasant, they do not appear to be as gruesome as some photographs described in other cases.

551 So. 2d at 173. In *Sharp v. State*, 446 So. 2d 1008, 1009 (Miss. 1984), we affirmed the admission of photographs of the victim's body because they "did have evidentiary and probative value in that at the time of their admission into evidence the circumstances of the killing and the *corpus delicti* had not been established." We went on to state that "[e]ven if the photographs had no probative value, in a case such as this, where the evidence weighs so heavily against the appellant and where the record shows no substantial prejudice to the appellant by admission of the photographs, such admission by the trial court was not reversible error." *Sharp*, 446 So. 2d at 1009.

¶185. In the case *sub judice*, Myrlie Evers was the State's first witness. It was her testimony, used in conjunction with the two photographs, that established the circumstances of the killing and the *corpus delicti*. Therefore, the photographs had some evidentiary value. Furthermore, they were not autopsy photos or photos of the victim's wounds, but rather they showed Medgar Evers' body lying in its casket at each of his two funerals, where his body was available for public view. Although unpleasant, as are any photographs of a murder victim's body, the photographs were not so gruesome or used in such a way as to be overly prejudicial or inflammatory. Accordingly, we find the trial court did not abuse its discretion in admitting these photographs into evidence.

> ### XIII. WHETHER THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE IRRELEVANT AND PREJUDICIAL TESTIMONY CONCERNING MEDGAR EVERS' CIVIL RIGHTS ACTIVITIES.

¶186. On direct examination, Myrlie Evers was permitted to testify, over defense objection, about Medgar Evers' involvement as Mississippi's field secretary of the NAACP, his efforts to integrate the schools and his quest for equal rights for African American citizens. Beckwith argues this evidence was irrelevant and was introduced solely to prejudice the predominantly African American jury against him. He cites only *Berry v. State*, 455 So. 2d 774, 776 (Miss. 1984), which stated the general rule that the character or reputation of the deceased is not admissible in a murder case. Beckwith contends that even if the evidence had "the slightest modicum of relevancy," its prejudicial effect outweighed "any shred of probative value."

¶187. Indeed, evidence of a person's character, and evidence of other crimes wrongs or acts to prove his character, are not generally admissible to show that he acted in conformity therewith on a particular occasion. Miss. R. Evid. 404. We find, however, that evidence of Medgar Evers' civil rights activities was admissible for the same purpose and to the same extent as was evidence of Beckwith's hostile views toward civil rights leaders and the black race, i.e., to show motive. It was the State's

contention that Beckwith murdered Medgar Evers precisely *because* of Evers' civil rights activities for the advancement of the rights of African Americans. As previously discussed, the State is permitted to put on evidence of motive, and the evidence here complained of was relevant to the State's theory of Beckwith's motive for killing Medgar Evers. We also find that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We decline to rule, as Beckwith entreats, that the evidence was unfairly prejudicial simply because the jury was predominantly African American. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

### XIV. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE PROSECUTION DURING VOIR DIRE TO EXTRACT PLEDGES FROM VENIRE PERSONS AND TO SUGGEST THAT THE STATE DID NOT RECEIVE FAIR TRIALS DURING THE TWO MISTRIALS IN 1964.

¶188. During voir dire, the prosecutor asked prospective jurors whether they would be influenced by the fact that thirty years had passed between the crime and the trial. The defense objected when the question was first asked, which objection was sustained. The trial court later overruled the objection and allowed the prosecutor to ask the question. Beckwith argues the question violated Uniform Criminal Rule of Circuit Court Practice 5.02, which provided, "No hypothetical questions requiring any juror to pledge a particular verdict will be asked." He cites the case of *Harris v. State*, 532 So. 2d 602, 607 (Miss. 1988), wherein we held that defense counsel has "no right to particularize what the facts would show and then ask the jurors if they would return a verdict of not guilty."

¶189. In *Harris*, we explained the parameters of voir dire questioning by counsel as follows:

> The parties' counsel each knows more about the facts of the case and his own client than does the trial judge. It is therefore perfectly proper for counsel to ask further questions beyond the court's inquiries reasonably necessary to assure himself and the court that the jurors selected will give his client the benefit of every right to which he is entitled under the law, as well as to reveal or signify particular antipathies that could prejudice his client before any proposed juror. *Phenizee v. State*, 180 Miss. 746, 178 So. 579 (1938).

> All of this is in keeping with the trial objectives of selecting a jury which can even-handedly weigh the adduced evidence and fairly and rationally apply the law given by the court to what they find to be the facts. Governed by a wise and liberal discretion of an experienced trial judge, a wide latitude should be allowed counsel to gain knowledge of jurors' attitudes towards the issues to be tried, and also towards special matters which likely will come up in a trial which reasonably could unduly influence some of the jurors, or indicate bias or hostility. Counsel should also be permitted to ask questions which give some measure of the competency or capacity of jurors to decide the issues in the case. Such questions should be permitted not only to challenge prospective jurors for cause, but to give trial counsel clues from which they will exercise peremptory challenges. *Murphy v. State*, 246 So. 2d 920, 921 (Miss. 1971); *Atlanta Joint Terminals v. Knight*, 98 Ga. App. 482, 106 S.E.2d 417 (1958).

> This is the extent of the rights of litigants in the jury selection process. While it is no doubt true that most of the questions asked of prospective juries will be the same, repeatedly asked in hundreds of cases, the selection of a jury should by no means be purely by a rote or "boiler

plate" inquiry by court or counsel. Because the line between a proper and improper question is not always easily drawn, it is manifestly a process in which the trial judge must be given considerable discretion. *Murphy*, 246 So. 2d at 922. And, while the trial judge should be lenient in seeing that these requirements are fulfilled, no court is required to permit trial tactics which go beyond them.

532 So. 2d at 606.

¶190. In the case *sub judice*, the prosecutor in this instance did not particularize what the facts would show nor did he ask the jurors to pledge a particular verdict. Rather, he was trying to determine whether any jurors were predisposed to finding Beckwith not guilty simply by virtue of the fact that thirty years had passed between the crime and the trial. We find this was in keeping with our stated policy of allowing counsel to gain knowledge of jurors' attitudes "towards special matters which likely will come up in a trial which reasonably could unduly influence some of the jurors, or indicate bias or hostility." *Id.* In fact, the question was first asked in response to a juror's statement that when she first heard about the case, she thought, "Why bring up something that happened 30 years ago?" The trial of this case was proceeding under the presumption that the State had the right to present its evidence to an impartial jury despite the fact that thirty years had passed between the crime and the trial. As we stated in *Harris*, it is "perfectly proper for counsel to ask questions beyond the court's inquiries reasonably necessary to assure himself and the court that the jurors selected will give his client the benefit of every right to which he is entitled under the law, as well as to reveal or signify particular antipathies that could prejudice his client before any proposed juror." *Id*. Accordingly, the trial court did not err in overruling Beckwith's objection to this question.

¶191. In a separate argument, Beckwith contends the trial court erred in allowing the prosecutor, during individual voir dire in chambers and over defense objection, to ask a prospective juror whether he felt that because of racial attitudes at the time, the State couldn't get a fair trial thirty years ago. Beckwith fails to cite any authority in support of his argument, and fails to demonstrate any prejudice to the defense. In fact, the venire person who was asked the question was not finally seated on the jury. This assignment of error therefore is without merit.

### XV. WHETHER THE TRIAL COURT ERRED IN TRANSFERRING VENUE FOR JURY SELECTION PURPOSES TO PANOLA COUNTY, IN DRAWING A SPECIAL VENIRE WITHOUT ISSUING AN ORDER, IN DRAWING THE SPECIAL VENIRE FROM BOTH JUDICIAL DISTRICTS OF PANOLA COUNTY, AND IN TRANSPORTING THE PANOLA COUNTY JURY TO HINDS COUNTY FOR TRIAL.

#### A. Transferring Venue for Jury Selection Purposes to Panola County

¶192. Beckwith requested a change of venue from the First Judicial District of Hinds County, which request the trial court granted. The trial judge ordered counsel for both parties to meet and submit to the court a list "of those jurisdictions wherein the racial balance is the same as, or very close to the same racial balance, as the First Judicial District of Hinds County, Mississippi." The judge stated that he would "not consider any jurisdictions where the racial population is far out of proportion to this jurisdiction." Counsel for the parties were unable to agree upon a mutually acceptable jurisdiction for transfer of the case, so the trial court made the selection, ordering that venue be transferred for jury selection purposes only to the Second Judicial District of the Third Circuit Court District, Panola

County, Mississippi.

¶193. Beckwith argues the trial court erred in considering racial demographics in selecting a jurisdiction for change of venue. He contends that such consideration deprived him of his constitutional rights to an impartial jury, randomly chosen from a cross-section of the population, and to equal protection of the laws. Beckwith cites the case of *Britt v. State*, 520 So. 2d 1377, 1379 (Miss. 1988), wherein, citing ***Batson v. Kentucky*, 476 U.S. 79 (1986)**, we stated:

> Although the defendant does have a right to be tried by a jury whose members were selected pursuant to nondiscriminatory criteria, the ***Batson*** Court noted that the Sixth Amendment to the Constitution of the United States has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population.

*Britt* has no application here, for it dealt with the alleged exclusion of men from the jury by use of peremptory strikes, and involved no issue regarding the selection of venue. More on point is the case of *Simon v. State*, 633 So. 2d 407 (Miss. 1993), *vacated on other grounds*, 115 S. Ct. 413 (1994), *on remand*, 679 S. 2d 617 (Miss. 1996), also cited by Beckwith.

¶194. In *Simon*, the defendant requested a *second* change of venue to a county with a racial population more similar to that of the county where he was indicted, which request the trial court denied. *Simon,* 633 So. 2d at 411-12. In considering the case on appeal, we cited *Mallett v. Missouri*, 769 S.W.2d 77 (Mo. 1989), *cert. denied*, 494 U.S. 1009 (1990), wherein the defendant similarly argued that the change of venue to a county with no members of his race violated his constitutional right to a fair trial, which argument the U.S. Supreme Court declined to accept in denying *certiorari*. We accordingly affirmed, holding that the defendant failed to make out a *prima facie* case, as set out in *Lanier v. State*, 533 So. 2d 473, 477 (Miss. 1988), that he was denied a trial by an impartial jury representing a fair cross-section of the community. *Simon*, 633 So. 2d at 412.

¶195. Although *Simon* stood for the proposition that a defendant has no right to a change of venue to a jurisdiction with certain racial demographics, it said nothing to the effect that a trial court may not attempt to maintain a similar racial composition in a change of venue. The point of *Simon*, rather, was that the racial composition of the jurisdiction from which the jury will be selected is of no prejudicial effect to the defendant. That is to say, any prejudice to the defendant is caused not by *where* the jury is selected, but instead by *how* the jury is selected. This is reflected in the *prima facie* requirements for a violation of the right to an impartial jury representing a fair cross-section of the community, set out in *Lanier*:

> [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) *that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community*; and (3) *that this under representation is due to systematic exclusion of the group in the jury-selection process.* (emphasis added).

533 So. 2d at 477 (quoting ***Duren v. Missouri*, 439 U.S. 357, 364 (1979)**).

¶196. Like the defendant in *Simon*, Beckwith has failed to make a showing of any of these *prima facie* elements. Beckwith's argument, we believe, is even less meritorious than was the defendant's in

*Simon*, for whereas Simon complained of a change of venue to a jurisdiction with fewer members of his race than the jurisdiction where he was indicted, Beckwith here complains of a change of venue from the jurisdiction where he was indicted to a county with *the same or similar* racial composition. It is therefore difficult to see what prejudice Beckwith could have suffered, unless his complaint is that Panola County did not have enough members of his own race -- the very complaint we denied in *Simon*. This argument is without merit.

### B. Drawing a Special Venire Without Issuing an Order

¶197. Beckwith complains that the record reflects no formal order by the trial court to draw a special venire in Panola County. However, Beckwith does not claim that he was prejudiced in any way by the court's failure to issue a formal order nor does he cite any authority in support of his argument. The appellant bears the burden on appeal, and we will entertain no claims for which no supporting authority has been cited. *Allman v. State*, 571 So. 2d 244, 254 (Miss. 1990); *Smith v. State*, 430 So. 2d 406, 407 (Miss. 1983). We therefore decline to consider this error which, at most, was harmless.

### C. Drawing the Special Venire From Both Judicial Districts of Panola County

¶198. Beckwith's argument here rests upon statutory noncompliance with the jury laws of this state. Miss. Code Ann. § 13-5-21 (Supp. 1996) provides that when a special venire is drawn from both judicial districts of a county, jurors shall be drawn "one (1) name for each [judicial district] alternately." Beckwith points out that for his trial, the jurors were not drawn alternately from each judicial district of Panola County, but were drawn randomly from the county as a whole in violation of the statute, which violation the State admits.

¶199. "[T]he statutory method of selecting jurors is directory, not mandatory, and unless it is shown that the method used was fraudulent or such a radical departure from the method prescribed by the statute as to be unfair to the defendant or to prevent due process of law, this Court will not reverse." *Capler v. State*, 237 So. 2d 445, 448 (Miss. 1970), *vacated in part*, 408 U.S. 937, *on remand*, 268 So. 2d 338 (Miss. 1972) (quoting *Armstrong v. State*, 214 So. 2d 589, 594 (Miss. 1968)), *cert. denied*, 395 U.S. 965 (1969). "The jury laws of this state are directory and the selection of the jury in an irregular manner does not render it illegal." *Rhone v. State*, 254 So. 2d 750, 752 (Miss. 1971). Rather, the question is "whether the jury lists reasonably reflect a cross-section of the population." *Peterson v. State*, 268 So. 2d 335, 336 (Miss. 1972).

¶200. Beckwith has alleged no prejudice as a result of the trial court's noncompliance with the statute and, as previously discussed, he has altogether failed to demonstrate that the jury was not chosen from a fair cross-section of the community. We find no reversible error here.

### D. Transporting the Panola County Jury to Hinds County for Trial

¶201. Beckwith argues that the trial court lacked authority to transport the Panola County jury to Hinds County for trial, asserting that the only manner by which this could lawfully be done was by agreement between the parties, a proposition for which he cites no authority. We find this argument specious and to be without merit.

¶202. The trial court never intended to try the case in Panola County. In his order transferring venue

to Panola County for jury selection purposes only, the trial judge ordered that the trial would be held in the DeSoto County courthouse in Hernando, Mississippi. Later, booklets and a letter written by Beckwith claiming that he was a political prisoner were disseminated in Panola and DeSoto Counties. The State then petitioned the court to move the trial back to Hinds County. Also, the DeSoto County Board of Supervisors filed a motion protesting the court's order moving the trial to DeSoto County without notice to that county. The Board claimed that the small town of Hernando could not handle the traffic, that the courthouse had neither the security system nor the facilities to accommodate the trial, and that the duties required of county law enforcement during the trial would be excessive and would impede them in the performance of their duties to protect the citizens of DeSoto County. Attached to the motion were over 100 pages of affidavits and other exhibits showing the unfitness of DeSoto County as a site for the trial.

¶203. The court held a hearing in which it heard arguments from both parties, along with testimony by the Panola County Sheriff that he could not provide proper security for the trial. After the hearing, the judge issued an order transferring venue, under authority of Miss. Code Ann. § 99-15-35 (1972), to Hinds County for trial proceedings. Section 99-15-35 allows the trial judge to transfer venue in any criminal case to a "convenient county." Having reviewed the abundant evidence of the unfitness of DeSoto County as the trial site, the judge found that DeSoto county was not a "convenient county." The judge never considered trying the case in Panola County, that smaller county being even less capable of accommodating the trial than DeSoto County. We find the trial court was within its considerable discretion in transferring venue for trial purposes to Hinds County, which had more accommodating facilities and a large law enforcement contingent to provide proper security for this highly publicized trial.

¶204. Beckwith also argues that transferring venue to Hinds County for trial proceedings deprived him of his right to be tried by a jury chosen from a fair cross-section of the community, including senior citizens. He contends that moving jurors from Batesville to Jackson made elderly persons more inclined to exercise their statutory exemption from jury service under Miss. Code Ann. § 13-5-25 (1972). Beckwith claims the prejudice against him is evidenced by the exemption claimed by Forrest Tuttle, 81 years old, who stated that although he was willing to serve in Panola County, he would be unable to serve in Hinds County due to his responsibilities in caring for his ill, 77-year-old wife.

¶205. Again, Beckwith has failed to make a *prima facie* showing of the denial of his right to an impartial jury chosen from a fair cross-section of the community. The U.S. Supreme Court has held that states are "free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." ***Taylor***, 419 U.S. 522, 538 (1975). We have held there is no unconstitutionality in the "sixty-five and over" exemption, which is a personal exemption and must be claimed by that individual. **Turner v. State**, 573 So. 2d 657, 666 (Miss. 1990), *cert. denied*, 500 U.S. 910 (1991). Furthermore, Beckwith presents no evidence to indicate that the jury lists were not representative of the community. We cannot say that the change of venue for trial purposes to Hinds County amounted to a "systematic exclusion" of senior citizens from the jury-selection process. This assignment of error therefore is without merit.

### XVI. WHETHER THE TRIAL COURT ERRED IN PERMITTING JURORS, BAILIFFS AND WITNESSES TO BE IMPROPERLY SWORN.

¶206. Beckwith argues that the oath given to jurors by the Circuit Clerk of Panola County did not conform to Miss. Code Ann. § 13-5-73 (1972), which requires jurors in capital cases to swear that they will "well and truly try the issue between the state and the prisoner, and a true verdict give according to the evidence and the law." Indeed, in *Miller v. State*, 122 Miss. 19, 84 So. 161 (1920), this Court held that the defendant in a capital case is entitled to have his case heard by a legal jury, that is, a jury specially sworn in accordance with the statute, and that although the jury laws are merely directory, the oath of the jury to try the issue is essential to a legal jury.

¶207. In the case *sub judice*, it was brought to the trial judge's attention that the jurors had been improperly sworn. The day after the improper oath was given, after the jurors had been transported to Hinds County for trial and prior to commencement of the trial, the trial court directed the Circuit Clerk of Hinds County to administer the proper oath, which was done. (R. 1955). Beckwith contends, however, that once venue was transferred to Panola County, the Circuit Clerk of Hinds County no longer had jurisdiction to administer oaths, which jurisdiction rested solely with the trial judge and the Circuit Clerk of Panola County. We find this argument to be wholly without merit. The trial court in its order explicitly transferred venue to Panola County "for the purpose of jury selection only," and transferred venue to DeSoto County for trial proceedings. The court later transferred venue to Hinds County for trial proceedings, which order we have already upheld above. Clearly, once venue had been transferred back to Hinds County for trial, the Circuit Clerk of Hinds County had jurisdiction to administer oaths.

¶208. Beckwith also argues that the bailiffs who accompanied jurors to their respective homes after the improper oath was given, but before the proper oath was given, were themselves not properly sworn. Beckwith contends that until such time as the jurors were properly sworn and thus became legal jurors, the bailiffs could not have been sworn to perform their duties for a legal jury serving in a capital case. This argument also is without merit.

¶209. Beckwith alleges no error in the swearing of the bailiffs other than that the jurors whom the bailiffs accompanied home were not properly sworn. In *Thomas v. State*, 298 So. 2d 690, 692 (Miss. 1974), where the trial court neglected to swear the jury in accordance with Section 13-5-73 until after a few questions had been asked of the first witness, we held that such oversight was technical error, but only harmless. Beckwith fails to allege, much less show, any prejudice that occurred during the brief period in which the jurors were not properly sworn. We therefore find that the technical error was only harmless.

¶210. Beckwith also argues that most of the State's witnesses were not properly sworn, as their oaths were given by the Circuit Clerk of Hinds County, who Beckwith contends did not have jurisdiction to administer oaths after venue was transferred to Panola County. We have already disposed of this argument above, and thus this assignment of error is without merit.

### XVII. WHETHER THE TRIAL COURT ERRED IN ALLOWING UNAUTHORIZED PERSONS TO COMMUNICATE WITH THE JURY AFTER THE JURY WAS SELECTED AND SWORN.

¶211. Beckwith complains that immediately after being sworn, the trial judge allowed jury members to return to their homes in the presence of various law officers to retrieve their personal belongings

and that the officers accompanying these jurors had not been properly sworn as bailiffs. Second, he argues that the trial court erred by allowing the alternate jurors to mingle with the jury after it had retired to deliberate. The appellant correctly states that Mississippi Law requires alternate jurors to be discharged when the jury retires to deliberate. Miss. Code Ann. § 13-5-67 (As Amended). See also *Balfour v. State*, 598 So.2d 731 (Miss 1992).

¶212. The record, however, does not substantiate this broad error alleged by the appellant. First, we find it noteworthy that Beckwith has alleged no improper or prejudicial contact with any juror by the bailiffs or anyone else. The bailiffs were sworn by the Circuit Clerk of Panola County in the manner in which bailiffs are customarily sworn. Section 13-5-73 of the Mississippi Code of 1972 states in pertinent part that bailiffs "may be specially sworn by the Court, or under its direction, to attend on such jury and perform such duties as the Court may prescribe for them." As we point out to the parties in the preceding issue, this statute applies to capital cases. The bailiffs in this case were sworn under the direction of the Court and were instructed by the Court to accompany the jurors to their homes to collect their belongings for the trip. They were assigned a duty by the Court and they accomplished their task. No error occurred in these regards.

¶213. As to the statement that alternate jurors were allowed to "mingle" with the jury during their deliberations, there is simply no proof in the record supporting this contention. The trial judge clearly told the alternate jurors not to go into the jury with the regular jurors. None of the alternate jurors were ever seated. Any error made by the trial judge in sequestering the alternates separately was a technical error as to this case and is not worthy of further comment.

### XVIII. WHETHER THE TRIAL COURT ERRED IN IMPANELING JURORS WHO HAD BEEN IMPROPERLY INFLUENCED BY ADVERSE MEDIA COVERAGE, SOME OF WHOM VIOLATED THE COURT'S SPECIFIC INSTRUCTIONS.

¶214. Two hundred and fifty veniremen were summoned to report to the Batesville Courthouse on Tuesday, January 18, 1994, and an additional two hundred and fifty were summoned to report the following Monday, January 24, 1994. Beckwith argues that the second group received no admonitions from the Court to prevent their unfettered exposure to the media of the *voir dire* of the first group.

¶215. The first group had been admonished by the Court to not read the local newspapers or otherwise expose themselves to media coverage of the case. Five of them, however, admitted having read various articles concerning the case.

¶216. As to the second group of veniremen, the appellant cites no authority for his contention that the trial court should have admonished jurors who had received a summons but had not yet been to court. Clearly no error occurred here because the trial court cannot admonish persons who are not in his presence. Since no authority is supported for this portion of the appellant's argument, we will not consider it on appeal. *Allman v. State*, 571 So.2d 244 (Miss.1990).

¶217. The second part of this issue deals with the failure of the trial court to excuse for cause jurors from the first group who stated on *voir dire* that they had read newspaper articles or seen television newscasts about the case after being admonished by the trial court not to do so. These jurors who had some exposure to the media were as follows:

Mrs. Reed said she had seen the case on the news after she had received her summons;

Mr. Barksdale had seen about two minutes on Channel 3 News;

Mr. Hentz had read about the jury selection for the case in the local newspaper the day after he reported for jury duty;

Mrs. Stewart had read about the jury selection; and

Mrs. Johnson had read about the case after receiving her summons.

¶218. None of these jurors said that his or her opinion would be affected by anything they had read or seen.

¶219. The defense asked that only Hentz and Stewart be excused for cause. They did not name the other jurors. This motion was overruled by the trial court. The trial court also denied Beckwith's motion for additional peremptory challenges.

¶220. Beckwith cites *Billiot v. State*, 454 So.2d 445 (Miss.1984), *cert. denied*, 469 U.S. 1230 (1985), for his proposition that he was denied the right to a fair trial by an impartial jury. In *Billiot*, as in the case *sub judice*, the trial court refused to remove several jurors for cause when asked to do so by the defendant. Citing *Armstrong v. State*, 214 So.2d 589 (Miss.1968, Cert. Den. 395 U.S. 965, 89 S. Ct. 2109, 23 L.Ed. 2d. 750) we stated that a juror who may be removed on a challenge for cause is one against whom a cause for challenge exists that would likely affect his competency or impartiality at trial. *Id.* at 457. In the present case, none of the jurors ever intimated that he or she was prejudiced either for or against the defense by anything seen or heard outside the courtroom.

¶221. Justice Sullivan, writing in *Billiot*, noted that the defense had not asked for more peremptory challenges and did not exhaust those he had until the choosing of the alternate juror. We repeated the standard that generally "improper failure to excuse a juror for cause is error when the defendant has exhausted his peremptory challenges." Beckwith, on the other hand, used all of his peremptory challenges, but not merely because the challenged jurors had read or heard something about the case after being cautioned by the Judge. The record shows that Beckwith did challenge Juror Reed because she had read news accounts in the local newspaper after being admonished not to do so. Barksdale was challenged because he was "too quick to agree with the District Attorney that he would consider circumstantial evidence . . ." Hentz was challenged by the defense because he "had read books and magazines about Medgar Evers, and based on what he read, he appreciated and admired Medgar Evers." Neither Johnson nor Stewart were challenged by the defense although they had both stated that they had read or heard about the case through the news media after receiving their summons.

¶222. In essence, Beckwith argues that he was forced to take Stewart on the jury. This argument is not supported by the record. The record shows that he had peremptory challenges remaining when her name came up. He chose to use those challenges on other jurors instead. Therefore, this issue is not appealable. The names of both Stewart and Hentz, the two jurors that Beckwith asked the trial court to excuse for cause, were brought up before the defendants' challenges were exhausted. Thus *Billiot* does not apply in this case.

¶223. We have also previously dealt with the issue of a trial judge refusing to excuse for cause veniremen who stated that they had been shocked, upset or bothered by what they had heard and read about a case. *Porter v. State*, 616 So.2d 899 (Miss.1993). In *Porter*, we upheld the trial judge who refused to excuse veniremen. The judge in the present case was faced with veniremen who had read a story dealing only with the selection of the jury. There was no proof in the record that any of them were in any way prejudiced toward or against the defendant. The trial court in the present case was clearly within his discretion in denying the challenges for cause. See *Coverson v. State*, 617 So.2d. 642 (Miss.1993). A defendant does not have the right to be tried by particular jurors so long as the panel selected to hear the case is fair and impartial. Beckwith has made no showing that his jury was in any way prejudiced against him and we therefore find no merit in this issue.

### XIX. WHETHER THE COURT WAS UNDULY RESTRICTIVE ON APPELLANT'S VOIR DIRE EXAMINATION.

¶224. "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (citations omitted).

¶225. Appellant cites *Rosales-Lopez*, where the U.S. Supreme Court held that a federal trial court must allow the defendant to examine potential jurors' ability to deal impartially with racial prejudice, at least if there is a likelihood that racial issues will be involved. *Rosales-Lopez*, 451 U.S. at 190. The court further held that though trial courts have traditionally been granted broad discretion in conducting voir dire, the trial judge is obligated to impanel an impartial jury. *Id.* at 189.

¶226. In the case *sub judice*, the record establishes that the trial court allowed the appellant to extensively question potential jurors about racial matters, including civil rights activities. The court did caution the defense after it had asked what the court described as "highly inflammatory racial questions." One question in particular dealt with the term "nigger," which led the court to caution that:

> I'm not going to excuse these witnesses [sic] if you bring up these--these--what I call highly inflammatory racial questions to the prospective jurors. Certainly, I'm going to assume that they're going to be offended by the question, and they're going to say they're going to be offended by it, and if they're otherwise qualified, I'm not going to excuse them simply because they get excited about those questions.

However, the trial court did not restrict the defendant's questioning on racial issues. The questions propounded more than met the requirements established in *United States v. Johnson,* 527 F. 2d 1104, 1107 (4th Cir. 1975), where the court held that "[a] general query whether any juror is unable to judge the case fairly because of race, creed or color of the defendant should suffice." (quoting *United States v. Grant*, 494 F. 2d 120, 122-23 (2d Cir.), *cert. denied,* 419 U.S. 849 (1974)). The trial court merely cautioned the defense to avoid using highly inflammatory language. This cautionary admonition did not rise to the level of curbing or limiting the defendant's inquiry into racial prejudice. This assignment of error is without merit.

## XX. WHETHER THE TRIAL COURT ERRED IN OVERRULING BECKWITH'S MOTION FOR MISTRIAL, OR TO QUASH THE VENIRE, WHEN THE DISTRICT ATTORNEY IMPROPERLY CREATED AN EXPECTATION ON THE PART OF THE VENIRE THAT THE APPELLANT WOULD CALL WITNESSES IN HIS DEFENSE.

¶227. During voir dire, the District Attorney told the veniremen it was possible that the defendant would introduce the testimony of two police officers to establish an alibi, and asked them whether they would give more credence to the testimony of those witnesses because they were police officers. Citing no authority, Beckwith argues the prosecutor's comments unfairly created the expectation that Beckwith would call witnesses in his defense.

¶228. The appellant bears the burden on appeal, and we will not consider issues on appeal for which no supporting authority has been cited. *Allman v. State*, 571 So. 2d 244, 254 (Miss. 1990); *Smith v. State*, 430 So. 2d 406, 407 (Miss. 1983). Furthermore, even assuming *arguendo* that the prosecutor's comments were improper, Beckwith did in fact call the two police officers to testify, and he makes no claim that he would not have done so but for the prosecutor's comments. We fail to see, therefore, how Beckwith could have been prejudiced by any "expectation" created by the District Attorney's comments. This assignment of error is without merit.

## XXI. WHETHER THE TRIAL COURT ERRED IN ACCEPTING THE DUPLICATE TRANSCRIPT OF THE 1964 TRIAL AS A TRUE AND CORRECT COPY AND IN ALLOWING THE PRIOR TESTIMONY OF UNAVAILABLE WITNESSES TO BE READ FROM THE TRANSCRIPT.

¶229. Beckwith argues the trial court erred in authenticating the duplicate transcript of the 1964 trial as the official transcript of those proceedings. He relies on the affidavit of Hardy Lott, the sole surviving member of the 1964 defense team, who stated therein that the 1964 trial transcript was prepared by the court reporter "as quickly as possible," and that it "contained many errors," was an "hastily prepared, error-filled transcript," and "is replete with substantive errors and is not, in my opinion, sufficiently reliable for presentation to a jury." We find this argument lacks merit.

¶230. Mississippi Rule of Evidence 901(a) provides that the authentication or identification of a document for admission into evidence is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Beckwith has never alleged, including in his brief, that the duplicate transcript was not a true and correct copy of the original 1964 trial transcript. He relies instead on Rule 1003, which provides that a duplicate is admissible to the same extent as the original unless a genuine question is raised as to the authenticity of the original. Beckwith contends that Mr. Lott's affidavit raised such a question.

¶231. The record reflects that on November 19, 1990, the trial court heard the State's motion to authenticate the duplicate transcript as the official transcript of the 1964 proceedings. The court noted that the only appearance or response Beckwith made with regard to the State's motion was a motion for continuance of the hearing, which motion was denied and of which denial Beckwith was notified. The court granted the State's motion. During trial, when the State first sought to use the 1964 testimony of an unavailable witness, Betty Jean Ellington, the defense objected. Again, although the defense objected "based on the attempted authentication of a transcript," no argument was made attacking the authenticity of the 1964 transcript. It was not until after the State rested its case-in-

chief, when the defense moved for a directed verdict or a mistrial, that the defense called the court's attention to Mr. Lott's affidavit attacking the authenticity of the original 1964 transcript. We can hardly view this as a timely objection raising a genuine issue as to the authenticity of the original transcript. Furthermore, in *Cole v. State*, 608 So. 2d 1313, 1321 (Miss. 1992), *cert. denied*, 508 U.S. 962 (1993), we held that a witness' affidavit disputing the record was parole evidence which could not be used to impeach the verity of judicial records. We stated:

> [O]fficial records required by law to be kept, import verity. [Citations omitted]. They deal with and dispose of, property, liberty and lives of litigants. There must be an end and finality to such proceedings. To permit witnesses, years after the judicial acts have taken place, to give to triers of fact who might accept them, their oral opinions that . . . official records were not genuine, would produce utter chaos in judicial procedure . . . . [I]t would cut the throat of reason and knock the brains out of common sense.

*Cole*, 608 So. 2d at 1321 (quoting *Entrekin v. Tide Water Associated Oil Co.*, 203 Miss. 767, 35 So. 2d 305, 307 (1948)); *see also* *Wright v. State*, 577 So. 2d 387, 390 (Miss. 1991) (describing trial transcripts as "unimpeachable documentary evidence"). We find that the defense's objection attacking the authenticity of the transcript was insufficient to raise a genuine issue as to authenticity of the original transcript, and thus the transcript was admissible under Rules 901 and 1003.

¶232. Beckwith also argues the transcript was inadmissible under Rule 804(b)(1), which requires that the party against whom the former testimony is offered "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Beckwith contends that due to the lack of discovery rules at the time, he had no meaningful opportunity in 1964 to develop the testimony of prosecution witnesses on cross-examination by use of impeachment material available to the 1994 defense counsel.

¶233. In the case of *Mitchell v. State*, 572 So. 2d 865, 870 (Miss. 1990), where the transcript of the unavailable witness' former testimony reflected extensive cross-examination, we affirmed the admission of the former testimony despite the defendant's argument that he was unable to cross-examine the witness on matters that surfaced after the first trial but before the second trial. Likewise, in the case *sub judice*, because the transcript of the former testimony of unavailable prosecution witnesses reflects extensive cross-examination, "[t]he testimony comes before us bearing sufficient indicia of reliability that the values that have given rise to our hearsay rules have been more than satisfied." *Mitchell*, 572 So. 2d at 870. The trial court did not err in admitting the former testimony of unavailable witnesses.

## CONCLUSION

¶234. Miscreants brought before the bar of justice in this State must, sooner or later, face the cold realization that justice, slow and plodding though she may be, is certain in the State of Mississippi.

¶235. Today's ruling represents the final act of this sovereign State's attempt to deal with a maelstrom born out of human conflict as old as time. The legal and law enforcement communities of this State must be applauded for their energetic, patient and longsuffering efforts, beginning only minutes after the shooting of Medgar Evers, to squeeze some justice out of the harm caused by a furtive explosion which erupted from dark bushes on a June night in Jackson, Mississippi. Final resolution of this

conflict resulted from voices, both present and past, who showed the courage and will, from 1964 to 1994, to merely state the truth in open court. Their voices cannot be ignored. We affirm the finding of the jury that Byron De La Beckwith, VI murdered Medgar Evers on the night of June 12, 1963.

¶236. We find no reversible error in the proceedings below.

¶237. **CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**

**PITTMAN, ROBERTS AND SMITH, JJ., CONCUR. DAN LEE, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION. SULLIVAN, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY LEE, C.J. PRATHER, P.J., BANKS AND McRAE, JJ., NOT PARTICIPATING.**

### DAN LEE, CHIEF JUSTICE, DISSENTING:

¶238. I concur with the excellent dissenting opinion of Presiding Justice Sullivan as to Issue III dealing with discovery violations committed at the trial level. I write separately to demonstrate the unequal application of the constitutional guarantees, both federal and state, of the right to a speedy trial to the facts in this case. Twenty-six years and seven months, i.e. some nine thousand seven hundred and six days (9,706), elapsed between the hung jury of the second mistrial in April, 1964, and re-indictment of Byron De La Beckwith ("Beckwith") in December, 1990, thereby allowing the State to gain a tactical advantage whereby the State obtained a conviction unlikely to be secured in the 1960's, as evidenced by two hung juries. Times do change. The State openly admitted that the political climate had changed and that it waited until the time was favorable for conviction to pursue Beckwith, some 9,706 days after Beckwith had requested a speedy trial and twenty-one years after a *nolle prosequi* had been entered in March, 1969, at the behest of the State.

¶239. I disagree with the majority's conclusions as to Issues I and II regarding the flagrant violation of Beckwith's right to a speedy trial and whether the egregious and unprecedented delay of some thirty years between the second mistrial in 1964 and the third trial in 1994 violated the due process, equal protection, and fundamental fairness provisions of the federal and state constitutions.

¶240. Condoning the unparalleled violation of Beckwith's constitutional rights to speedy trial is not the proper remedy for the perceived unfairness of the juries in the first two trials. The old axiom is true -- two wrongs do not make a right. Because Beckwith's constitutional rights have been violated, and the speedy trial portion of our state and federal constitutions have been so blithely tossed aside and ignored, I would reverse the lower court's conviction in this case. Accordingly, I dissent.

### I. WHETHER BECKWITH WAS DENIED HIS CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL.

¶241. The Sixth Amendment to the United States Constitution proclaims that in "all criminal prosecutions the accused shall enjoy the right to a speedy and public trial . . . ." Article 3, Section 26 of the Mississippi Constitution tenders the same guaranty. Beckwith's right to a speedy trial has been grossly violated. The length of delay and the degree of prejudice suffered by Beckwith eclipses any case reported by this Court, and the cursory treatment of this issue offered by the majority opinion is flawed.

¶242. In *Beckwith v. State*, 615 So. 2d 1134 (Miss. 1992) ("*Beckwith I*"), this Court declined the invitation to consider Beckwith's speedy trial claim at that time, asserting that most speedy trial issues "are best considered only after the relevant facts have been developed at trial." *Id.* at 1138 (*quoting United States v. MacDonald*, 435 U.S. 850, 853-863 (1978)). The majority's discussion of this issue is a legally unsound attempt to consider the facts developed at trial and accomplishes little in addressing this complex question.

¶243. The leading U.S. Supreme Court case on the issue of speedy trial is *Barker v. Wingo*, 407 U.S. 514 (1972), which we adopted in *Wells v. State*, 288 So. 2d 860 (Miss. 1974). *Barker* announced a balancing test to apply when determining whether a defendant's right to a speedy trial has been violated and enumerated four factors to consider in such an analysis: (1) Length of delay; (2) Reason for the delay; (3) The defendant's assertion of his right to a speedy trial; and (4) Prejudice resulting to the defendant. *Barker*, 407 U.S. at 530.

¶244. The majority opinion seeks the legal equivalent of "having its cake and eating it too." The majority evidently is seeking to assert that the *nolle prosequi* was a final judgment for speedy trial purposes. The majority opinion relies on *Beckwith I* for support in its assertion that the *nolle prosequi* did not bar re-indictment and re-prosecution of Beckwith and therefore was not final for double jeopardy purposes. The *nolle prosequi* either was a final judgment or it was not. If it was final, then the State faces serious double jeopardy challenges. If the *nolle prosequi* was not final, then, pursuant to the general rule that judicial decisions apply retroactively, *Solem v. Stumes*, 465 U.S. 638, 642-43 (1984), the *Barker* factors **must** be applied. Assuming, *arguendo*, that the case *sub judice* is not yet final, an assumption which follows from the majority's glowing approval of *Beckwith I*, a **careful** analysis of the *Barker* factors is **required** for a thorough review of the facts developed at trial in the context of Beckwith's right to a speedy trial, in contrast to the cursory, erroneous, and legally deficient analysis advanced in the majority opinion.

## A. Length of Delay

¶245. The United States Constitution does not specify an exact length of time required to satisfy speedy trial standards; a state may set its own constitutionally consistent standard. *Barker*, 407 U.S. at 523. Under the *Barker* standard, the defendant must have been subjected to a presumptively prejudicial delay in order to justify further inquiry. We and the federal courts have declared that an eight-month delay from indictment to trial is "presumptively prejudicial." *See Beavers v. State*, 498 So. 2d 788 (Miss. 1986); *Bailey v. State*, 463 So. 2d 1059 (Miss. 1985); *United States v. Rogers*, 781 F. Supp. 1181 (S.D. Miss. 1991); *Doggett v. United States*, 505 U.S. 647, 652 (1992).

¶246. Approximately **five years (one thousand seven hundred eighty-seven days)** elapsed between Beckwith's second mistrial on April 17, 1964, and the *nolle prosequi* on March 10, 1969. Thereafter, **twenty-one years** elapsed until the State secured a new indictment. The time between Beckwith's

second mistrial and the re-indictment measures almost **twenty-seven years, i.e. 9,706 days.**

¶247. As to the 1,787- day delay from the second mistrial until the *nolle prosequi*, this Court has found on numerous occasions that less delay was a violation of a defendant's right to a speedy trial. *See Jenkins v. State*, 607 So. 2d 1137 (Miss. 1992) (two and one-half year delay, eleven months of which were chargeable to the defendant, held a violation of the right to a speedy trial); *State v. Ferguson*, 576 So. 2d 1252 (Miss. 1991) (two hundred eighty-eight day delay a violation of the right to a speedy trial); *Flores v. State*, 574 So. 2d 1314 (Miss. 1990) (six hundred ten day delay a violation of the right to a speedy trial); *Trotter v. State*, 554 So. 2d 313 (Miss. 1989) (one thousand four hundred seventy day delay held a violation of the right to a speedy trial); *Vickery v. State*, 535 So. 2d 1371 (Miss. 1988) (1,283 day delay, 860 of which were attributable to the State, a violation of the right to a speedy trial); *Beavers v. State*, 498 So. 2d 788 (Miss. 1986) (four hundred thirty-two day delay held a violation of the right to a speedy trial); *Burgess v. State*, 473 So. 2d 432 (Miss. 1985) (sixteen month delay a violation of the right to a speedy trial). One need not be a mathematician to recognize the clear fact that the delay from Beckwith's second mistrial to the *nolle prosequi* **exceeds** the trial delay of any reported decision by this Court.

¶248. As to the delay after the *nolle prosequi*, the majority places its reliance on the cases of ***United States v. Loud Hawk***, 474 U.S. 302, *reh. den.* 475 U.S. 1061 (1986), and ***United States v. MacDonald***, 456 U.S. 1 (1982). These cases hold that the period of time during which an accused is neither under indictment nor subject to restraint should not be counted in the determination regarding a speedy trial violation. This position may once have had some credence in an analysis of the federal right to a speedy trial. ***Doggett***, however, announced a new standard: "[o]nce triggered by arrest, indictment, or other official accusation, however, the speedy trial enquiry must weigh the effect of delay on the accused's defense just as it has to weigh any other form of prejudice . . . . Condoning prolonged and unjustifiable delays in prosecution would . . . penalize many defendants . . . ." ***Doggett***, 505 U.S. at 655-57. ***Loud Hawk*** and ***MacDonald*** are distinguishable and are superseded by ***Doggett***.

¶249. In *Corley v. State*, 584 So. 2d 769 (Miss. 1991), we considered a violation of the statutory two hundred seventy day rule and stated that we would apply the ***Barker*** factors to any case where we found that the prosecution had re-indicted the accused in order to get around the two hundred seventy day rule. *Id.* at 772. That basic rationale applies to the case *sub judice*, i.e., a prosecutor should not be permitted to wait over twenty-six years before deciding to re-indict an accused.

¶250. The length of delay in the instant case from the second mistrial until the *nolle prosequi* was **four years and eleven months** or **1,787 days**, a delay which is presumptively prejudicial. The additional twenty-one year delay constitutes oppressive conduct under Article 3, Sections 24 and 26 of the Mississippi Constitution, and represents the State's attempt to gain a tactical advantage. The length of delay factor weighs heavily against the State.

### B. Reason for the Delay

¶251. The basic rule governing the reason for delay is as follows: the **State must prove** either that the defendant prompted the delay or that the State had good cause. *Ross v. State*, 605 So. 2d 17, 22 (Miss. 1992). In other words, where the delay is presumptively prejudicial, the burden of production and persuasion falls on the prosecution. *Ferguson*, 576 So. 2d at 1255. We held in *Beavers* that the risk of non-persuasion was on the prosecution. *Beavers*, 498 So. 2d at 791. In *Jenkins* we stated

that "[w]here the defendant has not caused the delay and the State does not show good cause for that delay, this Court weighs this factor against the prosecution." *Jenkins*, 607 So. 2d at 1139.

¶252. The prosecutor incredibly stated that "speedy trial is out the window. . . . [t]here's **no burden on the State**." Therefore, the prosecution made no attempt to prove that Beckwith caused the delay or provide any reason for the delay. This results in a silent record. In *Flores*, we held that a silent record is chargeable against the State. *Flores*, 574 So. 2d at 1322. The prosecution, thereby, failed to meet the burdens of persuasion and proof placed upon them by this Court's decisions.

¶253. We have found speedy trial violations in numerous cases far less egregious than the delay in the instant case. In *Jenkins* we held that the prosecution failed to show good cause for a delay of more than one year and nine months, even though the prosecution alleged that the case was presented to the grand jury after the accused was extradited. *Jenkins*, 607 So. 2d 1139. *See also* *Ferguson*, 576 So. 2d at 1254 (a two hundred eighty-eight day delay charged against the State with the burden to justify the delay and the legitimacy of the reasons for the delay upon the State); *Flores*, 574 So. 2d at 1322 (most of a six hundred ten day delay chargeable to the State where no reason for delay shown in the record); *Bailey*, 463 So. 2d at 1062-63 (two hundred ninety-eight day delay caused by grand jury not convening weighed against State, but not as heavily); *Burgess*, 473 So. 2d at 433 (a sixteen month delay due to the State's failure to bring accused back from the State penitentiary is chargeable against the State); *Beavers*, 498 So. 2d at 791-92 (four hundred thirty-two day delay chargeable against the State; the record was silent and the risk of non-persuasion was on the prosecution); *Trotter*, 554 So. 2d at 316-17 (one thousand four hundred seventy day delay chargeable against the State; good cause for delay not shown by State so it must be weighed against the prosecution); *Smith v. State*, 550 So. 2d 406, 408-09 (Miss. 1989) (a three hundred seventy day delay with no reason in the record charged against the State); *Vickery*, 535 So. 2d at 1376-77 (the prosecution was charged with a one thousand one hundred ninety-two day delay where part of the delay was caused by the defendant's motion for continuance after the State failed to provide timely discovery). In *Doggett*, the U.S. Supreme Court held an eight and one-half year delay between indictment and arrest to be a violation of the right to a speedy trial as guaranteed by the Sixth and Fourteenth Amendments. *Doggett*, 505 U.S. at 657.

¶254. The State admitted in its brief and in oral argument that the reason for the delay in Beckwith's re-indictment and retrial was to allow a change in the political and racial climate of our state, as the possibility of convicting Beckwith in the 1960's was nonexistent. This is intentional delay for a tactical advantage. At the very least, the State is guilty of official negligence. Extremely important in *Doggett* is the Supreme Court's condemnation of "official negligence":

> Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, and its consequent threat to the fairness of the accused's trial. **Condoning prolonged and unjustifiable delays in prosecution would . . . penalize many defendants for the state's fault . . . . The Government can, indeed, hardly complain too loudly, for persistent neglect in concluding a criminal prosecution indicates**

**an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.**

*Id.* (emphasis added) (citations omitted). The State's egregious persistence in failing to prosecute Beckwith is clear.

¶255. The failure, whether through negligence or intentional delay, to provide Beckwith with a speedy trial, or to furnish a **legitimate** explanation for the delay, weighs heavily against the State. The official delay from the time of the second mistrial until the *nolle prosequi*, compounded over some twenty-seven years, operated to egregiously deprive Beckwith of his right to a speedy trial.

### C. Assertion of the Right to a Speedy Trial

¶256. We stated in *Ross* that "[w]hile the [S]tate bears the burden of timely bringing the accused to trial, the circumstances weigh more heavily in the defendant's favor if the defendant asserts the right." *Ross*, 605 So. 2d at 23 (citations omitted). In *Handley v. State*, 574 So. 2d 671 (Miss. 1990), we quoted from *Barker*, with approval, that the "failure to assert [a] right to a speedy trial . . . is by no means fatal . . . it is only one factor to be considered . . . ." *Id*. at 677 (*quoting Smith v. State*, 550 So. 2d 406, 409 (Miss. 1989). *Barker* states that an accused has no duty to bring himself to trial. *Barker*, 407 U.S. at 527.

¶257. Beckwith asserted his right to a speedy trial in a document filed by his attorneys in 1963 objecting to a mental examination. Old newspaper articles demonstrated that Beckwith had been requesting a speedy trial. The circuit judge was quoted in one article as saying, "I understand you have been calling for a speedy trial and I am ready to give you one." One of Beckwith's previous attorneys stated that "[w]e have wanted a speedy trial for about five months. He is entitled to a speedy trial under the Constitution. They're absolutely depriving him of his constitutional right to a speedy trial."

¶258. The prosecution's endeavor to place on Beckwith the burden of seeking a speedy trial after the second mistrial is misplaced and incredible. Nevertheless, Beckwith testified during the Motion to Dismiss hearing and provided an affidavit attached to the motion. Hardy Lott, Beckwith's defense attorney in 1964, also supplied an affidavit stating that he was ready for and expected a third trial.

¶259. Additionally, no specific method is required to assert a speedy trial claim. Beckwith demonstrated through the best evidence available that he had asserted his right to a speedy trial. The implication in the majority opinion that Beckwith must continually reassert his claim to a speedy trial is legally unsound and illogical. In *Flores* we noted that the accused does not have to badger the prosecution to proceed with his trial. *Flores*, 574 So. 2d 1323. This factor weighs in Beckwith's favor.

### D. Prejudice

¶260. In *Ross* we cited *Barker* to identify the several forms that prejudice to a defendant resulting from delay may embody. *Ross*, 605 So. 2d at 23. Only one of the types of the prejudice enumerated by *Ross* is germane to our discussion here: "delay may prejudice the outcome of the defendant's case." *Id.* In other words, the inability of the defendant to properly mount a defense is prejudicial.

Important to understand is that a federal and state speedy trial right can be violated even though no affirmative prejudice is shown. In ***Doggett***, the U.S. Supreme Court held:

> As an alternative to limiting ***Barker***, the Government claims Doggett has failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. Though Doggett did indeed come up short in this respect, the Government's argument takes it only so far: consideration of prejudice is not limited to specifically demonstrable, and, as it concedes . . . **affirmative proof of particularized prejudice is not essential to every speedy trial claim.**

***Doggett***, 505 U.S. at 655 (citations omitted) (emphasis added). Six years before ***Doggett***, we held that "there is nothing in the constitutional provisions at issue qualifying the right to a speedy trial so that its assertion depends upon a showing of prejudice." ***Beavers***, 498 So. 2d at 792. We reiterated that assertion in ***Ferguson***, stating that a weak showing of prejudice benefits the State little. ***Ferguson***, 576 So. 2d at 1255.

¶261. Though under no obligation to do so, Beckwith established actual prejudice within the framework of ***Jaco v. State***, 574 So. 2d 625 (Miss. 1990), wherein we wrote:

> We look to such questions as whether witnesses have died or become unavailable, documents or other evidence have been destroyed, or memories have dimmed so that the accused is at a disadvantage which would not have attended him at a prompt trial.
>
> * * * *
>
> If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

***Id.*** at 632 (citations omitted). The prosecution has the burden of proving that the accused has not been prejudiced by the delay. ***Ferguson***, 576 So. 2d at 1255.

¶262. During the Motion to Dismiss hearing and the trial of the instant case, Beckwith overwhelmingly demonstrated the prejudice to his defense in the form of dead witnesses, unavailable witnesses, unavailable documents, unavailable evidence, and dimmed memories. The prosecution's delay permitted it to improve its case against Beckwith at the expense of his right to a speedy trial.

¶263. Beckwith lists twenty-four separate items shown during the Motion to Dismiss hearing and the trial which conclusively establish actual prejudice:

> (1) Beckwith's counsel moved for an independent examination of the bullet fragment removed from Mr. Evers, the unspent shells from the rifle, and the fifty-three (53) spent shells recovered from Thorn McIntyre. The trial Court granted the motion for independent testing and the prosecution later informed the defense that these items were lost. Dr. Baden testified that having the bullet would be important.
>
> (2) The prosecution provided Mr. Beckwith a purported transcript of the first trial in 1964.

There was no transcript of the second trial. Additional witnesses testified at the second trial who are now either dead or no longer have any memory of their testimony.

(a) Sam Warren's name was discovered by defense counsel while reviewing FBI files. The FBI records reflected that Mr. Warren impeached a prosecution witness, Mr. Lee Swilley, during the second trial. Swilley had failed to identify Mr. Beckwith in a police lineup as the man coming out of the Trailways Bus Station and asking for "Evans's" address shortly before Mr. Evers's death. By the time of the first trial Mr. Swilley and another cab driver, Mr. Herbert Speights, both testified that they could positively identify Mr. Beckwith. Mr. Warren testified at the second trial that Mr. Swilley admitted he had lied about identifying Mr. Beckwith. Mr. Warren died November 14, 1968 and Mr. Swilley is dead. Counsel for Beckwith were unable to show that Mr. Swilley lied because of pressure exerted on him by law enforcement officials, due to his death and the death of Mr. Warren.

(b) A newspaper article also alerted counsel for Mr. Beckwith to additional witnesses who testified during the second trial. The witnesses were John Turner, Faye Bullock and Gwin Adkinson. These witnesses contradicted a prosecution witness, Barbara Holder, who claimed that Mr. Beckwith's car was at Joe's Drive In on the night Mr. Evers was shot. The newspaper article revealed that Turner, Bullock and Adkinson all testified they were at a lounge with Barbara Holder on the evening she claims to have seen Beckwith's car. Turner and Bullock are deceased. Gwin Adkinson was advanced in age and could not remember the incident.

It is unfortunate, but important for constitutional analysis, that counsel for Mr. Beckwith had to learn of witnesses through old newspaper clippings. Mr. Beckwith was unable to assist his counsel in this regard and no one else had advised counsel for Mr. Beckwith that new witnesses were produced for the second trial. This illustrates the ***Doggett*** holding, supra, page 530, wherein the Court stated, "impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown."

(3) Two of Mr. Beckwith's prior attorneys, Hugh Cunningham and Stanney Sanders, are deceased and their files are not in existence. The surviving lawyer, Mr. Hardy Lott, was eighty-three (83) at the time of the Motion to Dismiss hearing. Mr. Lott no longer had any files and could not remember important facts about the two prior trials. Mr. Lott was unable to recollect the new witnesses who testified during the second trial.

(4) Counsel for Mr. Beckwith were given 1963-'64 Jackson Police Department Offense Reports. These reports contain information not provided to Mr. Beckwith's counsel in 1964 which materially impeached some prosecution witnesses.

(a) Mr. Herbert Speights testified in 1964 that he, along with Lee Swilley, positively identified Mr. Beckwith as having come out of the Trailways Bus Station looking for the "Evans" home.

The police reports reflect that both Speights and Swilley identified the man as a white male, six (6) feet two (2) inches tall, weighing one hundred eighty-five pounds. Mr. Beckwith was only five (5) feet eight (8) inches tall and weighed one hundred fifty (150) pounds. Cross-examination of Mr. Speights and Swilley on these points was not available to Mr. Beckwith's

counsel in 1964 because they were not provided the exculpatory information.

Due to Mr. Speights' death the prosecution was able to read from the first trial transcript and counsel for Mr. Beckwith were unable to cross-examine Mr. Speights about this significant difference in the physical description.

(b) Mr. Beckwith objected to the reading of Mrs. Betty Coley Ellington's testimony from the first trial. Counsel had obtained information from the 1963-'64 police reports that would have impeached Mrs. Coley's testimony. This information was not available to Mr. Beckwith's counsel in 1964. Present counsel were unable to cross examine the transcript.

(5) The prosecution had additional witnesses who were not called. These witnesses claimed Mr. Beckwith was at the NAACP headquarters on June 11, 1963, at 1:30 p.m. The Jackson Police Department determined that Mr. Beckwith was at the Refuge Plantation in LeFlore County with Hugh Warren on June 11, 1963, from 1:00 p.m. until 3:00 p.m. Mr. Hugh Warren was deceased at the time of the 1994 trial. Had Mr. Warren been alive counsel could have shown the tendency of people mistakenly to [identify] Mr. Beckwith and put him at places where he was never present.

(6) A crucial alibi witness for Mr. Beckwith is deceased. Mr. Roy Jones testified in the first trial that Mr. Beckwith was in Greenwood, Mississippi, at a time when it would have been impossible for him to have shot Mr. Evers in Jackson.

Mr. Hollis Cresswell, another alibi witness, was infirm and unable to attend the trial. Mr. Beckwith's defense had to be content with the testimony of two of his three alibi witnesses' being read from the purported transcript of the first 1964 trial. This is hardly a fair substitute for live witnesses who would have been available years earlier.

(7) M. B. Pierce, Chief of Detectives with the Jackson Police Department in 1963-'64, is dead. Counsel could have developed other suspects through his testimony.

(8) John Chamblee, a retired Jackson Police Detective, testified about his involvement in the Medgar Evers death investigation. Mr. Chamblee on cross-examination admitted that he had forgotten more about the investigation than he could remember. Other reports were generated which are lost. Many suspects were interviewed, including a hotel porter who saw three (3) men sitting in a room with a rifle around the time of Mr. Evers's death. Mr. Chamblee could not remember any additional information.

Additionally, Mr. Chamblee wrote a report about three (3) men walking quickly away from a house on Missouri Street after the shot killing Mr. Evers was fired, and about a suspect who rode a bus into Jackson from Shreveport.

Counsel for Mr. Beckwith were unable to track down any of these leads or suspects and unable to cross examine Mr. Chamblee effectively due to his failed memory.

(9) Over defense objection the Court allowed the State to read the testimony of O. M. Luke, another retired Jackson police detective. Counsel for Mr. Beckwith objected because they would be unable to cross examine Mr. Luke with material contained in the 1964 police reports

that Mr. Beckwith's 1964 counsel did not have available.

(10) Counsel for Mr. Beckwith also learned through a newspaper article of an additional alibi witness. This witness was the gas station attendant who served Mr. Beckwith in Greenwood on the evening he was supposed to have been in Jackson shooting Mr. Evers. Mr. Hardy Lott could not remember any details about the witness.

(11) Mr. Lott, attorney for Mr. Beckwith in 1964, took a written statement from Mr. Robert Don Pittman. Pittman testified for the prosecution and had a memory that was better in 1994 that it was in the first trial. According to Mr. Pittman he saw a white Valiant with a Masonic emblem on June 8, 1963, and on June 11, 1963.

In the statement of Mr. Pittman taken by Mr. Lott, Mr. Pittman never told the detectives he saw a white Valiant parked at Joe's Drive In or the Pittman store. Furthermore, Mr. Pittman said he could not identify the car. Mr. Lott's written statement would have provided compelling impeachment of Mr. Pittman. It was lost due to the passage of time.

(12) Counsel for Mr. Beckwith did not have a transcript of the second trial. Only by looking through old newspapers and FBI reports were they able to learn that in the second trial Herbert Speights testified he was not positive the man coming from the bus station was Mr. Beckwith. Mr. Beckwith was unable to cross examine the transcript of Mr. Speights read by the State concerning this significant fact.

(13) Counsel for Mr. Beckwith were unable to follow leads of another individual who may have been the man Mr. Swilley and Mr. Speights saw coming out of the Trailways Bus Station. The description of the man in the police reports compares [more favorably] than Mr. Beckwith's description which was given by Swilley and Speights.

(14) Due to the passage of time counsel were unable to follow up on leads or locate exculpatory information provided in Jackson Police Reports. For example, a blue truck was seen during civil rights demonstrations in Jackson on May 29, 1963. The occupants of the truck did not fit Mr. Beckwith's description. The same blue truck was seen on the afternoon of June 11, 1963 (the day before Mr. Evers' death), parked in a vacant lot five hundred (500) feet from Mr. Evers's home. The blue truck contained a rifle with a scope! Mr. Beckwith testified in the first trial that his gun was stolen prior to the shooting.

(15) Mr. Beckwith testified during the hearing on Motion to Dismiss that he had no recollection of Mary Ann Adams, Peggy Morgan, Dick Davis of Delmar Dennis. Due to the passage of time and dimmed memory, Mr. Beckwith was unable to provide his counsel any information to rebut or impeach these witnesses.

(16) Counsel for Mr. Beckwith located one witness who was present with Mary Ann Adams when she claims Mr. Beckwith allegedly made an incriminating admission. This witness, James Sims, no longer had any recollection of these events.

(17) Mr. Beckwith could not remember meeting Peggy Morgan. Lloyd Morgan could have rebutted Peggy Morgan's testimony but he could not be found.

(18) Mr. Beckwith had no recollection of where he met Delmar Dennis. Counsel for Mr. Beckwith could not locate anyone present when Mr. Beckwith allegedly made a statement at a rally that he had shot Mr. Evers. L. E. Matthews, the owner of the land where the rally occurred, was deceased. Locating a witness who was present at the rally was critical because of the comment attributed to Mr. Beckwith by Delmar Dennis. Mr. Dennis had never reported the contents of this statement to the FBI.

(19) Mr. Beckwith had no memory of ever meeting Dick Davis. Mr. Davis' original files given to the FBI in the 1960s were lost.

(20) Numerous other witnesses have died and Mr. Beckwith was deprived of the ability to cross examine them with new material from the 1963-1964 Jackson Police Reports. Deceased: Mr. and Mrs. B. L. Pittman; Chief of Detectives M. B. Pierce; John Goza; Lee S. Prospere; Sheriff J. R. Gilfoy.

Counsel for Mr. Beckwith could have questioned several of the above witnesses with the new material obtained from the 1963-'64 Jackson Police Reports. This information was not made available to Mr. Beckwith's counsel in 1963-'64.

(21) Counsel for Mr. Beckwith learned of additional witnesses who apparently misidentified Mr. Beckwith, and persons who were mistakenly identified as Mr. Beckwith on either June 7, 1963 or June 11, 1963.

These witnesses could not be located and counsel were unable to prove the strong theory that Mr. Beckwith was identified only after his picture and name appeared in the newspapers and on television.

(22) Mr. Beckwith's counsel located an individual named Elbert McNutt. NcNutt felt certain he saw Mr. Beckwith in Greenwood at a time when it would have been impossible for him to have committed this crime. Due to the passage of time and the loss of Mr. McNutt's documents, he would not swear to these facts.

(23) Mr. Beckwith was not able to assist his counsel in a meaningful way because the passage of time had severely affected his health and memory. Mr. Beckwith testified he could only remember about fifty percent (50%) of what he had read in the 1964 trial transcript. Mr. Beckwith was unable to provide his lawyers the names of Turner, Bullock, Adkinson or Warren. He could not provide any information concerning Peggy Morgan, Dick Davis, Delmar Dennis or Mary Ann Adams. Mr. Beckwith was seventy-three years of age at the time of the hearing on the 1994 trial. He was in poor health with an inability to concentrate. He could not recall any facts about many of the prosecution witnesses.

For speedy trial purposes it is alarming that Mr. Beckwith was unable to remember witnesses who actually testified in his second trial in 1964. These critical witnesses would have gone unnoticed due to the passage of time and lapsed memories had it not been for old newspaper articles. The testimony of these witnesses died with them!

(24) Counsel could not locate Martha J. O'Brien. Ms. O'Brien worked at Joe's Drive In and saw

a man getting out of a white Valiant automobile on the evening Mr. Evers was shot. This man did not fit Mr. Beckwith's description.

¶264. The **actual** prejudice to Beckwith's defense is substantial and exceeds that of any reported decision by this Court. *See Flores*, 574 So. 2d 1314 (no specific prejudice shown and no affirmative showing of prejudice necessary); *Trotter*, 554 So. 2d 313 (no prejudice actually shown and actual showing unnecessary); *Burgess*, 473 So. 2d 432 (defendant unable to locate witnesses and had thrown away information concerning witnesses).

¶265. *Doggett* states:

> We have observed in prior cases that unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence. Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."

*Doggett*, 505 U.S. at 654 (citations omitted). The prosecution's delay in the instant case skewed the fairness of the entire system. Beckwith established substantial actual prejudice in the instant case, although not required to do so. This factor weighs in Beckwith's favor and against the State.

## Conclusion as to Speedy Trial

¶266. Each of the four *Barker* factors weighs heavily against the State and in Beckwith's favor. The length of the delay is unprecedented in Mississippi. One thousand seven hundred eighty-seven days passed from the second mistrial until the *nolle prosequi*, which alone is presumptively prejudicial. The additional twenty-one year delay is oppressive under the facts of this case and should be counted under the speedy trial provisions of the Mississippi Constitution as interpreted by our case law. The prosecution did not carry its burden to show the reason for the delay. Beckwith clearly asserted his right to a speedy trial. Though not required by law, he established substantial, actual prejudice to the preparation of his defense.

¶267. Beckwith's right to a speedy trial under both the federal and state constitutions has been flagrantly violated. For the foregoing reasons, the conviction of Beckwith should be reversed.

### II. WHETHER DELAY OF PROSECUTION FROM 1964 TO 1990 VIOLATED THE DUE PROCESS, EQUAL PROTECTION, AND FUNDAMENTAL FAIRNESS PROVISIONS OF THE FEDERAL AND STATE CONSTITUTIONS.

¶268. Assuming, *arguendo,* that the majority opinion is correct in its reliance upon *MacDonald* and *Loud Hawk* with respect to the time period following the *nolle prosequi* until the third trial of Beckwith, the delay of Beckwith's prosecution from 1969 until 1990 violated his due process rights. Because there is no statute of limitations on murder, Beckwith must rely upon the intentional delay standard we adopted in *Hooker v. State*, 516 So. 2d 1349, 1351-52 (Miss. 1987), which requires that the defendant show actual prejudice plus intentional delay by the prosecution.

¶269. As to actual prejudice, the record is rife with instances of **substantial, actual prejudice**, as

demonstrated by the discussion of prejudice under the previous issue, *supra*. The majority relies on ***United States v. Beszborn***, 21 F.3d 62 (5th Cir. 1994 ), for its assertion that lost witnesses, faded memories, and misplaced documents are inadequate proof of actual prejudice: "***Vague assertions*** of lost witnesses, faded memories, or misplaced documents are insufficient to establish a due process violation from pre-indictment delay." ***Id.*** at 67 (emphasis added). The majority conveniently overlooks the adjective "vague" in the quote, *supra*. The substantial, actual prejudice demonstrated by Beckwith far exceeds any showing required by our cases, the Fifth Circuit and the U.S. Supreme Court, and overwhelmingly eclipses any notion of vagueness advanced by case law. Beckwith has clearly established actual prejudice resulting from the additional twenty-one year delay in his prosecution.

¶270. The second prong of the ***Hooker*** test is intentional delay on the part of the prosecution for tactical advantage. ***Hooker***, 516 So. 2d at 1351. On March 10, 1969, a *nolle prosequi* was entered as to Beckwith's indictment. The prosecution, by such action, for all intents and purposes, conceded that it could not convict Beckwith at that time. The State admitted in its brief that, due to the political climate in the 1960's, Beckwith could not be convicted. In 1987, District Attorney Peters stated to a reporter for the Jackson newspaper, *The Clarion-Ledger*, that "[t]here is no way under any stretch of the law that this case could be tried again. Anyone having the first class in law school ought to know that." The reason for the delay of the prosecution of Beckwith is clear -- the political climate in Mississippi had changed, and the prosecution believed that it could now accomplish what it was unable to do in 1964: convict Beckwith of murder. The State admitted in oral argument that the lapse of time and the change in the racial climate allowed them to seek and obtain Beckwith's conviction. This is obvious delay for tactical advantage -- "[a]nyone having the first class in law school ought to know that."

¶271. No better example of a due process violation can be illustrated than that in the record of this case. The only remedy is reversal of Beckwith's conviction.

## CONCLUSION

¶272. The majority's affirmance of Beckwith's conviction places us on the precipice of legal misadventure. Beckwith's constitutional rights to a speedy trial and due process have been seriously and egregiously violated. The State delayed prosecution of Beckwith for some 9,706 days and, with the legal equivalent of a "straight face," asks us to ignore Beckwith's constitutional rights to a speedy trial and due process. The task of this Court is to determine whether or not the trial Beckwith received was constitutionally fair. Clearly, it was not. His trial, conducted in a circus-like atmosphere, was rife with discovery errors, as pointed out by Justice Sullivan's thoughtful dissent, and riddled with egregious constitutional errors. Both practically and legally, the majority opinion results in a total eradication of the guarantee of a speedy trial from the constitutional lexicon. For the foregoing reasons, I must dissent.

### SULLIVAN, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶273. I disagree with the majority's conclusions in Issue III regarding the multitude of egregious discovery violations in this case. The trial court's rulings on discovery violations were

disproportionate, and in my opinion require reversal. Therefore, I must respectfully dissent.

## III.

## WHETHER THE TRIAL COURT ERRED IN ITS RULINGS ON VARIOUS DISCOVERY VIOLATIONS.

### A. Martha Jean O'Brien, Defense Witness

¶274. Martha Jean O'Brien was the car hop who gave an identification of the man who exited the white Valiant seen at Joe's Drive-In on the night of Evers's murder. The prosecution theorized that the man was Beckwith, who parked the white Valiant at the drive-in and later shot Evers. Ms. O'Brien's testimony at the first trial in 1964 was that she could only say that the man who parked the Valiant was very tall, probably around 6'4", dressed in dark clothes, in his early twenties, and very good-looking. She was hesitant and uncertain about her description, particularly her ability to estimate height. Unknown to the defense in 1964, there was a Jackson Police Department report in which Ms. O'Brien had given descriptions of the man in the Valiant as a white male, dark complexion, black curly hair, mustache, around 6' to 6'2" tall, about 160 pounds, slim build, and wearing black pants and a black shirt with no hat. The defense was also unaware in 1964 of Ms. O'Brien's statement to the FBI in which she described the man in the Valiant as a "real nice looking" white male, 23-24 years old, around 6'2", 150 to 155 pounds, slender, curly black hair, dark complexion, mustache, and wearing black pants and a long-sleeve black shirt. These descriptions did not fit Beckwith. Beckwith's attorneys were not aware that either of these reports existed until the prosecution resumed in the 1990's.

¶275. After hiring two investigators, the defense was still unable to locate Ms. O'Brien for the 1994 trial. The State was aware that the defense was looking for Ms. O'Brien, or at least they should have known that she would be an exculpatory witness for the defense, especially after the August 3, 1992, hearing on Beckwith's motion to dismiss the case when the defense argued prejudice resulting from their inability to locate Ms. O'Brien. Both Mr. DeLaughter and Mr. Peters were present at that hearing.

¶276. Ms. O'Brien called the District Attorney's Office in August of 1992 when she heard that Beckwith was being tried again to find out if she would be needed as a witness. Investigator Crisco told her to come to the DA's Office, which she did on August 11, 1992, and at that time she gave Mr. Crisco her address and phone number. Mr. Crisco gave her a map and a subpoena which said that she would be notified when to appear. After this meeting, Ms. O'Brien moved to a new house, and her brother moved into her old house, but she never changed phone numbers. She tried to contact Mr. DeLaughter to inform him of her change of address, but he was unavailable, and she decided not to worry about it, because the DA's Office still had her phone number. No one from the DA's Office ever called her or tried to locate her by going to her brother's house. She called Mr. DeLaughter again on the night before the trial, but he told her that Investigator Crisco would be in touch with her if she were needed at trial. Mr. DeLaughter also asked Ms. O'Brien if the defense had contacted her, and she told him that they had not.

¶277. Because they were unable to ever find Ms. O'Brien, the defense moved to admit her previous trial testimony into evidence. The State agreed that Ms. O'Brien was unavailable, and the court

allowed her testimony to be read into evidence. However, the court overruled the defendant's motion to admit the police record and FBI report into evidence. When Ms. O'Brien heard on the news that the trial was almost over, she called defense attorney Jim Kitchens on February 3, 1994, the night before jury instructions and closing arguments. She told Mr. Kitchens about all of these events leading up to her phone call, and they discussed his inability to find her and her previous trial testimony. Ms. O'Brien got scared and finally hung up the phone.

¶278. The next day, Mr. Kitchens asked to call Mr. DeLaughter and Investigator Crisco as witnesses to clear up the matter, but the court refused. Instead, the court decided to conduct an evidentiary hearing after the trial, and required the trial to continue with jury instructions and closing arguments. At the evidentiary hearing, Mr. DeLaughter said that he stipulated that Ms. O'Brien was unavailable, because he was unable to reach her by phone immediately before her prior testimony was read into the record. He also testified that he was unaware that the defense wanted to call Ms. O'Brien as a witness until they made their motion to read her transcript testimony.

¶279. It is obvious that the State had known how to get in touch with Martha Jean O'Brien since August of 1992, when she gave Investigator Crisco her address and phone number. Even though she changed addresses, the State still had her current phone number, which had not changed as of the trial date. Ms. O'Brien could also have been found through her old address, because her brother was living there. The State also knew, or should have known that the defense was trying to locate Ms. O'Brien. The State's failure to notify the defense of Ms. O'Brien's location or at least her phone number was an egregious violation of the rules of discovery, and appears to have been intentional.

¶280. The majority concedes that the State's failure to provide the defense with Ms. O'Brien's address and phone number constituted a violation of the rules of discovery. However, they find that this was not reversible error, because Beckwith has failed to show that he would have been acquitted if Ms. O'Brien had been located and allowed to testify. The majority rationalizes the trial court's error by finding that reading Ms. O'Brien's former trial testimony was sufficient and that her testimony might have been impeached had she testified in person, so that the defense actually benefitted from her unavailability. The majority cites *Cummins v. State*, 515 So.2d 869, 876 (Miss. 1987) (citations omitted), in support of their theory that a discovery violation constitutes a violation of due process only if the evidence is material to guilt or punishment, with material meaning that there must be a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense. This is a misreading of our decision in *Cummins*. In that decision we held that where the criminal defendant is unable to show bad faith on the part of the prosecution, he can still prove a due process violation if the prosecution suppresses evidence material to guilt or punishment. In other words, the defendant may still show a due process violation where the prosecution did exhibit bad faith without the higher "material evidence" standard. In this case, the prosecution acted in bad faith by failing to disclose the whereabouts of Ms. O'Brien, so Beckwith is not required to meet the "material evidence" standard.

¶281. Even if we apply the more stringent "material evidence" test, Ms. O'Brien's testimony did constitute material evidence. Live testimony is always preferable to reading an old transcript. The newly discovered police report and FBI report would have supported Ms. O'Brien's description of the man in the Valiant and made her story more convincing that her 1964 testimony in which she seemed unsure of herself. The decision of the trial court to continue with the trial without Ms. O'Brien's

testimony after her location was discovered by the defense constituted reversible error.

¶282. The majority fails to distinguish *Gowdy v. State*, 592 So.2d 29, 34-37 (Miss. 1991), cited by Beckwith, in which this Court reversed and remanded a conviction because the trial court refused to grant a continuance when the State failed to provide the name and whereabouts of a confidential informant. In that case, this Court said:

> Here, as elsewhere in discovery, the test is not whether the party can prove the witness of whom discovery is sought would have been favorable. The whole idea behind discovery is that the discovering party ordinarily does not know how the witness will testify. The test is a different one: has the party seeking discovery shown that the witness likely has substantial knowledge relevant to the case.

*Id*. at 37. It cannot be disputed that Ms. O'Brien possessed substantial knowledge relevant to this case. She was a critical witness, and the trial court committed reversible error by excusing the prosecution's concealment of her whereabouts.

### B. James Hobby, Defense Witness

¶283. Because the defense never disclosed the name of defense witness James Hobby to the State, the trial judge completely excluded Mr. Hobby's testimony, citing the guidelines set out in *Box v. State*, 437 So.2d 19, 23-24 (Miss. 1983) and UCRCCP 4.06. The majority is disingenuous in finding that this discovery violation by the defense properly resulted in the evidence being excluded, while asserting that the State's withholding information on the whereabouts of Ms. O'Brien was harmless error. In essence, the majority is saying that the State can intentionally violate the rules of discovery and get away with it, but the defendant cannot. The majority forgets that we have a responsibility to fervently protect the rights of those accused of a crime, regardless of how repugnant we may find their actions. "Even those guilty of the most heinous offenses are entitled to a fair trial." *Screws v. United States*, 325 U.S. 91, 107 (1945). On the other hand, we have no duty to protect any "rights" of the prosecution. This is not to say that discovery violations by the defense should go unchecked. In this case there were blatant discovery violations made by both the prosecution and defense, and the trial judge should have sanctioned the attorneys on both sides for their lack of candor. However, a criminal defendant should not be sanctioned due to the actions of his attorney. Beckwith was unfairly punished for the failure of his attorney to disclose the identity of defense witness James Hobby. The better solution would have been to grant a continuance for the State to have time to interview Mr. Hobby and prepare for cross-examination. *Box*, *supra*.

¶284. The defense theory involved proof from Mr. Hobby that the car parked behind the drive-in belonged to Mr. Hobby and not Beckwith. Exclusion of testimony which is essential for developing the defendant's sole defense theory constitutes reversible error. *Hentz v. State*, 542 So.2d 914, 915-17 (Miss. 1989) (citations omitted). "A defendant has a legal right to have the jury consider his sole defense and an error which denies him that right is substantial, not harmless." *Wilson v. State*, 390 So.2d 575, 581 (Miss. 1980). *See also Lester v. State*, So.2d , 1997 WL 167015, 27 (Miss.) (citing *Sayles v. State*, 552 So.2d 1383, 1384 (Miss. 1989); *Giles v. State*, 650 So.2d 846, 848-50, 854 (Miss. 1995) (citations omitted); *Jenkins v. State*, 607 So.2d 1171, 1178 (Miss. 1992). Excluding Mr. Hobby's testimony denied Beckwith the opportunity to fully develop his sole defense of mistaken identity and requires reversal by this Court.

## C. Mark Reiley, State Witness

¶285. Mark Reiley, a former guard at Angola, contacted the prosecution in the middle of the trial and said that he could testify that Beckwith had confessed to killing Evers. The defense was only allowed to talk with Mr. Reiley during lunch on Monday, January 31 before the court allowed Mr. Reiley to testify.

¶286. The majority finds that this was either within the trial court's discretion or harmless error, citing *Overstreet v. State*, 369 So.2d 275, 277 (Miss. 1979). However, this case is easily distinguishable from *Overstreet*, because in *Overstreet* the defendant was given notice of the potential witness at least two days before the trial started, and the defendant had conducted interviews with the witness. *Id*. We determined that under such circumstances, "the defense was not surprised and thereby prejudiced" by the trial court allowing the witness to testify. *Id*. The fact that her testimony was similar to that of the other eyewitness only further minimized any surprise effect. *Id*.

¶287. Here, the defense *was* surprised by the appearance of Mr. Reiley. Condoning the admittance of Mr. Reiley's surprise testimony without even a continuance for adequate time to prepare goes against current Mississippi case law regarding surprise witnesses. *Galloway v. State*, 604 So.2d 735 (Miss. 1992); *Traylor v. State*, 582 So.2d 1003 (Miss. 1991). Again, the majority appears to condone discovery violations by the State while punishing the defense for them.

## D. Tom Van Riper, State Witness

¶288. Former FBI agent Tom Riper was allowed to testify without being disclosed as a potential witness by the State before trial. He stated that he was the agent who worked with former FBI informant Delmer Dennis, who testified for the State concerning statements that Beckwith made about Evers's murder. The State asserts that they did not know that Mr. Van Riper was the FBI agent who took Dennis's information until after jury selection, and they gave the defense his name and telephone number and the relevant material on his testimony on the first day of testimony.

¶289. Again, the majority does not deny that a discovery violation occurred when the State failed to disclose the name of its witness Tom Van Riper before trial. Instead they find that the trial court acted within its discretion and that the defense was not unfairly prejudiced in light of the relative insignificance of Mr. Van Riper's testimony. The majority points to *Gallion v. State*, 396 So.2d 621, 622-25 (Miss. 1981), in support of their theory that no prejudice results so long as the defense is given an opportunity to interview undisclosed witnesses during a recess. However, in *Gallion*, the defendant cited no authority in support of his argument, and the defense attorney refused to interview the undisclosed witnesses, because the witnesses wouldn't talk to him outside of the district attorney's presence. *Id*. This Court determined that the defense had no right to question the State's witnesses outside of the presence of the district attorney, and that both the district attorney and the defense had exhibited offensively discourteous conduct during the exchange. *Id*. We held that the trial judge properly handled the situation in light of the misconduct. *Id*. Here there were no extenuating circumstances such as in *Gallion*, so the trial court should have excluded Mr. Van Riper's testimony.

¶290. It is problematic that the defense did not request a continuance for time to prepare. However, the defense did object to the use of Mr. Van Riper's testimony and renewed their objection after the

recess on grounds that a discovery violation had occurred, and that they did not have an opportunity to conduct an investigation, as well as improper bolstering. As the majority points out, failure to request a continuance does not preclude exclusion of the objectionable evidence. *Taylor v. Illinois*, 484 U.S. 400, 413-16 (1988); *Box*, 437 So.2d at 23; *Glaskox v. State*, 659 So.2d 591, 594 (Miss. 1995); *McCaine v. State*, 591 So.2d 833, 836 (Miss. 1991); *Houston v. State*, 531 So.2d 598, 611 (Miss. 1988); *Coates v. State*, 495 So.2d 464, 466-68 (Miss. 1986).

¶291. Following the guidelines in *Box*, *supra*, and UCRCCP 4.06, the trial court should have allowed a continuance for the defense before proceeding with Mr. Van Riper's testimony or excluded his testimony altogether. The majority may be correct that Mr. Van Riper's testimony was insignificant, but that only adds support to Beckwith's argument that it should have been excluded.

### E. Mary Ann Adams, State Witness

¶292. In her pre-trial statement, Mary Ann Adams said that she could not remember what Beckwith said to her when he was introduced to her as Evers's murderer. Then on the witness stand she testified that Beckwith told her that, "He had not killed a man, but a damn chicken-stealing dog, and you know what you have to do with a dog when -- after it's tasted blood." While Ms. Adams testified that she had given the prosecution this statement some months after her taped statement, Mr. DeLaughter stated that he did not remember taking this statement from her. I disagree with the majority's conclusion that there is insufficient evidence of a discovery violation here to warrant reversal. Ms. Adams had no reason to lie about having disclosed her statement to the prosecution before the trial. Mr. DeLaughter, on the other hand, had every reason to lie. This was an intentional violation of the rules of discovery, and the testimony should have been excluded, or a mistrial declared.

¶293. The majority also concludes that Beckwith's failure to make a contemporaneous objection to this testimony bars reversal on appeal. However, "[i]n cases where an appellant cites numerous instances of improper and prejudicial conduct by the prosecutor, this Court has not been constrained from considering the merits of the alleged prejudice by the fact that objections were made and sustained, or that no objections were made." *Smith v. State*, 457 So.2d 327, 333-34 (Miss. 1984) (citing *Wood v. State*, 257 So.2d 193, 200 (Miss.1972); *Howell v. State*, 411 So.2d 772, 776 (Miss.1982); *Forrest v. State*, 335 So.2d 900, 902 (Miss.1976)).

¶294. I vehemently disagree with the majority that any resulting error was harmless. Ms. Adams's testimony about Beckwith's statement was incredibly inflammatory and highly prejudicial. There was no way to cure this error. However, even if a mistrial were not appropriate, the trial judge should at least have instructed the jury to disregard the statement.

### CONCLUSION

¶295. The murder of Medgar Evers was a horrible and shocking crime. However, no matter how revolted we may be by the crime or the criminal, this Court must not be deterred from fulfilling our role as the protector of the rights of every defendant. If we let egregious trial errors go unchecked in a case just because we strongly believe that the defendant is guilty, we open the door for an innocent person's rights to be trampled when he is wrongfully accused. The trial court committed reversible error in ruling on the numerous blatantly intentional discovery violations in this case, depriving

Beckwith of his right to a fair trial. I would reverse the conviction of murder and sentence of life imprisonment and remand the matter to the Hinds County Circuit Court for a new trial.

**LEE, C.J., JOINS THIS OPINION IN PART.**

1. The prosecutor had become apprised of this information the previous evening.

2. Beckwith was convicted in New Orleans in 1973 of knowingly transporting a bomb without a license or permit, and was sentenced in 1975 to five years incarceration in the Louisiana Department of Corrections. His appeal of this conviction was affirmed. *State v. Beckwith*, 344 So. 2d 360 (La. 1977). The conviction was later vacated by the Criminal District Court of Orleans Parish, Louisiana on August 3, 1992.

3. See Justice Anderson's dissent to *Pruett v. State*, 574 So.2d 1342 (Miss.1990).